IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MARK PURNELL, | § | |
| | § | |
| Defendant Below, | § | No. 113, 2020 |
| Appellant, | § | |
| | § | |
| v. | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| STATE OF DELAWARE, | § | |
| | § | |
| Plaintiff Below, | § | Cr. ID No. 0701018040 |
| Appellee. | § | |

Submitted: March 24, 2021
Decided: June 17, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR**, and **MONTGOMERY-REEVES**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court. **JUDGMENT REVERSED**, **CONVICTION VACATED** and **REMANDED FOR NEW TRIAL**.

Herbert W. Mondros, Esquire, Rigrodsky Law, P.A., Wilmington, Delaware, Tiffani D. Hurst, Esquire (*argued*), Hurst Legal Services, Philadelphia, Pennsylvania for Appellant.

Carolyn S. Hake, Esquire, Delaware Department of Justice, Wilmington, Delaware for Appellee.

**VALIHURA**, Justice, for the Majority:

*Introduction*

On January 30, 2006, two armed assailants fatally shot Tameka Giles in the back at the corner of Fifth and Willing Streets in Wilmington after a botched robbery attempt while she was walking with her husband. A nearby eyewitness identified one assailant from a photo array as Ronald Harris. The victim's husband identified Kellee Mitchell as the shooter in another array.

During the investigation, police located a .38-caliber revolver hidden in ceiling tiles outside the apartment Kellee Mitchell was staying at in Compton Towers. With Mitchell in the apartment was Dawan Harris, Ronald's older brother to whom he bears a striking resemblance. Dawan Harris admitted that the gun belonged to both Mitchell and himself and pleaded guilty to a weapons charge.

In January 2007, after his arrest on drug charges, an individual named Corey Hammond implicated Mark Purnell and Ronald Harris as Tameka Giles's killers based on statements they made earlier in the day, and in the week following the killing. Later that month, Kellee Mitchell also told police that Mark Purnell bragged about having committed the murder. Thereafter, Purnell and Ronald Harris were arrested and charged.

Across multiple lengthy police interrogations in the two years following the murder, Ronald Harris had repeatedly told police of his significant learning disabilities and that he knew nothing about the crime and had not been involved. But on the eve of trial and after jury selection, the State offered a plea agreement dropping the murder and weapons charges

2

and recommending a three-year sentence in exchange for his plea and testimony. Ronald Harris accepted and entered a guilty plea.

At the April 2008 Superior Court trial, the State's case for proving that Purnell was one of the two perpetrators consisted almost entirely of the claims made by Corey Hammond and Kellee Mitchell, combined with the "accomplice" testimony of Ronald Harris pursuant to his plea.

Purnell's court-appointed trial attorney was the same advocate who represented Dawan Harris in the weapons prosecution earlier in the murder investigation. The trial judge did not permit him to withdraw when he brought the conflict, and the defense theory that his former client might be the true killer, to the State's and court's attention. Trial counsel failed to investigate evidentiary leads implicating Dawan Harris, did not call him as a witness, and failed to present even then-known or obvious evidence and argument to the jury that would have inculpated his former client. Following this constrained defense, the jury convicted Purnell of Murder Second Degree and all other charges after more than a day of deliberation. The Superior Court sentenced him to forty-five years of unsuspended Level V incarceration. In 2009, based on the narrow issues presented to us, which did not include the conflict, we upheld his conviction and sentence.

Following the denial of his direct appeal, Purnell filed a 133-page handwritten *pro se* Rule 61 motion raising ten grounds for relief, of which the first was an objection to his trial counsel's conflict of interest. After he obtained representation, postconviction counsel filed an amended motion asserting only three grounds and did not include the conflict

3

claim. The Superior Court denied Purnell's motion and, again without having the conflict brought to our attention, we affirmed that denial in 2014.

Because postconviction counsel died a few weeks prior to oral argument before us in 2014, we will likely never know why he did not include the conflict issue in the amended motion. Due to that omission, the conflict claim comes to us now as one of Purnell's grounds in an untimely, successive Rule 61 motion.

To qualify for an exception to Rule 61's procedural bars against untimely, successive motions, Purnell must identify with particularity new evidence that creates a strong inference that he is actually innocent in fact of the acts underlying the charges. Stated differently, Purnell must present additional evidence that was not available at trial and would not have been despite his exercise of due diligence. Purnell must also convince us that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted. In this extraordinary case, we find that he has made just such a showing.

We do not fault the Superior Court for ruling as it did. It carefully considered the issues before it. But this case presents novel legal issues embedded in an unusual factual background. We have never before found a case to qualify for the "actual innocence" exception. Thus, the Superior Court had little guidance on when evidence is "new" or what showing creates a "strong inference" of innocence. Much of the evidence Purnell presents, though knowable or even known at the time, was unavailable *to him* at trial because his counsel was not permitted to withdraw and was precluded from obtaining or presenting it due to his ethical duties to his former client.

4

Ordinarily, having clarified the standards for newness and persuasiveness necessary for relief, we would remand the matter to the Superior Court for an evidentiary hearing and a decision guided by those rulings. But because Purnell has spent more than fourteen years in prison for murder based on a manifestly unfair trial and conviction, and based on his new evidence, viewed as a part of the entire evidentiary record, we are convinced that in this extraordinary case remand for an evidentiary hearing would serve no useful purpose. Instead, we reverse and remand for a new trial.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

#### 1. Purnell's Injury

On January 21, 2006, Mark Purnell ("Purnell") was admitted to Christiana Hospital with a gunshot wound to his right leg.[1] He was shot in the lower thigh, and the bullet continued down to the back of his knee, coming to rest around the knee joint. The following day, Purnell underwent surgery to remove the bullet, for which he was placed under general anesthesia.

The surgical team, led by vascular surgeon Dr. Harad, attempted to remove the bullet from the back of Purnell's knee. During the surgery, Dr. Harad discovered that the bullet had moved from the back of Purnell's knee to the front, and after approximately a half hour to 45 minutes, he was unable to remove the bullet from that angle. A second practitioner, orthopedic surgeon Dr. James Rubano ("Dr. Rubano"), continued the attempts

---

[1] App. to Opening Br. at A337 [hereinafter "A___"] (Testimony of Dr. James Rubano).

5

to remove the bullet via an arthroscopic procedure from the front. This involved making three incisions on the front of Purnell's knee and, at various times, putting a camera in one incision to look around while manipulating the tissue through another incision seeking to find the bullet. Eventually, Dr. Rubano was able to locate and remove the bullet in this manner. The three incisions in the front of Purnell's knee were closed with centimeter-long sutures, while the longer incision in the back of his knee was closed with approximately ten staples.

The following day, January 23rd, Dr. Rubano examined Purnell's knee and verified that his blood flow was normal and that the nerves were working. At his discharge, Purnell told the physical therapist that he was unable to use crutches and needed a wheelchair. Purnell did not cooperate with physical therapy or follow-up care. Purnell's sutures and staples were removed in the beginning of February when he was in a juvenile detention facility.

### 2. The Murder of Tameka Giles

Seven days following Purnell's discharge from the hospital, on the evening of January 30, 2006, Angela Rayne ("Rayne"), high on crack cocaine, was sitting on her outside step a couple of feet from the intersection of Fifth Street and Willing Street. She saw two young black men pass her, double back, and then cross paths with a couple, later identified as Ernest Giles ("Mr. Giles") and his wife Tameka Giles ("Mrs. Giles"). The Gileses were carrying shopping bags. Rayne heard a single gunshot, causing her to look

6

in that direction immediately.[2] She saw the two young men flee, running, and saw Mrs. Giles lying on the ground with Mr. Giles calling for help.

Rayne recognized one of the two assailants from earlier in the day, when she had seen him with Wilmington Police at Fifth and Jefferson Streets. Based on that information, the police suspected Ronald Harris. Police also located a 9mm shell casing 40 feet north of the intersection of Fifth and Willing Streets.[3]

At a police interview on February 16, 2006, Rayne identified Ronald Harris from a photo lineup and confirmed that he was present at the robbery at the time of the fatal shot.[4] Other than noting that the second assailant was shorter, Rayne said that she did not get a good look at him and would be unable to identify him.[5] In a photo lineup array containing six photographs, including Purnell's, conducted in January 2007, a year after the incident, Rayne did not identify Purnell as the second assailant but instead identified two of the other individuals in the photographs as having eyes similar to those of the second assailant.

### 3. Mr. Giles Becomes a Suspect

Detectives Gary Tabor ("Detective Tabor") and Andrew Brock of the Wilmington Police Department interviewed Mr. Giles late in the evening of February 2, 2006,

---

[2] Responding officers identified several nearby residents and people who overwhelmingly concurred that there was only a single gunshot. A690–92 (Wilmington Department of Police Supplemental Report).

[3] A75 (Testimony of Detective Gary Tabor).

[4] A686 (Wilmington Department of Police Supplemental Report).

[5] *Id.*

beginning after 11:00 p.m.[6]  By that time, they had already identified a number of suspicious factors raising the possibility that Mr. Giles was involved in the robbery.

One of Mrs. Giles's coworkers told Detective Tabor that she had previously seen Mrs. Giles with several injuries consistent with domestic violence, and that Mrs. Giles had confided in her that Mr. Giles had on one occasion broken her jaw, that he had a crack cocaine problem, and that he had previously stolen money from her, including her tax refund.  According to Mrs. Giles's journal, Mr. Giles abused her, stole from her, and Mrs. Giles feared him.  Mr. Giles's father previously had to intervene in at least one serious incident of domestic violence, and Mrs. Giles had checked herself in to the Mother Mary of Hope Domestic Violence Center at some point in 2005.  Mrs. Giles's family members further reported to Detective Tabor and Detective David Simmons ("Detective Simmons") that Mr. Giles had not shown up at the funeral home for his wife, and that she had been due to receive $2,000 from a tax refund on the day of the murder.

Likewise, on February 2, 2006, family members of the Gileses reported to Detective Tabor a number of suspicious actions and factors which led them to suspect Mr. Giles's involvement in the murder.  These factors included an absence of bereavement by Mr. Giles after the murder and Mr. Giles's mistress coming by the house the day following the murder.  They conveyed that Mr. Giles owed a drug-related debt and was in possession of a nickel-plated .38-caliber handgun.  Mr. Giles's former girlfriend similarly reported to Detective Tabor that Mr. Giles had stolen her .38-caliber revolver which she used as a duty

---

[6] A683.

8

weapon in her job as a security guard while he lived with her in October 2005, and which was never recovered. The family advised police that they believed Mr. Giles was involved in the death of Mrs. Giles.

At Mr. Giles's February 2, 2006, interview, he described a previous robbery attempt he suffered when trying to buy marijuana and stated that he thought one of the perpetrators of that earlier robbery was the killer. Police presented him with a photo array containing an individual who had previously been arrested for robberies in the area, but he made no identification.

Mr. Giles was interviewed again on February 16, 2006. He was shown a new photo array containing Ronald Harris and other individuals whom Detective Tabor believed were Ronald Harris's associates. Mr. Giles tentatively identified Kellee Mitchell ("Mitchell") as the shooter, but he was not positive. He did not identify Ronald Harris when shown his photo.

### 4. The Police Act on the Identifications

Based on the foregoing investigative developments, the police sought and obtained search warrants for the two apartments where Ronald Harris and Mitchell were living and arrest warrants for them. A SWAT team executed those warrants on February 18, 2006. The basis for the warrants was the investigation of Mrs. Giles's murder. Mitchell was a suspect in that murder at that time.

Mitchell was living with his girlfriend, Etienne Williams, in the Compton Towers apartment building. Dawan Harris, Ronald's older brother, was dating Etienne's sister, Aqueshia Williams. At the time police executed the warrants, Mitchell and Dawan were

9

both in the apartment, as were four members of the Williams family. Based on statements from the Williamses, police located a .38-caliber Smith & Wesson revolver in the ceiling tiles in the common hall area outside the apartment. Police took Dawan Harris and Mitchell into custody. Police did not locate Ronald Harris in his apartment when executing that warrant. Instead, on learning that he was at his cousin Latoya Moody's Compton Towers apartment, police arrested him there without incident. Purnell was also in Moody's apartment but was not arrested at that time.[7]

Police thereafter interrogated the Harris brothers. Mitchell promptly requested an attorney and was not interviewed.

5.      *The Ronald Harris Interrogation*

Police arrested and interviewed Ronald Harris on February 18, 2006. He did not request counsel, and his interview continued until 8:00 p.m., totaling approximately eleven hours.

At the time of the interview, Ronald was 17 years old. It is not disputed that Ronald Harris is intellectually disabled and was unable to read or write.[8] He had an individualized education plan ("IEP") and had been in special education classes before he dropped out of school. At the outset of questioning, police represented to Ronald that they had obtained his mother's permission to question him, and they gave him a Miranda warning.[9] During

---

[7] The record suggests that one of the detectives who arrested Ronald Harris examined Purnell's injury and that Purnell was required to remove his bandage to ensure that he was not concealing any contraband. A821 (Letter from Peter Veith to Steve Wood).

[8] It is likewise uncontradicted that Ronald Harris continues to have limited literacy skills.

[9] A518 at 1:45–2:15 (Ronald Harris February 2006 Interview DVD).

questioning, Ronald was handcuffed to a chair. At some point during the interview, Ronald's mother, who was not in the room, informed the detectives that he had cognitive disabilities. The record suggests that the only evidence against him at the time was Angela Rayne's identification.

The interrogating officer quickly informed Ronald that the interview was related to a murder and that he had been identified by a witness. He informed Ronald that investigators' belief was that he, Ronald Harris, was with the person who murdered the victim but was not himself the shooter:

> Let's get past all this nonsense, okay? Here's the facts. There was a murder, okay? You were involved. And you were with somebody who was, who actually committed the murder, okay? Those are the facts that we know. You got a baby on the way. Okay, you're trying to get your life straightened out. I think you were with the wrong person at the wrong time.[10]

Ronald assiduously denied involvement. Eight minutes after the interrogation began, the interrogating officer left the room. The video of the interrogation, which this Court has reviewed, reveals that Ronald immediately threw his body on the table and began crying and moaning.[11] Between sobs, Harris spoke to the empty room, saying "Me don't commit no crime. Me? It's me though? Me?"[12] He then calmed down and began talking to himself, saying:

> Somebody tell me. Somebody tell me what's going on. Me committing a crime? No. No. No. Not me commit no crime. Not me commit no crime. No. Uh-uh. Uh-uh. Now I was with someone that commit a crime? Somebody tell me. Somebody please tell me what's going on. I was with

---

[10] *Id.* at 3:44–4:07.

[11] *Id.* at 8:06–8:36.

[12] *Id.* at 8:36–8:52.

11

somebody that commit a crime? No, man. No. Not me. Not me. Might be my brother but not me, I'm sorry. You can't get me like that. Not me.[13]

After an officer resumed questioning him, Ronald Harris said he had recently seen his brother with a black .38-caliber revolver with a brown handle which his brother had stolen from Cameron Johnson, the child of their mother's foster sister. Ronald Harris told the officer he knew this because, the night before, his brother Dawan had been on the phone discussing the gun with Johnson and that Johnson was accusing Dawan of having stolen the gun from him. On more than one occasion, he told the detective that he had a "mental problem" for which he took medication.

After another break in questioning, the interviewing officer asked Ronald Harris, "Where does Mark keep his gun?" Ronald Harris, after confirming with the officer that he was asking about the other person in Latoya Moody's apartment, said he had met him only once before that day, did not know whether Mark was his real name, and had never seen him with a gun.

Other than that brief discussion, which contained no mention of "Mark's" full name, the conversation contained no mention of Purnell. Instead, the officers' focus was on getting Ronald Harris to implicate either himself, or his brother and Mitchell. Officers specifically confronted him with the information that one witness had identified him from a photo lineup, and another had positively identified Mitchell.

---

[13] *Id*. at 8:52–9:56.

Ronald Harris repeatedly insisted throughout that initial interview that he was not present or in the area when the robbery occurred, and "that night, when *those shots* went off, I was home."[14] When asked how many gunshots he heard, he responded, "*three*" -- a statement supported by no other evidence.[15] Later in the interview, he claims to have seen two people fleeing, one of whom had a beard -- a statement that also matched no other witness account.[16]

Ronald Harris remained handcuffed to the chair in the interrogation room, aside from escorted toilet breaks, for more than seven hours of intermittent questioning. After those seven hours, a police sergeant took Ronald to another room for a polygraph interview where questioning continued but was not captured in the video recording. Ronald was subject to a total of approximately eleven hours of questioning on that day alone, lasting from approximately 9 a.m. through 8 p.m.

6. *The Dawan Harris Interview*

At the time of his February 18, 2006 interview, Dawan Harris was 20 years old.[17] As with his younger brother, the interviewing officer first informed Dawan of his right to

---

[14] *Id*. at 2:50:10–2:50:13 (emphasis added).

[15] *Id*. at 4:19:15–4:19:21.

[16] *Id*. at 4:20:33–4:21:50. As discussed in the trial section below, Ronald Harris's report of hearing multiple gunshots and seeing two fleeing men, one of whom had a beard, *does* align with the testimony of a disinterested witness, Dawnell Williams, about another shooting that occurred in the same area earlier in the evening.

[17] A762 at 6:07–6:10 (Dawan Harris February 2006 interview DVD).

remain silent[18] and then immediately presented Dawan with the assertion that police knew

he was present at the murder but was not the shooter:

> There was a woman who was killed, okay, at Fifth and Willing Street, okay?
> And you've been identified as a person who was involved in that, okay? Let
> me finish, okay. I don't know, I don't personally think that you shot anybody
> and killed them. But I think that you were there.[19]

The interviewing officer further told Dawan that he had been positively identified

by an eyewitness and picked from a photo lineup.[20] Just as with Ronald, the interviewing

officer suggested Dawan was "in the wrong place, maybe at the wrong time,"[21] and invited

him to implicate the shooter.[22] The officer insisted that multiple eyewitnesses placed

Dawan at the shooting, even revealing details of the crime -- that it involved only a single

shot -- telling him "everybody tells me what a surprised look you had on your face when

*that shot* went off."[23]

When the investigating officer asked about the gun, Dawan denied having one.

When the officer revealed that police had recovered the firearm, Dawan admitted to

---

[18] *Id*. at 5:42–5:51.

[19] *Id*. at 7:18–7:37.

[20] *Id*. at 8:19–8:27 ("You were there. . . somebody identified you."); *id.* at 18:19–18:23 ("People identified you in a photo lineup. How would they be able to do that? That's one in a million.").

[21] *Id*. at 6:52–6:55.

[22] *Id.* at 9:30–9:53 ("You've been identified as a person involved in a murder, okay? You've been identified as being with the person who actually killed someone. Now, you can either own up, listen to me, you can either own up to being there, and saying, 'alright, I was there,' listen to me, 'I was there, here's the person that did it,' okay *or* you can just take the murder rap for that person, is that how you want to go?").

[23] *Id*. at 19:39–19:42 (emphasis added).

14

stealing it from a friend, Cameron Johnson,[24] "some time this week."[25] He specified that he had stolen the gun from Cameron on Valentine's Day just four days earlier. He asserted that he sold it to Mitchell the same day, but that Mitchell did not pay him the full price. Instead, Dawan claimed they had agreed that the gun would remain their shared property.[26] He said that Mitchell had placed the gun in the ceiling tiles outside the apartment in Compton Towers where they both stayed with their girlfriends, the Williams sisters.

Approximately eighteen minutes after it began, Dawan Harris demanded an attorney and the interview abruptly ceased.[27]

7.     *The Aftermath of February 18, 2006 Searches and Interrogations*

On the evening of February 18, 2006, police charged Ronald Harris with attempted robbery, conspiracy, and possession of a deadly weapon during the commission of a felony ("PDWDCF")[28] in relation to the Giles robbery and murder. Dawan Harris and Mitchell were charged with Possession of a Deadly Weapon by Persons Prohibited ("PDWBPP")[29] relating to the .38-caliber revolver. Dawan Harris's bail paperwork reflects that the arraigning Court characterized him as a "poss[ible] suspect in [a] murder."[30]

---

[24] *Id*. at 13:44–14:09. Dawan explained that he referred to Cameron Johnson as a 'cousin' because of their mothers' childhood relationship, but that they are not blood relatives.

[25] *Id*. at 13:09–13:21.

[26] *Id*. at 12:40–13:09.

[27] *Id.* at 23:18–23:25 ("I want a lie detector test. And I'm getting a lawyer. End of that discussion. I ain't saying no more.").

[28] 11 *Del. C.* § 1447.

[29] 11 *Del. C.* § 1448.

[30] A833 (Dawan Harris Bail and Disposition Sheet).

15

Based on the events of that day, police came to recognize Purnell as another possible suspect.[31] Pursuing a theory of Purnell's involvement, police searched Purnell's grandmother's apartment with her permission on February 21, 2006, seeking a handgun and searched Purnell's own residence two days later via a warrant obtained from an unrelated case. Neither search obtained any evidence. On February 22, 2006, police presented Mr. Giles with a fourth photo lineup, this one containing Purnell, but Mr. Giles did not identify Purnell as being involved in his wife's murder.

*8.    Purnell's February 21, 2006 Interview*

Also on February 21, Purnell came to the police station to speak with Detective Thomas Curley ("Detective Curley"). Their conversation was recorded on video.[32] In that interview, Purnell and Detective Curley discussed a number of issues, including extensive discussion of the recent arrest of the Harris brothers and Kellee Mitchell.

Purnell informed Detective Curley that he was blood cousins with the Harris brothers on his mother's side and had known Mitchell his entire life. He told Detective Curley that he was aware that the three had been arrested "for murder."

Purnell explained that he knew that Dawan had stolen a .38-caliber firearm from

---

[31] A704 (Wilmington Department of Police Supplemental Report). The record does not disclose what caused police to develop this suspicion. The police report states, relating to February 18, 2006, but without a timestamp:

> Throughout the day the name Mark Purnell is mentioned as a possible suspect. It was learned that he recently accidentally shot himself. It was also learned that Detective Thomas Curley had probable cause to obtain a search warrant for his residence in an unrelated matter.

A704–05.

[32] Trial Exhibit 38.

16

"Sticky" and hidden it in the ceiling.[33]  He explained that Dawan's theft of the gun was retaliatory for an earlier robbery committed by two other individuals.  And he told the detective that Mitchell mostly hung out with Dawan, but that Ron did not hang out with either of them.

Purnell also told Detective Curley about certain suspicious behavior from Dawan Harris and Mitchell the night before their arrest.  Mitchell, Purnell explained, had been repeatedly calling him at three to five in the morning, and was giving him the impression that Mitchell was "trying to set me up."  Purnell further explained that by that he meant that Mitchell kept bombarding him by phone to come upstairs to look at the gun.

Purnell seemed to assume that the .38-caliber revolver was the murder weapon, since "that's why they locking them up for murder."  During the searches and arrests on February 18, Detective Curley agreed that he had been "hanging" with Purnell for about two hours, and so he explained to Purnell he did not know the circumstances by which the other investigators had found the revolver.  Purnell explained that after Detective Curley had left, Purnell found out from "the girls" that "the little pregnant girl" (a third Williams sister, Kenyatta) had told the other detective where it was, leading to its discovery, and so to the murder arrests.  Asked for further clarification, Purnell said that Aqueshia had told him that the revolver was the murder weapon.  Under further questioning, he reiterated that Aqueshia told him it was the murder weapon, which he thought was information that came from Dawan.

---

[33] Police reports identify "Sticky" as another individual not otherwise referred to in this Opinion.

Purnell also explained that he had also known that the revolver was there because whenever he went up to the ninth floor in Compton Towers, he would see Dawan checking the ceiling tile to make sure no one had stolen the gun. In response to Detective Curley's inquiries about how long Dawan had possessed the gun, Purnell said that Dawan had it for a long time, but conceded that he could not say for certain it was the same gun the entire time. Purnell had only actually seen the .38-caliber revolver the night before Dawan's arrest, when Dawan had said he "got to put it up somewhere because they might be coming to get it," referring to the police. He knew that Dawan possessed a gun at least as far back as when he, Purnell, had been shot, because Dawan had suggested engaging in reprisal violence at that time. Purnell advised the detective that Dawan had been caught in security camera footage in Compton Towers firing the gun.

They also discussed the Giles robbery itself. Purnell commented that whoever committed it must have been desperate.[34] As Detective Curley transcribed the exchange:

> [PURNELL]: Whoever it was it in um yeah whoever it was was desperate for money right.
>
> [DETECTIVE CURLEY]: I don't know.
>
> [PURNELL]: They try to rob their people but people and they ran away and that means they was desperate for money. So somebody, if I'm robbing somebody and they run away and they're gone ain't nothing you could do but you rob somebody and they running and you shoot 'em.
>
> [DETECTIVE CURLEY]: Um hum.

---

[34] *Id*. at 18:45–19:14.

18

[PURNELL]: Then that means they desperate for money.[35]

Another incident Purnell discussed with Detective Curley had occurred the previous night, February 20, 2006. As he explained, he had been in Buttonwood, having purchased some marijuana to smoke "to calm my nerves," but a police officer named Kramer had confronted him. Purnell explained that he had managed to run away and escape the officer.

### 9.    *Purnell Makes an Inculpatory Phone Call*

In March of 2006, Etienne and Aqueshia Williams were with Jerome Portis when he had a phone conversation with Purnell, his cousin. During the conversation between Portis and Purnell, Purnell addressed Aqueshia and told her of Dawan, "That's why I did kill that lady and your boyfriend is sitting in jail for it. . . sike."[36] "Sike" is a slang term which can mean "just kidding."

---

[35] Trial Exhibit 39 at 27–28 (Detective Curley's Transcript of Purnell Interview). We have watched and listened to the recording, and the recording, which was played to the jury, is audibly ambiguous as to some of the words and especially punctuation. However, none of the ambiguities materially change the thrust of the remarks as Detective Curley transcribed them. Citing exclusively to the recording and Detective Curley's testimony authenticating it -- not the transcript -- the State instead quotes Purnell as saying "if robbing someone and they run away, they're gone, ain't nothing you could do but rob somebody and they run and you shoot them." State's Supp. Ans. Br. at 18. That iteration of the quotation does not match the cited exhibit, and omits key words -- including a critical "I'm," and "you," and the entirety of the final dependent clause "then that means they desperate for money." The State similarly described Purnell's remark in closing arguments, provoking an objection from Trial Counsel. A355 (State's Closing Argument). After re-listening to the recording outside the presence of the jury, the trial judge ruled that the State's characterization was not a misrepresentation, and Trial Counsel withdrew his objection in favor of arguing about the contextual meaning of the remark. In our view, the State's characterization is vastly different, as it implies that Purnell was suggesting that shooting a robbery victim was the only way to respond to the victim's flight. To the contrary, Purnell appears to be commenting that shooting a fleeing victim means the shooter must have been desperate for money.

[36] A178 (Testimony of Etienne Williams); A197 (Testimony of Aqueshia Williams).

19

### 10. *The Investigations Continue*

Over the course of the next several months, police pursued a number of investigatory leads. In June 2006 they identified a witness who, when he was arrested on unrelated charges, asserted that Dawan Harris had repeatedly bragged to him and Troy Hammond of the Giles murder saying, "you should have seen the way she fell" while they were at Fifth and Jefferson Streets some time before Mrs. Giles's funeral.[37]

Police received other reports about the murder, often including secondhand or thirdhand claims that Dawan Harris, Mitchell, Purnell, or other individuals were involved or had made inculpatory statements.

By July 2006 Cameron Johnson admitted that he had been holding a .38-caliber revolver for someone else but that the gun was stolen by his cousin, Dawan Harris.

### 11. *Corey Hammond Implicates Purnell*

The break in the case leading to Purnell's prosecution came from an interview with Troy Hammond's brother, Corey Hammond ("Hammond"), in early 2007.

Like Purnell, Hammond grew up in the Southbridge neighborhood of Wilmington, where they were neighbors but did not have a close relationship. By the time of Mrs. Giles's murder, Hammond already had a substantial criminal record, having been convicted as a juvenile of felony Receiving Stolen Property ("RSP") in June 2003, and of Possession with Intent to Deliver a Schedule II Narcotic ("PWID"), felony RSP, and misdemeanor RSP in June 2005, again as a juvenile.

---

[37] A707 (Wilmington Department of Police Supplemental Report).

In September 2006 Detective Tabor interviewed Hammond about Mrs. Giles's murder. At that time Hammond did not implicate anyone for the murder or the events surrounding it. Over the course of the conversation, Hammond noted that Dawan had shown him, Hammond, a gun.[38] He recalled the gun being "like a Glock."

Hammond's reticence changed on January 4, 2007, when he was arrested for another PWID offense two days before his son's birth.[39] After that arrest, the arresting officer notified Detective Tabor that Hammond was in custody. Detective Tabor took that opportunity to interview Hammond again. After this interview, Detective Tabor advised Hammond's arresting officer that Hammond was being cooperative. The bail set at Hammond's arraignment thereafter was low enough that Hammond was easily able to post it and obtain his release prior to his son's birth.

At the new interview, Hammond immediately informed Detective Tabor "I'm just doing this for my seed," *i.e.*, his son whose birth was so imminent. At that interview, Hammond told Detective Tabor that Ronald Harris and Purnell committed the Giles robbery, and that although both had guns, Ronald Harris was the shooter. He claimed to

---

[38] A619 (Corey Hammond Interview Transcript). The name of the individual Hammond claims showed him a gun is listed as "(CU)" meaning "can't understand," meaning unintelligible to the transcriptionist, but Detective Tabor recalls the conversation and that Hammond spoke of Dawan showing him a gun. A165 (Testimony of Detective Tabor).

[39] PWID was the offense formerly codified at 16 *Del. C.* § 4751, which was repealed by 78 Del. Laws, ch. 13, effective Sept 1, 2011. Under the statute in force at the time, any person not authorized by the Controlled Substances Act "who manufactures, delivers or possesses with intent to manufacture or deliver a controlled substance or a counterfeit controlled substance classified in Schedule I or II which is a narcotic drug is guilty of a class C felony and shall be fined not less than $5,000 nor more than $50,000." Upon a showing that the offender was not himself an addict, "[f]or the second or subsequent violation of this section a mandatory minimum sentence of 12 years to be served at Level V" which could not be suspended was applicable.

21

have been with Dawan Harris walking down Washington Street at the time of the robbery and that he heard the shooting. Further, Hammond claimed that he next saw Purnell a week or two later, and that at that time Purnell bragged about committing the murder.

Detective Tabor then drew a map of the area around the shooting. Hammond described events and interactions he claimed to have had with Purnell and Harris, telling Detective Tabor when they occurred and where, referencing the map. He further claimed that earlier on the day of the robbery, Purnell had shown off a gun, and that he had complained about wanting money, to which Ronald Harris responded by telling Purnell that he was "ready to do something."

Hammond described being with Dawan Harris at the time of the shooting and claimed to have heard *multiple* gunshots:

> I don't know where we was going we just walking. We turned down Jefferson and like was walking around I think we hollered at some girls over there for a minute and we walked back up towards his aunt house (CU) and that's like we was chilling for a minute and I heard this *and I heard the shots* cause we ran we like *we ran towards the shots I was coming down here*.[40]

After that disclosure, Detective Tabor continued to question Hammond.

Following Hammond's specific and contradictory descriptions of where he was with Dawan Harris when he heard multiple gunshots, Detective Tabor asked him to indicate the location on the map, while prompting him that there was only a single gunshot:

[DETECTIVE TABOR]: Where were you at when you heard *the shot*?

[HAMMOND]: I was like on like right on this block down here.

[DETECTIVE TABOR]: Okay and you heard *the shot*?

---

[40] A638 (emphasis added).

22

[HAMMOND]: Heard *the shot*.[41]

Later in the interview, Hammond claimed to have seen Harris and Purnell later in the day of the shooting, and that Purnell told him that "we getting ready to rob the bitch and she ain't wanna give it up so I popped the bitch."[42]

### 12. *Mitchell Implicates Purnell*

After the second Hammond interview, police conducted further investigations into Purnell's possible involvement. Detective Tabor interviewed Mitchell on January 22, 2007. According to Detective Tabor, Mitchell told him that the previous April, when he and Purnell were incarcerated together in the New Castle County Detention Center, Purnell bragged that he had intended to rob the Gileses and that Mrs. Giles had "recognized him and called him by name and so he shot her."[43]

Detective Tabor then began recording the interview and questioned Mitchell about Purnell's prior statement, occasionally suggesting facts to which Mitchell tersely assented:

[DETECTIVE TABOR]: Tell me again you guys were at Ferris together or Bridgehouse or…

[MITCHELL]: Detention Center.

[DETECTIVE TABOR]: Detention Center and this was when, when did he go in for the stolen car like April?

---

[41] A646 (emphasis added). The detectives had also referenced "the shot" in the singular prior to that, asking him "Where were you at when *the shot* went off" before he had given his narration of events. A630. As noted earlier, in Dawan Harris's February 18, 2006 interrogation, police also referred to there being only a single gunshot when they, bluffing, told him "everybody tells me what a surprised look you had on your face when *that shot* went off."

[42] A650.

[43] A111 (Testimony of Detective Tabor).

23

[MITCHELL]: I think so.

[DETECTIVE TABOR]:  Something like April?

[MITCHELL]: I think so.

[DETECTIVE TABOR]: And that's when you had this conversation?  Tell me again what he said to you, exactly whatever his words were that you can remember?

[MITCHELL]: Basically just bragging about (CU).

[DETECTIVE TABOR]: What did he say?

[MITCHELL]: I already told you.

[DETECTIVE TABOR]: Tell me again.  I wanna be able to pick it apart and see if I can get you to remember anything else that he might a said?

[MITCHELL]: I don't wanna say it again.

[DETECTIVE TABOR]: Okay well you told me that it was he told you that it was like the last bus that she got off and was walking and he saw her walking with the bags and he was gonna rob her, is that right and she recognized him?  Did he say if… did he say if anybody else was there?  No?

[MITCHELL]: Her husband I think.

[DETECTIVE TABOR]: Her husband was there?  Did Mark tell you that or you just know that from hearing it on the street?

[MITCHELL]: That's what he said.

[DETECTIVE TABOR]: That's what Mark said and he said she recognized him?  How did he say he knew that, did she say his name, call his name?  Yeah I mean she knew him by name and that's why he shot her?  Alright. Did you hear, did he tell you anything else about why he was going to rob her?

24

[MITCHELL]: Tax time.[44]

As discussed below, Mitchell has now recanted these statements.

Based on the Hammond and Mitchell interviews and the police investigations, police arrested Purnell on January 23, 2007.

*13.    Ronald Harris is Interrogated Again*

The next day, on January 24, 2007, Detective Simmons interviewed Ronald Harris. In an attempt to elicit a confession, investigators told Ronald that Purnell had implicated him. The detective told him that, "Mark, he's not quite as dumb as you are," and "Little Mark decided not to be quite as dumb as you are that's all." The interview transcript indicates that the detective told Ronald that Purnell was arrested the previous night for murder and showed Ronald a paper to that effect.[45]

Throughout the interview, Detective Simmons told him that he would be in jail for the rest of his life if he did not reveal what really happened. The following excerpts show a few such examples:

> [DETECTIVE SIMMONS]:  You just had your last free moments this morning.  Soon as you walked through this door you are now under arrest you're gonna go to Gander Hill.  You're not gonna get out of jail for the rest of your natural life.  Do you understand that?
>
> [RONALD HARRIS]:  Alright can I talk to mom?
>
> [DETECTIVE SIMMONS]:  You will no you can not.

---

[44] A499–500 (Mitchell 2007 Interview Transcript).

[45] A563 (Harris 2007 Interview Transcript).  Ronald Harris then asked how Purnell could have been locked up if he had already been locked up.  The detective replied, "Son you can't be this thick you just can't be."  A564.  The detective then told him that Purnell had been released four days earlier but then got locked up again for murder.

[RONALD HARRIS]:  I can't…

[DETECTIVE SIMMONS]:  No.

[RONALD HARRIS]:  I got rights.[46]

. . . .

[DETECTIVE SIMMONS]:  It's over from the murder charge from the night you shot that lady (CU) with Mark when he shot that lady about that?

[RONALD HARRIS]:  That's a lie.

[DETECTIVE SIMMONS]:  Does that clarify your memory?

[RONALD HARRIS]:  That's a lie.

. . . .

[DETECTIVE SIMMONS]:  How old is your daughter?  How old is your daughter?[47]

[RONALD HARRIS]:  (CU)

[DETECTIVE SIMMONS]:  You'll never again see her as a free man unless you choose to help yourself out.

[RONALD HARRIS]:  Help myself out?

[DETECTIVE SIMMONS]:  Yeap.

[RONALD HARRIS]:  How the f--k I'm a help myself out?

After further denials by Ronald of any involvement, Detective Simmons emphasized the grave nature of the charges and Ronald's potential criminal liability:

[DETECTIVE SIMMONS]:  We know that you wouldn't be here you wouldn't be going to jail for murder you wouldn't be facing a capital crime

---

[46] A551–52.

[47] A569.

punishable by death or life imprisonment in the State of Delaware if we didn't know the truth.[48]

Ronald Harris repeatedly asked to take a lie detector test and for his mother to be present. Throughout the interview, the transcript of which goes on for ninety-three pages, Ronald Harris repeatedly and emphatically insisted that he had no knowledge of and had no involvement in the Giles murder. At its conclusion, the detective said, "Alright come on rocket science. Let's go downstairs and book ya. Jump on up brother turn around."[49]

### 14. Purnell Obtains Appointed Counsel

A grand jury indicted Purnell and Ronald Harris on April 30, 2007.[50] The indictment alleged six counts against each of them: (1) Murder First Degree, (2) PDWDCF as to the murder, (3) Attempted Robbery First Degree, (4) PDWDCF as to the attempted robbery, (5) Conspiracy Second Degree, and (6) PDWBPP.[51]

The Superior Court appointed Peter Veith, Esquire ("Trial Counsel") to represent Purnell on May 7, 2007.[52] However, Trial Counsel had already represented Dawan Harris -- as mentioned, a suspect in the murder of Mrs. Giles -- in his prosecution concerning the .38-caliber Smith & Wesson revolver police recovered in the February 2006 search.[53]

---

[48] A578. Detective Simmons's questioning continued to characterize the charges and their potential consequences in graphic terms, telling Ronald "[y]our last free moments as a human being are done" and "[n]ever again will you walk the face of this earth without handcuffs or shackles around your leg or being behind a building with lots and lots of bars." A595.

[49] A614.

[50] A1 (Superior Court Docket).

[51] A21–24 (Indictment).

[52] A1 (Superior Court Docket).

[53] A835 (Attorney Veith Conflict Letter).

In that earlier prosecution, Dawan Harris had faced PDWBPP and Conspiracy Second Degree charges. He entered a guilty plea to the PDWBPP count on June 5, 2006.[54] On the same day, he was sentenced to two years at Level V incarceration, suspended after 90 days for 21 months at Level IV partial incarceration, suspended after six months for one year of Level III probation.[55] By the time of his plea agreement and sentencing, the unsuspended Level V time had already elapsed, and a release was faxed to the H.R. Young Correctional Facility on the same day.[56]

On December 6, 2006, the Superior Court found Dawan Harris in violation of probation.[57] The Superior Court sentenced him to six months at Level V incarceration, effective November 30, 2006, suspended after time served. A different attorney represented Dawan Harris at the Violation of Probation hearing.

### 15. Trial Counsel's Investigation

Trial Counsel took a number of investigatory steps to develop Purnell's case. He hired an outside consulting firm to locate and interview potential witnesses.[58] He retained a handwriting expert to review writings the State's expert attributed to Purnell. He

---

[54] *Id.*; *see also* Case Review Calendar, *State v. Dawan Harris*, Case No. 0602015362 (Del. Super. June 5, 2006) (D.I. 5).

[55] Sentence Order, *State v. Dawan Harris*, Case No. 0602015362 (Del. Super. June 5, 2006) (D.I. 8).

[56] Release, *State v. Dawan Harris*, Case No. 0602015362 (Del. Super. June 5, 2006) (D.I. 6).

[57] VOP Order, *State v. Dawan Harris*, Case No. 0602015362 (Del. Super. Dec. 6, 2006) (D.I. 12).

[58] A1584 (Attorney's Affidavit in response to Defendant's Second Motion for Postconviction Relief) ("During pre-trial preparation, the defense hired Shannon and Associates as our investigator. . . Shannon Associates also conducts polygraph examinations.").

28

interviewed the orthopedic surgeon, Dr. Rubano, and a nurse at the New Castle County Detention Center to prepare a defense around Purnell's physical incapability.[59] These efforts appear to have been aimed in significant part at persuading the State of Purnell's innocence rather than developing a case for trial.[60]

But by Trial Counsel's admission he did not pursue several investigatory leads. He did not investigate Troy Hammond as a possible witness to Dawan Harris's statement that "you should have seen the way she fell."[61] He did not obtain a ballistics expert to investigate the connection between the 9mm shell casing and Mrs. Giles's murder or otherwise investigate any connection between Mitchell's and Harris's illegally possessed .38-caliber revolver and the killing.[62] And, critically, Trial Counsel did not attempt to locate the other witnesses who had implicated his former client, Dawan Harris.

---

[59] A1586 ("I interviewed the treating physician and had him under subpoena to address this issue in the defense case. After speaking with the doctor on at least two occasion, [sic] I elected not to call him as a defense witness, however, the State call [sic] him in their case-in-chief, so he was subjected to cross-examination.") (alterations added).

[60] A1590–91 ("As I stated earlier in this affidavit, I tried to convince the State that the Defendant was innocent because of his injury requiring him to use crutches, I had him undergo a polygraph examination to support this claim, I spoke to his family and friend [sic] about his physical condition, I interviewed his treating physician and subjected him to cross-examination.") (alteration added).

[61] A1590 ("I did not investigate Troy Hammond").

[62] 1588 ("Trail [sic] counsel does not recall investigating or presenting evidence the ballistics evidence concerning the 9mm shell casing at the scene as it relates to a .38[-]caliber firearm. . . I do not recall retaining a ballistics expert. . . I do not recall investigating Kelli [sic] Mitchell and Dawan Harris in connection to a .38[-]caliber firearm.") (alterations added).

Finally, although he spoke to and subpoenaed Dr. Rubano, Trial Counsel did not speak with the vascular surgeon, Dr. Harad, or obtain an expert report examining whether Purnell was physically capable of running so soon after major knee surgery.

*16. Trial Counsel Brings the Conflict to the State's Attention*

In January 2008,[63] Trial Counsel alerted the State by letter of what he characterized as the potential conflict over his prior representation of Dawan Harris:

> I write to you today to either confirm or avoid a potential conflict that I may have representing Mr. Purnell. I was assigned as conflict counsel to represent a Dawan Harris I.D. No. 0602015362 for possession of a firearm by a person prohibited and conspiracy second. Dawan's co-defendant was Kellee Mitchel [sic] who is a State witness in Purnell. Based upon my review of the Dawan Harris file, it is clear that his arrest resulted from Detective Tabor's investigation of the Giles murder. The seized weapon was a .38[-]caliber revolver. Harris eventually, pleaded guilty to the person prohibited charge.
>
> Firstly, I have a conflict if Dawan Harris is a witness for the State in the Purnell matter. Secondly, it is clear from the discovery produced to date in the Purnell matter, that Mitchell will be a witness for the State. I have never represented Mitchell so I do not think that this will present a conflict. Please let me know your position.[64]

Thus, Trial Counsel made clear that Dawan's PDWBPP charge, including the .38-caliber revolver, was an outgrowth of the Giles murder investigation, but also that his view was that he would be conflicted if Dawan Harris were a witness for the State and that no conflict resulted from Mitchell's witness status.

The State responded, concurring with Trial Counsel's assessment that Mitchell's

---

[63] Dawan's sentence had apparently expired the previous month, as noted earlier.

[64] A835 (Attorney Veith Conflict Letter).

30

upcoming testimony would not present a conflict.[65] The prosecutor further explained that "[a]s of this date, the State has no plans to call [Dawan] Harris as a witness in this matter."[66] However, the State cautioned that, "as is true in any important case, our investigation is continuing and so it is possible that we could learn things in the future that would change our current plans about [Dawan] Harris," and that "Kelle [sic] Mitchell will be a State's witness."[67]

### 17. Ronald Harris Enters a Plea Agreement

Jury selection began on April 2, 2008.[68] On April 7, Ronald Harris entered into a plea agreement with the State. Under the terms of the agreement, Harris entered guilty pleas to Attempted Robbery First Degree and Conspiracy Second Degree and would testify in Purnell's trial, while the State dropped the remaining charges, including the Murder First Degree count. The State further agreed to recommend a three-year sentence of incarceration, less the fifteen months already served since his January 2007 arrest. Also pursuant to the plea, Ronald Harris sat for a third interview with Detective Tabor, part of which the State audio recorded and transcribed.[69] We refer to this third interview as his plea proffer interview discussed below in the context of his trial testimony.

---

[65] A837 (State's Response to Attorney Veith's Conflict Letter).

[66] *Id.*

[67] *Id.*

[68] A5 (Superior Court Docket).

[69] A245–46 (Testimony of Detective Tabor).

31

### 18.   *Trial Counsel Presents the Conflict to the Trial Court*

Also on April 7, after jury selection and Ronald Harris's change of plea but before the start of the trial, the trial judge held a hearing to rule on outstanding evidentiary motions *in limine*.[70]

Following the presentation of the evidentiary motions *in limine*, Trial Counsel brought the conflict to the Court's attention.  The State argued against the importance of the prior representation on the logic that the firearm involved was a different caliber than the one that left ballistics evidence at the scene.  Trial Counsel noted particular concern because Dawan Harris's name was read to the jury during *voir dire*, prompting him to worry that the State may be considering calling him.

Like Trial Counsel and the prosecutor, the trial court focused exclusively on whether Dawan Harris would be a testifying witness.  Trial Counsel expressed concern that, independent of whether Dawan testified, if Purnell were convicted, the fact of his prior representation of Dawan might be grounds for later collateral attack on the fairness of the trial.

Trial Counsel made clear to the trial court that one of the theories of the defense was that Mitchell and Dawan Harris committed the robbery, and that Rayne mistook Dawan for Ronald due to what the record suggests was a very strong familial resemblance.  Another theory was that Ronald and Dawan Harris were the culprits and Ronald was "covering for

---

[70] A25 (Motion *in Limine* Transcript).  Among these was the State's motion to exclude Mr. Giles's identification of Kellee Mitchell and non-identification of Purnell on hearsay grounds following Mr. Giles's death.

his brother and he's throwing Mark Purnell under this [sic] because Mark Purnell snitched on them for shooting this .38-caliber out of a window in Compton Towers that prompted them getting in trouble."[71] The following exchange then occurred:

> THE COURT: All right. So, you're arguing that a person that you represented in the past committed a crime this time?
>
> [TRIAL COUNSEL]: Potentially. That's an argument, yes.[72]

However, the trial judge expressed doubt that this theory was a meaningful conflict in light of Ronald Harris's plea.[73] Trial Counsel expressed a specific intent to call Dawan Harris to the stand.[74]

Furthermore, Trial Counsel noted at that hearing that he had received Dawan's recorded post-arrest interview from February 18, 2006, only days earlier. Trial Counsel called attention to the fact that Detective Tabor told Dawan that he was identified from a photographic lineup as a participant, and Trial Counsel represented to the Court that, based on the tapes, he was more certain than he was before that he was conflicted. The trial judge

---

[71] A39 (alteration added).

[72] *Id.*

[73] *Id.* ("Well, if Ron Harris admits he's the Harris involved, I'm asking -- I'm trying to figure out how substantive any potential conflict really is.").

[74] *See* A39:

> THE COURT: Do you intend to call him?
> TRIAL COUNSEL: I intend to, but whether I do, I don't know.

33

hypothesized, and the State confirmed, that Detective Tabor had been lying about the identification in an attempt to provoke an inculpatory admission.[75]

Further, the prosecutor noted the State's view that the Dawan interview was not material to the case, apparently to preemptively rebut any argument that the late disclosure was a discovery violation, asserting that "[w]e don't have any reason to believe [Dawan] has knowledge of the crime," that "[t]here's nothing of any substance in those audiotape interviews" and that "I don't see any *Brady*[76] material in there."[77]

---

[75] *See* A40–41:

> TRIAL COUNSEL: [The recorded interview is] information from Detective Tabor that he's alleging that [Dawan] Harris was identified as a suspect and picked out of a line-up. And I would try to cross examine him about that. . . I don't know if it's a total fabrication or if it's made up --
>
> THE COURT: Well, it might be that the cops are lying to him to get him to say something.
>
> TRIAL COUNSEL: It very well may be. I believe that's the representation that the State --
>
> THE COURT: [Prosecutor] you're standing and shaking your head, yes.
>
> THE PROSECUTOR: That's right, Your Honor.

[76] *See Brady v. Maryland*, 373 U.S. 83, 87 (1963) ("the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

[77] A41 (Motion *in Limine* Transcript). Yet, as the prosecutor concedes moments later, the recordings are potential impeachment material against *Detective Tabor*. *Id*.; *see also* D.R.E. 608(b) (permitting cross-examination as to previous instances of conduct probative of a witness's character for truthfulness or untruthfulness). Moreover, the State knew that in Hammond's January 2007 interview, the critical break in the case spurring the State to prosecute Purnell, Hammond claimed that Dawan Harris was with him when he heard the Giles shooting. The State therefore had to be aware that Dawan could necessarily corroborate or contradict Hammond's account.

34

Trial Counsel reiterated his belief that, despite the arguments to the contrary which the trial judge and prosecutor had offered, "I still have to call [Dawan] as a witness." He pointed out that simply letting the jury see the resemblance between the Harris brothers would support Purnell's theory that Rayne misidentified Ronald and that Ronald Harris pleaded guilty to protect his brother. Trial Counsel reiterated that the defense strategy would be to suggest that the .38-caliber pistol jointly possessed by Mitchell and Dawan Harris was the murder weapon and pointed out that the State had produced no ballistics expert to contradict that theory.

At the conclusion of the hearing, the trial judge instructed Trial Counsel to determine with certainty whether he would be calling Dawan Harris as a witness, and to give an answer the following morning. The following morning, Trial Counsel was unable to answer with certainty, and so the trial court reserved decision on the issue until and unless Dawan Harris was called. Thus, the trial began with Trial Counsel fully aware of the conflict of interest that could impact his trial strategy. But in his mistaken view, the conflict arose only if Dawan Harris were called to testify.

### B. *The Proceedings to Date*

#### 1. *The Trial*

At trial, witnesses testified as to the foregoing facts. Additional testimony was adduced as well, and which is discussed separately herein because of its relevance to the instant motion and Purnell's claim of actual innocence.

In its opening statement, the State discussed part of the investigation in this case, and explained that, although the revolver was discovered during a search pursuant to the

Giles murder investigation, and although Mitchell was a suspect at the time, "you will see no evidence whatsoever that that .38-caliber revolver was the weapon that killed Tameka [Giles]."[78] Instead, the State emphasized, "a single 9-millimeter shell casing was found on Willing Street, *just a few feet from where she fell after being shot*."[79] And because "a .38-caliber revolver cannot fire a 9-millimeter shell casing," there was therefore "no evidence that that .38-caliber revolver I just told you about had anything to do with this crime."[80]

Trial Counsel likewise recognized the centrality of the revolver and the shell casing. He explained "the only piece of physical evidence they have for this horrendous crime, and this is a horrendous crime, is a shell casing."[81] But "the defense would submit that that piece of evidence can't even be linked to this crime."[82]

Similarly, both the State and the defense immediately recognized that the State's case relied heavily on the testimony of unreliable witnesses whose testimony was motivated in part by self-interest. As the State conceded, "some of the folks whom we will call as 'witnesses' in this trial, and I mean no offense to them, but I think it's fair if I say they are less than ideal citizens.'"[83] The State also conceded that "in order to gain the cooperation of [Corey Hammond], the State has had to agree to seek a reduction in the

---

[78] A61 (The State's Opening Statement).

[79] *Id*. (emphasis added).

[80] *Id*.

[81] A67 (The Defense's Opening Statement).

[82] *Id*.

[83] A65 (The State's Opening Statement).

sentence he is currently serving," and that "in order to gain Ronald Harris's cooperation, the murder charges pending against him in this indictment were dropped."[84]

The State similarly conceded that, because "Wilmington Police were unable to locate any forensic evidence, whatsoever, that links the defendant with this crime," the State's case was instead based on Purnell's statements to others and the testimony of Ronald Harris. Trial Counsel echoed these criticisms, summarizing that "almost all their witnesses, he gets something out of it, he gets a benefit, he gets a deal."[85] And, in sum, "the State's evidence is lacking, the witness's [sic] credibility is at issue in this case, and my client has an alibi defense."[86]

### a.    Angela Rayne's Testimony

Rayne's testimony was consistent with what she had told investigators at the time. She was only a few steps away from the murder when it happened. Willing is a small side street leading off of the north side of Fifth Street. Fifth Street is a one-way street, westbound, which in the area of Fifth and Willing goes uphill in the direction of traffic.

The perpetrators were two African American boys, wearing dark-colored hoodies, coming towards the Fifth and Willing intersection from the direction of Fifth and West, one block to the east. She estimated that one was slightly shorter than she was, but the other was significantly taller.

---

[84] *Id*. Alteration added. At the time of the opening statements, the State still was not disclosing Corey Hammond's identity. A68 (The Defense's Opening Statement).

[85] A68 (The Defense's Opening Statement).

[86] *Id*.

37

The victims were "a guy and a girl" walking along Fifth Street. The two perpetrators, after passing in front of Rayne and doubling back the way they came, walked towards the couple. When their paths crossed, Rayne heard a single gunshot, but did not see the shot being fired as she had not been watching the people. She looked over immediately on hearing the shot and saw that both perpetrators had immediately fled, running, while the victim was laying on the ground. They fled in the direction of Fifth and West Streets, the direction from which they had come. She did not recall whether they were running together or not, but she emphasized that they were running *very fast* and at *full speed*, such that even though she had looked over immediately after hearing the shot, they were already gone.

Rayne had heard no verbal exchange between the perpetrators and the couple prior to the gunshot. And she conceded that she was high on crack cocaine (a $500 a day habit according to her) at the time of the robbery and when she identified Ronald Harris from the lineup, and at trial she admitted she was "not 100 percent certain" that Ronald was the perpetrator as she had been when she made the identification.[87]

### b. Ronald Harris's Testimony

Under Ronald Harris's plea agreement, he pleaded guilty to Attempted Robbery First Degree and Conspiracy Second Degree while the State dropped the Murder First Degree and PFDCF charges against him.[88] The agreement also required his testimony in

---

[87] A88 (Testimony of Angela Rayne).

[88] A238 (Testimony of Ronald Harris).

Purnell's trial. Under his plea agreement, the State would recommend three years of incarceration, against which Ronald had already served fifteen months. Prior to his testimony, the State told the trial court that Ronald Harris was "a little bit unpredictable."[89]

On April 17, 2008, Ronald Harris testified that in the morning of January 30, 2006, he met Purnell, although he did not recall where, and Purnell asked him to join him in a purse snatching by saying "Let's go rob somebody."[90] He testified that he agreed but they did not discuss the matter further. Later in the day, he described contact with the Wilmington Police while he was near the corner of Fifth and Jefferson Streets. He then testified that later that evening he met up with Purnell again at Compton Towers, whereupon they left to commit the robbery without any further discussion. He claimed that they arrived at Fifth and Willing Streets and that when a bus arrived he and Purnell approached the Gileses as they got off of it.

According to Ronald Harris's testimony, Purnell said "[c]an I get ya'll stuff" and pulled out a gun while he was only three or four feet away from them. Harris claims to have fled on seeing the gun, and that he heard a single gunshot approximately five seconds later. He claimed that he did not see Mark Purnell again until February 18, 2006, the day of his arrest, when he was in Latoya Moody's apartment with Purnell, and that, despite their both being in the apartment, he had not spoken to Purnell that day beyond saying "what's up."

---

[89] A207 (Trial Transcript).

[90] A239 (Testimony of Ronald Harris).

Thereafter, the State interrupted Ronald Harris's testimony to call Detective Tabor and introduce an audio recording of Ronald Harris's April 7 plea proffer interview as a prior voluntary statement under 11 *Del. C.* § 3507. The State also produced a transcript of the interview Detective Tabor had prepared based on the recording.[91]

Ronald's proffer interview, given just ten days prior to his trial testimony, was at times inconsistent both internally and with his trial testimony that had just been interrupted for the playing of the recording. In the proffer interview, when Detective Tabor asked him "why do you think [Purnell] shot her?" Ronald said, "[c]ause he told so many people about it."[92]

Ronald was asked "[d]id you *hear the shot*?" He answered, "[n]o." Detective Tabor told him that a witness is "gonna say that you were there when the gun, when the gun shot went off," that "you have to be completely truthful with me at this point" and that "to say that you didn't hear the gun shot that doesn't make any sense," to which, Ronald answered, "[r]ight."[93] He then resumed questioning Ronald, asking "Did you ever see Mark Purnell

---

[91] A245 (Testimony of Detective Tabor). After playing the audio for the jury, the State informed the trial court that "the State will be moving a copy of that recording in as a Court Exhibit" but that "We don't have a copy right at this moment." A246. That does not appear to have happened. Having reviewed the complete trial record, the Court has been unable to locate the audio recording of the Ronald Harris interview, and instead has relied on the transcript.

[92] Trial Court Exhibit 8 at 2. This seems to reflect Ronald misunderstanding the question. Detective Tabor's question appears to inquire as to Ronald's knowledge of Purnell's *motive* for shooting, whereas Ronald's answer relates to *how Ronald knows* about the shooting. Having misunderstood the question, Ronald's response, consistent with Purnell's theory that Ronald is also innocent and only entered his plea to avoid a possible life sentence, implicitly disclaims personal knowledge of who shot Mrs. Giles.

[93] *Id.*

with a gun," to which Ronald responded "[n]o."[94]

In the proffer interview Ronald claimed that he and Purnell were alone in Compton Towers when they agreed to commit the robbery on the night of the murder, rather than the preceding morning, before his police encounter.[95] Unlike in his trial testimony, in the interview he went on to claim that they went immediately from there to the robbery. He claimed that they saw the Gileses get off the bus and waited at the Fifth and Willing intersection until they got there -- a fact which is inconsistent with Rayne's eyewitness account.

In the interview, Ronald recalled that the Gileses were carrying white bags. Ronald claimed Purnell demanded "money" from Mrs. Giles, rather than her "stuff" as he had testified at trial. He also asserted that Mr. Giles responded to that demand by telling Purnell to "get away," a fact not testified to at trial and inconsistent with Rayne's disinterested account. Ronald claimed that at that point Purnell "pulled out the gun" and that he, Ronald, fled, and "heard a shot like two days later, a day later, two days it was a day or two days later, I got the phone call that Mark had shot somebody."[96] Detective Tabor responded that "Now you couldn't have obviously gotten too far away because from what the witness says the shot went off almost immediately when he pulled the gun."[97]

Despite Ronald's prior response that he did not hear the shot, Detective Tabor then

---

[94] *Id*. at 3.

[95] *Id*. at 1, 3–4.

[96] *Id*. at 6–7.

[97] *Id*. at 7.

asked, "[n]ow which way did you, where did you run to *after you heard the shot*, where did you run to?"[98]

Under further questioning, in the interview Ronald revised his story again and claimed that "I seen him pull the gun out *then I heard the shot* but I didn't see him shoot nobody."[99]  In that version of events, again articulating facts absent from his trial testimony, Ronald asserted that Purnell pointed the gun at Mr. Giles first, not Mrs. Giles,[100] and that after the shot Purnell ran off in the opposite direction, westbound down Fifth Street towards Washington Street.[101]

At the end, the detective revisited what happened after Purnell "pulled the gun out," and he asked, "[a]nd that's *when you heard the shot* or you turned to run *and you heard the shot*?"[102]  He then asked:

> Q:  Okay alright how many steps do you think you think you got *before you heard the shot*?  Couldn't have been many?
>
> A:  Like five feet.
>
> Q:  Yeah.
>
> A:  Like five feet, five and a half feet.
>
> Q:  Okay and *you heard the shot* and you guys ran separate directions?

---

[98] *Id*. at 11 (emphasis added).  As with Hammond, Mitchell, and Dawan Harris previously, Detective Tabor once again prompted Ronald Harris that there was only a single gunshot involved in this case.

[99] *Id*. at 13 (emphasis added).

[100] *Id*.

[101] *Id*. at 11.

[102] *Id*. at 16.

A: We ran in separate directions.[103]

Trial Counsel failed to cross-examine Ronald Harris on this nearly-incoherent recitation of events concerning whether he actually had seen Purnell with a gun and whether he had actually heard a shot fired. These confused statements, which preceded his trial testimony by only ten days, and which Purnell's conflicted counsel failed to challenge via *any* cross-examination, were by the State's own admission a linchpin to its case. As the Prosecutor, speaking of the effect of Ronald Harris's plea, asserted during the April 7 motion *in limine* "the State's case, until today, was almost exclusively based on the fact that the defendant, Purnell, made admissions to multiple people claiming responsibility for the crime. Two of those admissions were in detail to [Mitchell and Corey Hammond]."[104]

### c.    Corey Hammond's Testimony

When Corey Hammond testified he conceded that he was testifying as a part of a plea agreement he had entered in July 2007.[105] That plea agreement covered not only the charge for which he had been arrested on January 4, 2007, but also another drug offense for which he was arrested on February 3, 2007, after his release on bail.[106] Under the terms of his plea agreement he received a three year Level V sentence entirely suspended upon completion of the Greentree program, followed by six months of Level IV work release, followed by probation. Under the agreement, the State dropped a charge for Trafficking

---

[103] *Id.*

[104] A30 (Motion *in Limine* Transcript).

[105] A153 (Testimony of Corey Hammond).

[106] A172.

Cocaine, which would have had a mandatory minimum sentence. The State further agreed to ask the judge to remove the Level IV portion of the sentence in exchange for his truthful testimony in Purnell's prosecution.

Corey Hammond testified that approximately an hour before the Giles murder he was hanging around outside Aunt Sherry's house[107] at Sixth and Washington Streets with a group of others, including Purnell and Ronald Harris. He said that Purnell announced to those assembled that he was "tired of being broke." Hammond went on to claim that Ronald Harris at that time asked Purnell what he wanted to do. Hammond also testified that at around the same time, Purnell showed off a semiautomatic Glock-style pistol (not a revolver)[108] to him, hidden in Purnell's waistband, and that after these events, "one of my cousins had came past or walked past, or a friend I knew from my block came walked past, and I just walked off with them."[109]

As he had claimed in his January 2007 interview, Hammond testified that he was at Fifth and Jefferson Streets when the robbery occurred. But unlike at that earlier interview, he claimed to have heard only *a single gunshot -- "**the shot**"* -- rather than multiple shots, *and specifically denied that Dawan was with him*. And he testified that the next time he

---

[107] The Harris brothers' Aunt Sherry's home was at Sixth & Washington street. A156.

[108] As Carl Rone, a Delaware State Police Forensic Firearms Examiner, explained in his testimony, in a revolver, cartridges are loaded into a rotating cylinder and after a round is fired the spent shell casing remains in the cylinder. A235 (Testimony of Carl Rone). By contrast, in a magazine-loaded semiautomatic pistol, after a round is fired the force of the round going off pushes the slide (top) of the pistol back, causing it to extract and eject the spent casing, re-cock the pistol, and load another round from the magazine. *Id*.

[109] A157 (Testimony of Corey Hammond).

saw Purnell and Ronald Harris, a couple of days to a week later, Purnell bragged about shooting Mrs. Giles.

The State also played Hammond's 2007 interview as a voluntary prior statement under 11 *Del. C.* § 3507. When the State elicited testimony from Hammond laying the foundation for that prior statement, Hammond acknowledged that in his first interview he denied any knowledge of the murder. But he claimed that he provided information in January 2007 because he had been charged with several drug felonies and Detective Tabor "told me he would get me home to my son."

On cross-examination, Hammond stated that at the time he heard the shot and went to the scene he had 80 bags of crack cocaine on him. He acknowledged that he was a drug dealer and that he sold crack cocaine the night of the murder.

Trial Counsel did not attempt to impeach Hammond with his January 4, 2007 statement that "[l]ittle Ron pulled the trigger," a statement that was inconsistent with the State's theory that Purnell was the shooter. Although Trial Counsel asked Hammond to confirm that Dawan Harris was not with him, contrary to his January statement, Trial Counsel did not explore this critical discrepancy further.[110]

---

[110] In connection with Purnell's present Rule 61 motion, he has submitted an affidavit from Corey Hammond's brother, Troy Hammond. (A666) Troy Hammond states that he was at Fifth and Jefferson Streets with friends at the time of the gunshot and that Corey Hammond was not with him. He said he stayed at the scene for several minutes and saw Mrs. Giles lying on the ground, but he never saw his brother there.

45

### d. *Kellee Mitchell's Testimony*

When he testified, Mitchell denied any recollection of the details of the interrogation where he implicated Purnell and denied any recollection of the events he discussed in that interview. Instead, the State relied on a recording of the interview, introduced as substantive evidence under 11 *Del. C.* § 3507. When the State laid the foundation[111] for playing that prior statement, Mitchell insisted that he spoke with police only because he had outstanding warrants.[112]

---

[111] *See Barnes v. State*, 858 A.2d 942, 944 (Del. 2004) ("The prosecutor must inquire about the voluntariness of the declarant's pretrial out-of-court statement during direct examination of the declarant, and the judge must make a ruling on voluntariness before submitting it to the jury for consideration."); *Hatcher v. State*, 337 A.2d 30, 32 (Del. 1975) ("The voluntary nature of the statement may be elicited from the declarant during the direct examination now required by [*Keys v. State*, 337 A.2d 18 (Del. 1975)].").

[112] There is no requirement in 11 *Del. C.* § 3507 that a witness statement be subject to audio or video recording. But a recording offers numerous practical advantages to the State and the tribunal over sole reliance on the interviewer's notes and memory. Moreover, the law allows introduction only of a "*voluntary* out-of-court prior statement." 11 *Del. C.* § 3507 (emphasis added). "The Trial Court must be satisfied that the offering party has shown by a preponderance of the evidence that the statement was voluntarily made." *Hatcher*, 337 A.2d at 32. We have likewise held that a voir dire is necessary on this question "if the declarant denies that the statement was voluntarily given *or* if an issue is raised in any other way as to its voluntary nature," suggesting that even a witness's testamentary denial of coercion is not dispositive. *Id.* (emphasis added). Here, the detectives conducting the murder investigation interview in a room set up for audiovisual recording, interviewing a person who had been identified as the shooter by an eyewitness, did not turn on the recording equipment until partway through the interview. Detective Tabor's explanation for this failure was that he only turned the equipment on when he "realized the information that [Mitchell] was providing was significant to the investigation." A111 (Testimony of Detective Tabor). The State's failure to record part of an interview, and its explanation for that failure, are matters the trial court may consider in evaluating whether the State has satisfied the burden of showing voluntariness.

46

Mitchell knew himself to be a suspect in the Giles murder. The day of his arrest, police had told his girlfriend, Etienne Williams, that he had been arrested for a murder.[113] And, on the evening he was arrested, Mitchell called her from the New Castle County Detention Center to tell her that the police investigators were trying to obtain his confession to the murder.[114]

### e. *Handwriting Evidence*

The State also presented graffiti recovered from a correctional institution where Purnell had been held that contained a threatening message against Mitchell over him being a 'snitch,' and proffered a forensic handwriting expert who opined that the writing was Purnell's.[115]

### f. *Dawnell Williams's Testimony of an Earlier Nearby Shooting*

After the State closed its case in chief, Trial Counsel adduced testimony from Dawnell Williams, a social worker who worked for the Salvation Army at Fifth and Orange Streets.[116] She testified that she heard another shooting earlier in the evening on January 30, 2006, hearing two shots coming from the direction as Fifth and Tatnall Streets. From the intersection of Fifth and Orange, the intersection of Fifth and Willing is two blocks

---

[113] A177 (Testimony of Etienne Williams). Aqueshia Williams also understood the February 18, 2006 arrests to be for the Giles murder. A195 (Testimony of Aqueshia Williams). Detective Tabor likewise confirmed that Mitchell was a murder suspect at the time of his February 2006 arrest. A229 (Testimony of Detective Tabor).

[114] A192 (Testimony of Etienne Williams).

[115] A143 (Testimony of Georgia Carter).

[116] A254 (Testimony of Dawnell Williams). Fifth and Orange is three blocks east/southeast of Fifth and Willing.

further in the same direction (West) as Fifth and Tatnall. She saw two males running towards Fifth and Orange to a small primer-colored car. Testifying more than two years after the incident, Williams did not recall the males' appearances.[117]

### g. *Detective Tabor's Testimony*

Detective Tabor testified several times over the course of the trial. Trial Counsel cross-examined him as to his investigation of the .38-caliber revolver and as to the Giles murder investigation. Detective Tabor agreed that Rayne's contemporaneous identification of the assailants in the Giles murder was of two black males, one of whom was approximately 5'9," and the other who was shorter than her own height of 5'5" and of lighter skin tone than the taller one. Detective Tabor agreed that, in his report after arresting Dawan Harris and Kellee Mitchell for the .38-caliber revolver, he described Dawan Harris as 5'8" and dark complexioned and Kellee Mitchell as 5'5" and having a light skin tone. While both had confessed to possessing the .38-caliber revolver found in the search, the State dropped the charge against Mitchell. As Detective Tabor explained, the State did so to keep information relating to the Giles murder investigation from becoming public.

Detective Tabor also testified as to the 9mm shell casing recovered in the vicinity. He testified that the shell casing was located on Willing Street about *forty* feet north of the intersection of Fifth and Willing Streets. Contrary to the State's opening statement telling the jury that the casing was "*a few feet*" from the body, Corporal Dempsey of the

---

[117] At the time, she had told police that she recalled them as black, with "Sunni" beards. A685 (Wilmington Department of Police Supplemental Report).

Wilmington Police Department's Evidence Detection Unit explained that after he found it, he measured that it was more than *sixty* feet from the curb by where Mrs. Giles was shot.[118] As the first responding officers had earlier noted, Mrs. Giles had fallen approximately five feet outside the intersection of Fifth and Willing.

Detective Tabor also noted that the police investigation discovered that Mrs. Giles had received and cashed a tax refund check for $1,748 on the day she was murdered. He also gave a narrative timeline of the investigation into Purnell after Corey Hammond implicated him.[119]

### h. Alibi and Injury Evidence

Latoya Moody testified as to the circumstances of Ronald Harris's arrest on February 18, 2006. She explained that, in addition to being the Harrises' cousins, she is Purnell's cousin on her father's side. Ronald Harris, Purnell, Ronald's sister Dawn Harris, and Moody's brother Robert Pritchard all visited her overnight from February 17 until February 18, 2006, to celebrate Moody's and Dawn's birthdays. Moody testified that Purnell was still on crutches at the time and that the only time she saw him moving around without crutches in the two- to three-week period after his hospital discharge was one

---

[118] A217.

[119] Detective Tabor erroneously mixed up the dates and order of the interviews implicating Purnell, describing the Mitchell interview as taking place on January 4, 2007, Purnell's arrest on January 23, and the Hammond interview on January 24, which he then corrected to January 4. A219. The dates on the interview transcripts show that the Hammond interview was on January 4 (A624), and Mitchell's interview was on January 22 (A499). Detective Tabor's recall of Purnell's arrest date is correct, as reflected by the criminal docket (A1). The January 24, 2007 interview was with Ronald Harris (A522), who at that time continued to deny any involvement in the murder.

occasion where he hopped on one leg toward the bathroom and almost fell. She asserted that on the night of February 17, 2006, he was still on crutches and had slept in her bed "because his leg was still messed up."[120] She asserted that, after Purnell's hospital discharge, he initially went to his mother's house but shortly thereafter went to stay at his grandmother's in an apartment two floors below Moody's in Compton Towers.[121] From then until February 18, 2006, Purnell came to her home frequently.

Doris Honie ("Honie"), Purnell's grandmother, and Honie's friend Marline Smith ("Smith") testified that they played cards together at Honie's Compton Towers apartment on January 30, 2006, where they planned a party for the January 31st birthdays of several of their mutual friends. Both Honie and Smith testified that Purnell was there that evening, in a black recliner, and that he needed his father's or uncle's assistance to get up and to go to the bathroom.

Honie testified further that Purnell had come to her apartment after his hospital discharge and stayed there for weeks thereafter, and that she regularly cleaned his leg and changed his bandages. She further claimed that he was unable to get around on the crutches for close to two weeks. Until then, Honie claimed, Purnell was housebound in her apartment.[122] She further claimed that after he began using the crutches, approximately February 6, 2006, he still did not leave her apartment for several days and was only capable of hobbling. By February 21, 2006, when he had a police interview, she claimed he was

---

[120] A262 (Testimony of Latoya Moody).

[121] A266.

[122] *Id.*

50

still using one crutch.

On cross-examination, Honie denied having written any letters to Purnell while he was incarcerated, other than on his birthday. But the State confronted her with letters she wrote to him during his incarceration.[123] In one of those letters, Honie consoled Purnell about how difficult it can be to be falsely accused. The letter went on to state that Honie knew Purnell was being falsely accused because "I know I worked on your leg for a week and you didn't even use the crutches for a week," and that he had "scooted around on the floor for a week," and because Purnell was still in her apartment the evening following the murder when the local news reported on Mrs. Giles's being shot. The State also elicited Honie's admission that she had previously lied to police in another matter, giving a false name for one of her sons when police found him in her apartment.

Additionally, Trial Counsel adduced testimony from George White ("White"), a youth rehabilitation counselor at the New Castle County Detention Center, a juvenile holding facility. White confirmed that Purnell was detained at that facility from February 1, 2006, until the afternoon of February 3, 2006, due to an outstanding capias. While White recalled Purnell using crutches to get around during his detention he did not recall whether Purnell had arrived with them or if the detention center had issued them pursuant to a medical procedure.

---

[123] A297 (Testimony of Doris Honie). The State had not disclosed to Purnell that it possessed those letters, which it represented to the trial court had been found during a search of another inmate's cell on or about April 9, 2008, prior to confronting Honie. A303. Trial Counsel alerted the State and trial judge that he believed Purnell may have a valid basis to suppress the letters or to seek a mistrial due to the State's surprise use. A304.

*i. The State's Rebuttal Evidence*

In rebuttal, the State called Dr. Rubano, who testified about Purnell's surgery and his noncompliance with follow-up care. As Dr. Rubano noted, the vascular surgeon Dr. Harad had been the lead surgeon for the original attempt to remove the bullet from the rear of Purnell's knee. Dr. Rubano's knowledge of Purnell's recovery was further complicated by the atypical nature of the surgery -- "Going in from the back is not a normal surgery for orthopedic surgery. It is much more common for [a] vascular surgeon."[124] Dr. Rubano had performed such a surgery on only one or two other occasions in his career, despite performing thousands of knee surgeries. As a result, Dr. Rubano could not give an opinion, within a reasonable degree of medical certainty, whether Purnell would have been able to walk or run by January 30, 2006.

In addition to Dr. Rubano's testimony, the State called Detective Curley as a rebuttal witness. Detective Curley spoke of his February 21, 2006 interview with Purnell with an emphasis on Purnell's then-current physical mobility and his description of having fled from Officer Kramer the previous night. Excerpts from the video interview were played for the jury.

*j. The State's Closing Argument*

The State based its closing argument on how the accounts of Corey Hammond, Ronald Harris, and Mitchell resolved into a single coherent, mutually supporting narrative. The State heavily emphasized how, speaking of those three, "They're all telling you the

---

[124] A336 (Testimony of Dr. James Rubano).

same details, the same things" as to the Gileses both getting off the bus at Fifth and Willing, and having white plastic shopping bags.[125]

The State stressed the fact that the witnesses each had testified that there was only *a single gunshot*:

> THE STATE: Now, Corey Hammond also told you I wasn't there; I was in the vicinity, that's how we got there soon after the shooting. And he says I heard one, *one gunshot* on the night of January 30[th], *one gunshot*. *Corey Hammond tells you one, not two, not three, not ten, one gun shot*. Ronald Harris when he testified to you, when he told you the story of the robbery that he was involved in, *one shot*. He told you he turned away and he ran when he saw the gun that *he told you one shot*. That's what he heard. Also Angela [Rayne] tells you that. She saw sitting on the steps, close vicinity, she heard one gunshot.[126]

To rebut Honie's and Smith's testimony, the State pointed out inaccuracies in their testimony, such as Honie's denial that she wrote Purnell letters, or her claim that he never left her apartment for weeks after his hospital discharge despite his spending time in the New Castle County Detention Center. And the State pointed out inconsistencies between Honie's account and Latoya Moody's. The State also sought to explain Mitchell's claimed lack of memory on the stand as being in fear of reprisal for "snitching," and pointed to the threatening graffiti attributed to Purnell.

### k. Purnell's Closing Argument.

Trial Counsel opened his argument by pointing out that the graffiti complained both that Mitchell was snitching and that he was lying, and that the State had submitted no

---

[125] A349 (The State's Closing Argument).

[126] *Id.*

evidence to support the idea that Mitchell was aware the graffiti existed. He emphasized that Rayne failed to identify Purnell from a lineup and instead identified other photos. Instead, Trial Counsel argued that Mitchell committed the Giles murder and that Mitchell attempted to make Purnell a scapegoat to escape liability. He pointed out that the murder occurred around 8:45 p.m. and that Etienne Williams, Mitchell's then-girlfriend, testified that Mitchell had left the apartment the evening of the murder and returned later that evening around 9, 10 or 11 p.m. Trial Counsel urged the jury to disregard Purnell's inculpatory phone calls as the jokes and posturing of a sixteen-year-old. And although Trial Counsel was barred by the trial court's ruling *in limine* from mentioning Mr. Giles's identification of Kellee Mitchell,[127] Trial Counsel emphasized that Mitchell matched Rayne's physical description.

Trial Counsel argued that Mitchell had a motivation to lie because he was the culprit. Trial Counsel only weakly suggested that the .38-caliber gun was the murder weapon. But he stated that he could not speak about that .38-caliber revolver because it was not in evidence. He did refer to testimony about it, including that it was recovered from the ceiling outside the apartment where Mitchell was staying.

Trial Counsel further pointed out that Corey Hammond and Ronald Harris contradicted each other on when and where the agreement to commit the robbery took place, and that Hammond, like Mitchell, had a motivation to lie. Trial Counsel also sought

---

[127] Notably, when the State cross-examined Honie, questioning her on why she had not sought out police to "tell them you knew they had the wrong guy," Honie answered, "Mr. Giles already told them that they had the wrong guy." A308 (Doris Honie Cross-Examination).

54

to refute the State's emphasis on the consistency between the witnesses' stories by pointing out that Hammond's own testimony showed he gained some of his knowledge about the crime from news reports.

Trial Counsel attacked Ronald Harris's credibility, arguing that:

TRIAL COUNSEL: Well, when you're sitting in jail about to go to trial and you've been identified by a witness as being there when the murder happens and you get an offer to potentially three years as opposed to life, that's an offer you can't refuse. That is a good offer. And he even testified he was -- he has already served about 15 months, so he's out in 16 months if he gets three based upon his testimony. Go from life in prison to three years. I submit that is a lot of motivation to tell them a story they want to hear.[128]

In closing, Trial Counsel emphasized Purnell's injury, the care Honie had to give him to keep the wound clean, and the testimony that Purnell was in no physical condition to commit the crimes and then flee by running fast and at full speed.

### l. The State's Rebuttal

In its rebuttal, the State again emphasized the view that the jury should credit the State's witnesses rather than Purnell's witnesses as to alibi and impossibility because the State's witnesses "were consistent on all of the key points that establish the Defendant's guilt, Angela [Rayne], Corey Hammond, and Ronald Harris."[129]  As the State explained:

THE STATE: Let's put something on the table here. What [Defense Counsel] is saying essentially in his typically gracious way is this: 'Look, Corey Hammond, Kellee Mitchell, Ronald Harris, they're all lying; they're all trying to get a deal; this isn't true. Now, do these witnesses have an interest, some of them anyway, in coming in here and telling you who shot [Tameka] Giles? Well, sure, no doubt about that. But why are they all telling the same lie and why are they all telling the same lie about him?

---

[128] A362 (The Defense's Closing Argument).

[129] A368 (The State's Rebuttal).

And the State connected those witnesses' testimony to the physical evidence from the spent 9mm shell casing, emphasizing that it corroborated their stories and disproved Purnell's contrary theory that Dawan or Mitchell killed Mrs. Giles with the .38-caliber revolver:

> THE STATE: We've talked some about that [.]38[-]caliber revolver that [Defense Counsel] suggests to you might be the murder weapon. And, once again, this is a case you need to decide on the evidence. You can't make it up when it's not there. And there's no scientific or ballistic evidence that the [.]38[-]caliber revolver found on the 9th floor in the hallway of Compton Towers was the weapon that killed [Tameka] Giles. There is a single 9-millimeter shell casing found on Willing Street *not far from where [Tameka] Giles began to die after she was shot*. Let's talk about the ballistic evidence that we do have for just a minute.
>
> First of all, we know that Corey Hammond said that the gun that he saw the defendant with a few hours before the crime was a semiautomatic. Do you remember Corey Hammond's testimony on that point? And we know further from [Delaware State Police Forensic Firearms Examiner] Carl Rone that that *9-millimeter shell casing found at the scene* was fired by a semiautomatic weapon because it was ejected from one. Remember, the shell casings stay in the revolvers, they eject from the semi-automatic. Does that prove anything? Not much. But it is a little bit more corroboration of Corey Hammond's testimony.[130]

### 2. The Verdict and Sentence

The trial court charged the jury the morning of April 24, 2008.[131] Though the jury had begun with four alternates,[132] by mid-trial they were down to two.[133] After the charge

---

[130] A369–70 (emphasis added).

[131] Jury Instructions, *State v. Mark Purnell*, No. 07022639R2, at 3–56 (Del. Super. Apr. 24, 2008).

[132] A52 (Trial Transcript).

[133] A186 (Trial Transcript).

to the jury, both were seated when two jurors were dismissed without objection: one because that juror had prior knee surgery and the other due to an incident that had occurred earlier in the trial.[134]

During their deliberations, the jury asked for audio, video, or transcripts of the Corey Hammond, Kellee Mitchell, and Ronald Harris interviews.[135] Trial Counsel opposed the request, which in his view would "unfairly highlight the [11 *Del. C.* §] 3507 statements," while it was "the State's application that we should see to the jury's wishes and give them what they ask for."[136] Reasoning that the statements had been difficult to understand, the trial judge ordered that the statements to be "played in the courtroom by a bailiff without any parties present, including the Court, that no conversation occur during the time that it is played, and that they may, . . . have it played as many times or for as long as they wish at the request of any of the jurors." [137] The trial judge also provided a cautioning instruction that "you should be sure not to give any undue weight to these particular witnesses or this particular testimony compared even with their own court room testimony or the other witnesses solely because you have been given an opportunity to hear

---

[134] Jury Instructions, at 48–52. In the earlier incident, a member of the audience had said, outside the courtroom and within the juror's hearing, "there goes a juror now, I hope he does the right thing, not guilty," from which the juror felt "a little harassed." A184 (Trial Transcript). Trial Counsel had moved for the juror's dismissal, which the trial court held in abeyance until the charge. A186. In Delaware criminal trials, the alternate jurors would have been dismissed after the charge had any remained. *See* Super. Ct. Crim. R. 24(c) ("An alternate juror who does not replace a regular juror shall be discharged after the jury retires to consider its verdict.").

[135] App. to Reply Br. at AR-1 [hereinafter "AR-_____"] (First Jury Note Transcript).

[136] *Id*.

[137] AR-4–5.

it more than once."[138]

At noon the following day, Friday, April 25, 2008, the trial court received another jury note. An alternate juror, who had been seated as Juror Six, expressed concern to the forelady that if a verdict was not reached that day his vacation might be adversely affected.[139] He intended to leave for his vacation the following day and had "let [the other jurors] know from the beginning" of his vacation plans, "[s]o they have very much had that in mind during the deliberations."[140] He reported to the court that "I think the deadline for them is that if they don't get a decision today, then it's pretty much a hung jury," and that he thought that most of the other jurors had drawn that conclusion.[141]

---

[138] AR-6. The trial judge relied on our rulings in *Jones v. State*, 940 A.2d 1, 13–14 (Del. 2007) and *Page v. State*, 934 A.2d 891, 901 (Del. 2007), in which we quoted a passage from *Flonnory v. State*, 893 A.2d 507, 525–27 (Del. 2006) opining on the circumstances when a trial judge may exercise the discretion to depart from the "default rule" against admitting a recording or transcript of a prior statement under 11 *Del C.* § 3507, including upon the jury's unprompted request. Several years after Purnell's trial, in *Alfred Lewis v. State*, we confronted the issue directly. 21 A.3d 8 (Del. 2011). In that case, we held that "in the absence of an agreement by both parties, statements should not be given to a jury for unlimited replaying during their deliberations in response to a request for a rehearing." *Id.* at 14. We also rejected audibility concerns as a justification for admission, and held that "[t]he jury certainly should not be permitted to 'work through' the recorded section 3507 statement during their deliberations until it is understandable." *Id.* We have subsequently upheld convictions where Section 3507 statements were admitted where the trial court carefully controlled the circumstances of replay and surrounding instructions to prevent the jury from giving undue weight to the replayed statement and where the trial court observed the requirement in *Alfred Lewis* sanctioning only a single replay. *Morse v. State*, 120 A.3d 1, 14 (Del. 2015).

[139] AR-8 (Second Jury Note Transcript).

[140] AR-9. At jury selection Juror Six had told the Court he would be in Williamsburg starting Monday, April 28, but had not disclosed that he intended to leave two days prior, *i.e.,* the preceding weekend. A54 (Trial Transcript). At that time, the trial judge had assured the juror that "[i]f it turns out that your vacation plans begin before this trial ends, then we will excuse you." *Id.*

[141] AR-9 (Second Jury Note Transcript). In summarizing Juror Six's comments, the court said that "they have decided, as a group, if they do not reach a verdict by the close of business today they will declare themselves hung." AR-10. This decision by the jury to set themselves a deadline was

Trial Counsel moved for that juror to be excused and for a mistrial.[142]  The trial court did not grant the motion, but instead instructed the jury to deliberate without regard to any deadlines, and that 'haste' should not factor into their decision.[143]  The trial court further explained that it was capable of remaining open in the evenings and over the weekend as well as other times to accommodate the schedule" of Juror Six if that became necessary.[144]  In a follow-up *voir dire*, Juror Six told the trial court he would return on Saturday, May 3,[145] but at that point Juror Three would be unavailable.

At some point after lunch on April 25, 2008, the jury returned a verdict, finding Purnell guilty of Murder Second Degree, Attempted Robbery First Degree, Conspiracy Second Degree, PDWBPP, and two counts of PDWDCF.[146]  On October 17, 2008, the trial court sentenced him to 77 years at Level V, of which 21 were mandatory, suspended after 45 years at decreasing levels of supervision.[147]

---

based "primarily" on Juror Six's plans to leave on vacation.  *Id*.  A "basic" feature of jury trials is that "there is no absolute necessity that the jury reach a verdict."  *Brown v. State*, 369 A.2d 682, 684 (Del. 1976).  Where the jury fails to reach unanimity on a charge, the court declares a mistrial on that charge.  *See, e.g., Desmond v. State*, 654 A.2d 821, 824–25 (Del. 1994).

[142] AR-11 (Second Jury Note Transcript).  "[W]hen a juror must be excused after deliberations have commenced, in the absence of the parties' consent to accept the unanimous verdict of eleven jurors, the declaration of a mistrial has been the norm in Delaware for more than two hundred years, pursuant to the common law and the Delaware Constitution."  *Claudio v. State*, 585 A.2d 1278, 1305 (Del. 1991).

[143] AR-11–12.

[144] *Id*.

[145] AR-19–20.

[146] The trial record does not include a transcript of the jury verdict.

[147] A388–96 (Sentencing Hearing Transcript).

*3.     Post-Conviction Proceedings Beginning with Purnell's Direct Appeal*

Trial Counsel continued the representation by timely appealing Purnell's conviction and sentence to this Court. The direct appeal alleged two errors. First, he argued that Mr. Giles's identification of Mitchell and nonidentification of Purnell should have been admitted under D.R.E. 807, the residual hearsay exception. Second, he argued the trial court wrongfully denied the April 25 mistrial motion.

Trial Counsel's direct appeal brief referred to Mitchell's February 2006 arrest for PDWBPP over the .38-caliber revolver as being "an unrelated firearms offense," but on the next page argued that Mr. Giles's statement that Mitchell was the shooter was reliable and was viewed by the State as reliable since it had been incorporated into a sworn affidavit of probable cause for the Mitchell search warrant.

Finding that the Superior Court had acted within its discretion on both issues, the Court affirmed the conviction and sentence on August 25, 2009.[148]

*4.     Purnell's Pro Se Rule 61 Motion*

Following the denial of his direct appeal, Purnell drafted and filed a *pro se* motion under Superior Court Criminal Rule 61 ("Rule 61") and timely submitted it on March 25, 2010. Over the course of 133 handwritten pages, he presented nine grounds for relief.[149]

His first ground was that his counsel's conflict, and the failure of either his own counsel, the State, or the Superior Court to intervene to disqualify Trial Counsel and obtain

---

[148] *Purnell v. State*, 979 A.2d 1102, 1104 (Del. 2009).

[149] A893–1026.

unconflicted counsel, violated his due process rights under the United States and Delaware Constitutions. He observed that Trial Counsel did not seek to call Dawan Harris as a witness and alleged that failure was due to Trial Counsel's prior representation of Dawan Harris. In an affidavit, Purnell stated that he objected to Trial Counsel's representation of him once he learned that he represented a State's witness. He further averred that Trial Counsel never disclosed to him who the witness was.

Purnell's eight other grounds were that his counsel was ineffective for failing to seek introduction of the excluded Mr. Giles identification statements as cross-examination confrontation material against Detective Tabor; that his counsel was ineffective for not raising on direct appeal a remark made at trial by Rayne which could be construed as an improper in-court identification; that his counsel was ineffective for permitting introduction of unauthenticated drawings accompanying the graffiti message; that his counsel was ineffective for failing to seek and obtain a new jury after Ronald Harris changed his plea; that the State committed discovery violations under both Superior Court Criminal Rule 16 and *Brady* through the State's failure to produce ballistics information, caulk, photographs, letters, and a map despite pertinent discovery requests, and that his counsel was deficient for failing to raise this issue; that his counsel was ineffective for failing to cross-examine Detective Tabor as to the cause of Mr. Giles's death; that his counsel was ineffective for failing to object to and obtain exclusion of Purnell's prior bad acts; and lastly, that Trial Counsel was deficient for failing to request and obtain proper jury instructions relating to Harris's testimony by reference to *Bland v. State* and its

61

progeny.[150]

### 5. Purnell's Amended Rule 61 Motion

After filing his *pro se* Rule 61 motion, Purnell obtained counsel. On October 11, 2011, counsel filed an amended Rule 61 motion. The amended motion was much narrower, asserting only three claims for relief, each of which was based on an allegation that Trial Counsel was ineffective. Inexplicably, it omitted the conflict issue concerning Trial Counsel's successive representation of Dawan Harris and then Purnell.

The first of these three claims was related to Purnell's ninth *pro se* claim, arguing that Trial Counsel was deficient for failing to request a *Bland* instruction.[151] The second was related to Purnell's fifth and ninth *pro se* claims, arguing that Trial Counsel was deficient for failing to seek a curative jury instruction protecting Purnell from the inference that, because his codefendant had entered a guilty plea after jury selection, he himself was also guilty.[152] The third claim in the amended petition was new, alleging that the prosecutor at trial improperly vouched for Ronald Harris's credibility by repeatedly advising the jury that he was "telling the truth" to police after entering his guilty plea.[153]

---

[150] *See Bland v. State*, 263 A.2d 286, 289–90 (Del. 1970) (providing a jury instruction that "the testimony of an alleged accomplice should be examined by you with suspicion and great caution").

[151] A1030–31 (Amended First Rule 61 Motion).

[152] A1031–32.

[153] A1032.

6.     *Courts Deny Relief Under the Amended Rule 61 Motion*

Considering Purnell's counseled Rule 61 motion, on May 31, 2013, the Superior Court found that none of the three grounds Purnell alleged asserted conduct that was inadequate performance by Trial Counsel within the meaning of the *Strickland* standard.[154] This Court disagreed in part, finding that Trial Counsel's failure to request a *Bland* instruction was deficient.[155] But we determined that Purnell failed to show a reasonable probability that the lack of a *Bland* instruction affected the jury's verdict and so found that that ground failed the *Strickland* test. We based this determination on testimony from four other individuals, none of whom were accomplices -- Hammond, Mitchell, Etienne Williams and Aqueshia Williams -- claiming that Purnell made statements identifying himself as the shooter.[156]

We agreed with the Superior Court that the other two grounds Purnell asserted in his counseled motion were not meritorious. Thus, we affirmed the Superior Court's denial of relief on November 21, 2014.

7.     *Purnell's Second Rule 61 Motion*

Following our opinion affirming the Superior Court's denial of relief, Purnell filed a federal *habeas* claim on December 29, 2014 in the United States District Court for the

---

[154] *State v. Purnell*, 2013 WL 4017401, at *9–11 (Del. Super. May 31, 2013); *see also Strickland v. Washington*, 466 U.S. 668, 687 (1984) ("First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.").

[155] *Purnell v. State*, 106 A.3d 337, 347 (Del. 2014).

[156] *Id*. at 348–49.

District of Delaware. That matter was stayed on August 9, 2017 for Purnell to litigate his claim of actual innocence before this Court. He filed his present Rule 61 motion on May 14, 2018. The current motion alleges ten grounds for relief.

First, Purnell argued that he is actually innocent, provable by recantation evidence relating to Mitchell, Ronald Harris, and Corey Hammond, evidence implicating Mitchell and Dawan Harris, new ballistic evidence, and new medical evidence.

Second, Purnell argued that Trial Counsel was conflicted due to his prior representation of Dawan Harris, prejudicing Purnell's case and denying him effective assistance of counsel.[157]

Purnell's third, fourth, and fifth ground for relief allege Trial Counsel was ineffective for failing to develop and present evidence at trial. The third ground relates to evidence implicating Dawan Harris; the fourth, to evidence that Mitchell's, Corey Hammond's, and Ronald Harris's statements were unreliably coerced; and the fifth, to evidence that Purnell at the time lacked the physical mobility to commit the crime.

Sixth, Purnell argues that Trial Counsel was ineffective for not objecting to certain of the prosecutors' trial questions and arguments.

In his seventh ground, Purnell argues that various instances of alleged prosecutorial misconduct occurring in these previous errors, separately or together, rendered his trial fundamentally unfair.

---

[157] Purnell based his ineffective assistance of counsel claim on both the United States and Delaware Constitutions. A437 (citing to "Del. Const. Art 1, Sect. 7 and the 6th and 14th Amendments to the United States Constitution.").

Purnell's eighth ground asserted that the exclusion of Mr. Giles's identification of Mitchell as the shooter was improper. His ninth ground is that Trial Counsel was ineffective on appeal for failing to raise the foregoing issues. Purnell's tenth and final claim alleges that the cumulative effect of the preceding errors collectively requires relief.

As a procedural matter, Purnell argues that his motion should be considered under the pre-2014 version of Rule 61 because the claims date from when previous postconviction counsel's ineffectiveness occurred by way of his failure to raise them. In effect, Purnell argues that the claims relate back to his initial motion for postconviction relief.

### 8.     The Superior Court's Ruling on Purnell's Second Rule 61 Motion

The Superior Court rejected Purnell's relation-back argument, and thus determined that the motion was a successive motion subject to Rule 61's procedural bars.[158] On that basis, the Superior Court determined that his only cognizable claim was that new evidence raised a strong inference of his actual innocence.

The Superior Court described the actual-innocence-in-fact provisions in Rule 61 as consisting of two prongs -- newness and persuasiveness. For the "newness" prong, the Superior Court relied on *Hicks v. State*[159] and *Brown v. State*[160] as establishing three criteria for when evidence is "new," requiring a showing that "(1) it must be evidence that was

---

[158] *State v. Purnell*, 2020 WL 837148, at *12 (Del. Super. Feb. 19, 2020) [hereinafter "*Trial Court Op.*"].

[159] 913 A.2d 1189, 1194 (Del. 2006).

[160] 117 A.3d 568, 580 (Del. 2015).

discovered since trial, (2) could not have been discovered before trial with due diligence, and (3) is not merely cumulative or impeaching."[161]

For the persuasiveness prong, the Superior Court relied on the standard set forth in the federal case *Schlup v. Delo*,[162] which requires that if "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial" were such that "it is more likely than not that no reasonable juror would have convicted the movant of the crime,"[163] then relief is warranted.

Considering the new evidence Purnell proffered in his motion, the Superior Court divided it into six categories: "(1) Kellee Mitchell recants his testimony; (2) Ronald Harris recants his testimony; (3) Corey Hammond recants his testimony; (4) New medical evidence of Purnell's inability to commit the crime; (5) New ballistic evidence showing that the shell casing was unrelated to the crime; and (6) New evidence of Dawan Harris and Kellee Mitchell's guilt."[164]

Other than an affidavit from Mitchell, which the Superior Court thought differed only marginally from his trial testimony,[165] the Superior Court found that none of the

---

[161] *Trial Court Op.*, 2020 WL 837148, at *12.

[162] 513 U.S. 298 (1995).

[163] *Trial Court Op.*, 2020 WL 837148, at *13.

[164] *Id.*

[165] *Id.* at *14 ("While the Court understands the difference between Mitchell's trial testimony and his affidavit, the Court does not believe that this subtlety transforms the affidavit into new evidence that would have a significant impact if introduced at trial.").

recantation evidence was "new" within the meaning of Rule 61.[166] Likewise, the Court construed the medical evidence as "not new in kind, and therefore merely cumulative."[167] The Superior Court also rejected as a grounds for relief Purnell's ballistic evidence, which strongly suggested that the 9mm shell casing found near the robbery site was unrelated to Mrs. Giles's murder, and so tended to support Purnell's theory that a weapon that retained the casing, such as Dawan's .38-caliber revolver, was the murder weapon. In the Superior Court's view, the ballistic evidence was "not new because it was available at the time of trial and Purnell was not denied such evidence despite diligent efforts to obtain it."[168] Similarly, the Superior Court did not think it would have changed the jury's verdict, reasoning that it bore only a "tangential relationship to the State's case."[169] Finally, the Superior Court determined that the evidence Purnell produced inculpating Dawan and Mitchell -- a video of Dawan's police interrogation, and a transcript of the interrogation of another individual, Cameron Johnson -- was not new because, although it "may not have been focused on by Purnell's trial counsel," it was nevertheless "available at the time of trial."[170]

In sum, the Superior Court found that:

Virtually none of the evidence that Purnell presents in the Motion qualifies as new evidence in the Rule 61 context. Additionally, the operative effect of Purnell's proffered evidence is to belatedly attempt to create reasonable

---

[166] *Id*. at *13–15.

[167] *Id*. at *16.

[168] *Id*.

[169] *Id*.

[170] *Id*. at *17.

doubt as to Purnell's guilt for the charges of which he was convicted. However, Purnell's trial has long since been concluded, the jury as fact-finder found that the State met its burden of proving guilt beyond a reasonable doubt, and his conviction and sentence are no longer reviewable on the grounds of reasonable doubt. The Court finds that Purnell's submission of new evidence fails to create a strong inference of his actual innocence of the acts underlying the crimes for which he was charged. Further, the Court finds no valid reason to expand the record in this case to permit an evidentiary hearing.[171]

On that basis, the Superior Court denied Purnell's motion as to his actual innocence and summarily dismissed it.

### C. Contentions on Appeal

Although the present appeal to this Court is Purnell's third appeal, it is the first time the conflict issue is before us. Following oral argument before a panel of three justices on October 7, 2020, the Court set the matter for oral argument before the Court *en Banc*. We also directed the parties to file supplemental briefs addressing additional questions centered on Trial Counsel's conflict of interest and the "new evidence" standard in Rule 61 as amended in 2014.

### 1. Purnell's Contentions

Purnell initially challenged the Superior Court's denial of his second Rule 61 motion on two grounds, which he further elaborated upon in response to this Court's supplemental briefing request.

*First*, Purnell argues that the Superior Court erred in rejecting his factual innocence claim. He argues that the proper test for factual innocence is the one this Court set forth in

---

[171] *Id*.

68

*Downes v. State*.[172]  Purnell insists that his new evidence "also meets the more stringent test" from *Schlup* and its federal court progeny.

*Second*, Purnell argues that the Superior Court erred by summarily dismissing his other claims under Rule 61's procedural bars as they existed when he filed the motion, arguing that the notice requirements of the Due Process Clause of the United States Constitution mandate application of Rule 61's pre-2014 formulation.  Purnell's argument is that, because any procedural default occurred when he failed to raise the arguments in his first Rule 61 motion, the effect of that default should be determined by the procedural bars in force at the time.

Responding to our supplemental briefing questions, Purnell argues *third*, that the decision by postconviction counsel on Purnell's first Rule 61 motion to abandon the argument that Trial Counsel was conflicted "was so extraordinary that postconviction counsel no longer functioned as Purnell's agent."[173]  Accordingly, Purnell argues that, by analogy to federal precedent, the Court can and should consider all of his arguments as though they were raised in his initial Rule 61 motion, *i.e.*, not procedurally barred.

*Fourth,* Purnell argues in the supplemental briefing that Trial Counsel's conflict presented an insurmountable bar to Purnell investigating and developing his theory that Dawan and Mitchell committed the Giles robbery, making the evidence "new" because Purnell could not have discovered it through diligent efforts.  Purnell extensively

---

[172] Opening Br. at 7 (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001)).

[173] Supp. Br. at 7.

catalogues the timeline of the Giles investigation with an eye to inculpatory developments concerning Dawan, alongside key points in Trial Counsel's conflicted representation.

*Fifth* and lastly, Purnell points to federal case law suggesting that claims of factual innocence fall into an equitable exception to federal *habeas corpus* procedural bars and time limits, such that lack of diligence reflects on the persuasive character of the petition instead of presenting a categorical bar to consideration. He urges this Court to adopt the same reasoning as to our own procedural bars and then catalogues the new evidence according to its persuasive force.

### 2. *The State's Answer*

The State contends that the Superior Court properly applied the post-2014 version of Rule 61, as that court consistently has done. It agrees with the Superior Court that Purnell's claim of new evidence creating a strong inference of actual innocence, as an exception to the procedural bars, is the only cognizable substantive claim in his motion.

Addressing Purnell's claim of actual innocence, the State argues that the Superior Court was within its discretion to find that Purnell had failed to meet his burden. The State agrees that the three-part *Downes* standard is the correct measure of both the newness and the persuasiveness prongs of Rule 61(d)(2)(i).[174] But in the State's view, all of Purnell's evidence either would have been obtainable with diligent efforts at the time of trial, or is

---

[174] State's Ans. Br. at 22 (citing *Emmett Taylor v. State*, 180 A.3d 41, 2018 WL 655627, at *1 (Del. Jan. 31, 2018) (TABLE) (citing *Downes*, 771 A.2d at 291)). The State's sole reference to *Schlup* and its progeny is to say that "the actual-innocence exception applied by federal courts is consistent with Delaware's Rule 61(d)(2) actual-innocence test in requiring due diligence and excluding impeachment evidence." State's Ans. Br. at 25.

impeachment evidence.  As a result, Purnell's "proffered evidence is not 'new' and is merely impeaching or cumulative" and so fails to satisfy this burden.[175]

Responding to Purnell's arguments in the supplemental briefing, the State asserts that "*there is no evidence in the record that counsel's conflicted status adversely affected his performance by preventing him from investigating, developing, and presenting Purnell's supposed evidence that Dawan and Mitchell were the 'true culprits.*'"[176]  During oral arguments before this Court, the State continued to argue that Trial Counsel was not prevented from pursuing a defense implicating his former client in the Giles murder so long as Dawan Harris himself was not called as a witness.

### D.    Standard of Review

This Court reviews the Superior Court's denial of a motion for post-conviction relief for an abuse of discretion.[177]  We review "'legal or constitutional questions, including ineffective-assistance-of-counsel claims, *de novo*.'"[178]

---

[175] *Id.* at 21.

[176] *Id.* at 11.

[177] *Swan v. State*, 248 A.3d 839, 856 (Del. Mar. 1, 2021) (citing *Richardson v. State*, 3 A.3d 233, 237 (Del. 2010)).

[178] *Id.* (citing *Green v. State*, 238 A.3d 160, 173 (Del. 2020)); *see also Starling v. State*, 130 A.3d 316, 325 (Del. 2015) ("We review ineffective assistance of counsel claims and alleged *Brady* violations de novo."); *Ploof v. State*, 75 A.3d 811, 820 (Del. 2013) ("When deciding legal or constitutional questions, we apply a *de novo* standard of review.").

## II.       ANALYSIS

### A.       The Superior Court Did Not Err in Applying the Current Version of Rule 61, as Opposed to the 2005 Version

#### 1.       The 2014 Version of Rule 61 Applies to Purnell's Motion

As this Court recently observed in *Swan v. State*, the pre-2014 version of "Rule 61 allows a subsequent postconviction motion if the claims are based on the failure of the initial postconviction counsel to raise ineffective assistance of trial counsel claims."[179] The previous version of Rule 61 permitted that narrow category of successive motions because an ineffective assistance of trial counsel claim generally cannot be raised on direct appeal in this jurisdiction, making the first Rule 61 motion function as a direct appeal for that type of claim. A successive motion alleging that postconviction counsel was ineffective for failing to raise trial counsel's ineffectiveness thus operated as a 'first' postconviction motion.[180] Under that narrow exception, the successive motion had to be filed within one year of the date "when the defendant's appeal to this Court from the Superior Court's denial of his first motion for postconviction relief is concluded."[181]

---

[179] 248 A.3d at 858 (citing *Guy v. State*, 82 A.3d 710 (Del. 2013)). If no appeal was taken, the one-year time limitation begins to run "'within 30 days following the Superior Court's denial of the defendant's first motion for postconviction relief.'" *Id.*

[180] *Id.*; *see also Guy*, 82 A.3d at 715 ("This rule recognizes, as the United States Supreme Court recently noted, that in a jurisdiction like Delaware, where ineffective assistance of trial counsel may not be raised on direct appeal, the first postconviction 'proceeding is in many ways the equivalent of a prisoner's direct appeal as to the ineffective-assistance claim.'") (quoting *Martinez v. Ryan*, 566 U.S. 1, 11 (2012)).

[181] *Swan*, 248 A.3d at 858 (quoting *Guy*, 82 A.3d at 715). As we noted in *Coles v. State*, defendants whose first motions were filed after the June 2014 amendments to Rule 61 are not eligible for a *Guy*-type second postconviction motion. 169 A.3d 858, 2017 WL 3259697, at *2 (Del. July 31, 2017) (TABLE).

Purnell's first motion for postconviction relief was filed under the pre-2014 version of Rule 61. But this Court affirmed the Superior Court's denial of Purnell's first Rule 61 motion in November 2014, and Purnell filed the instant motion in May 2018, more than three years later. Purnell's 2018 filing does not fall within the narrow category of permitted successive motions alleging ineffective assistance of counsel on postconviction claims filed before the 2014 amendments to Rule 61. Purnell's counsel acknowledges that his present motion "is untimely and successive."[182]

Purnell's motion instead must be considered on its own as a successive Rule 61 motion filed in May 2018. As the trial court correctly noted, the June 4, 2014 Order amending Rule 61 provided that, "[t]his amendment shall be effective on June 4, 2014 and shall apply to postconviction motions filed on or after that date."[183] This Court repeatedly has held that a motion for postconviction relief is to be adjudicated in accordance with Rule 61 as it exists at the time the motion is filed.[184]

Purnell acknowledges that this Court has consistently applied the version of Rule 61 in effect on the date a motion was filed. Yet he argues that the pre-2014 version should

---

[182] A1631 (Superior Court Oral Argument Transcript).

[183] Order Amending Super. Ct. Crim. R. 61, at 8 (Del Super. June 4, 2014) (available at https://courts.delaware.gov/superior/pdf/criminal_rule_61_amend_2014.pdf).

[184] *See Bradley v. State*, 135 A.3d 748, 757 n.24 (Del. 2016) ("We apply the version of the Rule that existed at the time [the defendant] filed his Rule 61 motion."); *Brochu v. State*, 2016 WL 690650, at \*4 n. 24 (Del. Feb. 19, 2016) ("The Court notes that the Superior Court properly applied the version of Rule 61 in effect in 2013 when [the defendant] filed his postconviction motion."); *Starling v. State*, 130 A.3d 316, 332 n. 95 (Del. 2015) ("Although Rule 61(i)(5) was amended on June 4, 2014, we must apply the version that existed at the time [the defendant] filed his Rule 61 motion.").

apply to this motion so that he can take advantage of an exception to the procedural bar against successive motions which the June 2014 revisions eliminated.[185] Purnell asserts that this Court has never analyzed whether the promulgation of the new version of Rule 61 without a notice period satisfies federal due process requirements.[186] We need not address this argument because we have concluded that Purnell has satisfied the requirements set forth in the 2014 version of Rule 61.[187]

---

[185] Prior to the 2014 amendments, Rule 61 provided an exception to the application of the procedural bars involving colorable claims of a miscarriage of justice. As we said in *Swan*, "Rule 61(i)(5) provides an exception to the bars of Rule 61(i)(1), (2), and (3) for a colorable claim that there was a miscarriage of justice because of a constitutional violation that undermined the fundamental legality, reliability, integrity, or fairness of the proceedings that lead to the conviction." *Swan*, 248 A.3d at 857. Under the old rule, we have no doubt Purnell would obtain relief on this successive motion, without the need to provide compelling new evidence of his actual innocence.

[186] The State argued that this Court answered that question in *Turnage v. State*, where we held that "the amended Rule 61 provides more due process and access to the courts than is constitutionally required. 127 A.3d 396, 2015 WL 6746644, at *1 (Del. Nov. 4, 2015) (TABLE). Purnell seeks to distinguish *Turnage* on the grounds that the movant in *Turnage*, unlike Purnell, had fair notice of the 2014 amendment for seven months before she filed her *initial* post-conviction motion, and thus Turnage, unlike Purnell, had notice on filing that initial motion that Delaware courts would adhere to the new procedural bars and more limited exceptions.

[187] The 2014 version contains no "miscarriage of justice" safety valve. Compare *Martinez*, 566 U.S. at 17 ("Where, under state law, claims of ineffective assistance of trial counsel must be raised in an initial-review collateral proceeding, a procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective."). Thus, although our rule entitles a defendant to counsel for an initial Rule 61 proceeding, there is presently no avenue of redress under the text of the 2014 version of Rule 61 for significant claims of ineffectiveness of that initial Rule 61 counsel. *See, e.g., State v. Galaviz*, 291 P.3d 62, 68 (Kan. 2012) ("[I]n other postconviction situations, this court has recognized that even though a defendant did not have a Sixth Amendment right to counsel, when there is a statutory right to the appointment of counsel, the appointed attorney *'must be effective and competent. Otherwise, the appointment is a useless formality.'"*) (citations omitted) (emphasis in original). Absent such an exception, Delaware prisoners are still entitled to raise such claims in federal court. Because we hold that Purnell's claims satisfy the requirements of the 2014 version of Rule 61, the absence of an avenue for redress for ineffectiveness of initial Rule 61 counsel is not before us. However, that lack of redress may merit further attention by this Court's Rules Committee.

## 2. *The Applicable Persuasive Burden*

As an untimely, successive Rule 61 motion, Purnell's petition must contend with the Rule's procedural bars before the substance of his claim for relief can be considered.[188] Under Rule 61 as amended, there is only one exception implicated in this case, namely the "actual innocence" exception. Under that exception, to survive summary dismissal a movant must have been convicted at trial rather than on a plea and must "plead[] with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."[189] And a movant can only prevail on the merits if the motion "satisfies" those pleading requirements.[190] Innocence of the "acts underlying the charges" requires "more than innocence of intent; it requires new evidence that a person other than the petitioner committed the crime."[191]

Purnell's claim of actual innocence is based on a theory that his Trial Counsel was unable to pursue, namely that two other people -- likely Dawan Harris and Kellee Mitchell -- killed Tameka Giles, not him. Thus, as the Superior Court correctly determined, Purnell must establish that his evidence is (1) *new* and (2) sufficiently *persuasive.*

---

[188] *Younger v. State*, 580 A.2d 552, 554 (Del. 1990).

[189] Super. Ct. Crim. R. 61(d)(2)(i).

[190] Super. Ct. Crim. R. 61(i)(5).

[191] *State v. Milton Taylor*, 2018 WL 3199537, at *7 (Del. Super. June 28, 2018), *aff'd*, 206 A.3d 825 (Del. 2019) (TABLE).

Federal courts employ an analogous doctrine for "actual innocence" in analyzing *habeas corpus* claims. In those cases, *Schlup* and its progeny, "actual innocence" constitutes an equitable exception to procedural barriers to a *habeas* petition set forth in federal statute that are analogues to Rule 61's procedural bars.[192] *Schlup* was concerned with cases where "a constitutional violation has probably resulted in the conviction of one who is actually innocent."[193] Envisioning a test in which a petitioner is "required to make a stronger showing than that needed to establish prejudice," the *Schlup* Court established the formulation, "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence"[194] for those federal *habeas* cases. These *habeas* petitions are "gateway innocence claims" because satisfying *Schlup* permits a federal court to review the petition's grounds for relief despite an unexcused procedural default, even though the Supreme Court has "strongly suggested" that proof of actual innocence is not itself a ground for relief.[195] As the *Schlup* Court explained:

> [I]f a petitioner such as Schlup presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.[196]

---

[192] *McQuiggen v. Perkins*, 569 U.S. 383, 394–95 (2013).

[193] 513 U.S. at 327 (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)).

[194] *Id*.

[195] *Buckner v. Polk*, 453 F.3d 195, 199 (4th Cir. 2006) (citing *Herrera v. Collins*. 506 U.S. 390, 400 (1993); *see also House v. Bell*, 547 U.S. 518, 555 ("We decline to resolve this issue. We conclude here, much as in *Herrera*, that whatever burden a hypothetical freestanding innocence claim would require, this petitioner has not satisfied it.").

[196] *Schlup*, 513 U.S. at 316 (alterations added).

After the 2014 amendments to Rule 61, the Superior Court in *Sykes v. State* noted a dearth of Delaware authorities on what constitutes "new" evidence for purposes of our postconviction remedy, and so it relied on federal cases analyzing *Schlup*'s actual innocence test for the "newness" prong.[197] In subsequent cases, the Superior Court has relied on *Schlup*'s formulation for the "persuasiveness" prong as well,[198] or for *both* prongs of the actual innocence inquiry.[199]

In the present case, as noted earlier, the Superior Court relied on *Hicks* and *Brown* to determine when evidence is "new," and on the *Schlup* line of federal cases for the persuasiveness prong.[200] Neither Purnell nor the State adopt this analysis. Instead, both parties argue for a three-part test to govern both the newness and persuasiveness prongs of

---

[197] 2017 WL 6205776, at *5 (Del. Super. Dec. 7, 2017) ("Nonetheless, the federal standard is helpful under these circumstances, as the Court has found little guidance for interpreting the precise meaning of new evidence in relation to a claim of actual innocence pursuant to Rule 61(d)(2)(ii)."), *aff'd* 195 A.3d 780 (Del. 2018) (TABLE).

[198] *State v. Abbatiello*, 2020 WL 1847477, at *3 (Del. Super. Apr. 8, 2020), *aff'd*, 244 A.3d 682 (Del. 2020) (TABLE); *State v. Windsor*, 2018 WL 3492764, at *2 (Del. Super. Jul. 19, 2018), *aff'd*, 202 A.3d 1126 (Del. 2019) (TABLE), *cert. denied*, 140 S. Ct. 201 (2019).

[199] *State v. White*, 2018 WL 6131897, at *4 (Del. Super. Nov. 21, 2018), *aff'd*, 208 A.3d 731 (Del. 2019) (TABLE); *State v. Flowers*, 2018 WL 1169644, at *1 (Del. Super. Mar. 6, 2018), *aff'd*, 191 A.3d 291 (Del.) (TABLE). The Superior Court has rejected application of the actual innocence exception on every successive or untimely Rule 61 motion, and we have affirmed every such motion appealed. Although this Court has never included the *Schlup* language in such an opinion, on at least two occasions we affirmed a Superior Court denial on the basis of its opinion where that opinion invoked the *Schlup* formulation. *White v. State*, 208 A.3d 731, 2019 WL 1529654, at *1 (Del. Apr. 8, 2019) (TABLE); *Phlipot v. State*, 169 A.3d 351, 2017 WL 3014434, at *1 (Del. July 14, 2017) (TABLE). But in each case where the Superior Court has used the *Schlup* language, the evidence was either plainly available at the time of trial, or was of little or no persuasive force. So, although we have ratified Superior Court decisions invoking the key language from *Schlup* and its federal progeny, none of those cases was founded on the specific persuasive burden applicable under the post-2014 Rule 61.

[200] *Trial Court Op.*, 2020 WL 837148, at *12–13.

77

the actual innocence exception, requiring a showing: (1) that the evidence is such as will probably change the result if a new trial is granted; (2) that it has been discovered since the trial and could not have been discovered before by the exercise of due diligence; and (3) that it is not merely cumulative or impeaching.[201]

This three-part test is the standard for a new trial based on newly discovered evidence under Superior Court Criminal Rule 33, a standard we established in *Lloyd v. State*.[202] Both *Hicks* and *Brown* derive from *Lloyd*. Purnell's cited case, *Downes*, held that the *Lloyd* standard for obtaining a new trial on the basis of new evidence showing actual innocence was an available form of postconviction relief under Rule 61.[203] The State's case likewise derives from *Downes*.[204]

The *Lloyd* line of cases provides a well-developed body of law in Delaware for analyzing actual innocence claims based on new evidence. Of the three elements of a *Lloyd* claim, the second relates to newness, while the first and third relate to persuasiveness. Although Purnell characterizes *Schlup*'s persuasive burden as a "more stringent test,"[205] we disagree. On both newness and persuasiveness, the *Lloyd* line of cases substantially aligns with *Schlup* and its progeny.

---

[201] Opening Br. at 7 (citing *Downes v. State*, 771 A.2d 289, 291 (Del. 2001)); State's Ans. Br. at 22 (citing *Emmett Taylor*, 2018 WL 655627, at *1).

[202] 534 A.2d 1262, 1267 (Del. 1987) (citing *State v. Lynch*, 128 A. 565, 568 (Del. Oyer & Term. 1925)).

[203] 771 A.2d at 292.

[204] The State cites the test as coming from *Emmett Taylor*, 2018 WL 655627, at *1, but *Emmett Taylor* cites and reproduces *Downes* verbatim. State's Ans. Br. at 22.

[205] Opening Br. at 15.

Regarding newness, *Lloyd* holds that evidence is new where it was "discovered since trial, and the circumstances must be such as to indicate that it could not have been discovered before trial with due diligence."[206] Such evidence is "new" in federal courts applying *Schlup* as well.[207]

On the persuasiveness prong, we believe that *Lloyd* and *Schlup* articulate the same burden despite using different language. As the *Schlup* Court explained, the persuasiveness of an innocence claim requires the Court to make "a probabilistic determination about what reasonable, properly instructed jurors would do."[208] It stressed that the *Schlup* inquiry is about what a *reasonable* trier of fact is *likely* to do, not merely what it was empowered to do.[209] As Justice O'Connor further explained, *Schlup* requires a petitioner to show that the

---

[206] *Lloyd*, 534 A.2d at 1267.

[207] *Carter v. Pierce*, 196 F. Supp. 3d 447, 454–55 (D. Del. 2016) ("In the Third Circuit, evidence is 'new' for the purposes of the *Schlup* standard only if it was not available at the time of trial and could not have been discovered earlier through the exercise of due diligence, except in situations where that evidence was not discovered due to the ineffective assistance of trial counsel.") (citing *Houck v. Stickman*, 625 F.3d 88, 93–94 (3d Cir. 2010)); *see also Reeves v. Fayette SCI*, 897 F.3d 154, 164 (3d Cir. 2018) ("when a petitioner asserts ineffective assistance of counsel based on counsel's failure to discover or present to the fact-finder the very exculpatory evidence that demonstrates his actual innocence, such evidence constitutes new evidence for purposes of the Schlup actual innocence gateway."), *cert. denied*, 139 S. Ct. 2713 (2019).

[208] 513 U.S. at 329.

[209] *Id*. at 330. As a result, the *Schlup* Court considered and rejected two even more stringent tests, *Sawyer* and *Jackson*. *Id*. at 326–27, 330. The *Sawyer* test, applicable when a capital defendant claims that the death penalty was imposed due to a constitutional error, requires a petitioner to "show *by clear and convincing evidence* that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992) (emphasis added). More stringent still, under the *Jackson* test, "the applicant is entitled to habeas corpus relief if it is found that upon the evidence adduced at the trial no rational trier of fact *could* have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (emphasis added).

lack of the new evidence caused more than mere prejudice, meaning more than simply "a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt."[210]

*Lloyd*'s burden of persuasiveness is that the new evidence "*would have probably changed the result if presented to the jury,*"[211] and in *Downes* and subsequently, we have used the phrase, "*will probably* change the result if a new trial is granted."[212] The *Lloyd* line of cases consistently requires a movant to show that the evidence will *probably* change the result -- meaning that the necessary showing is substantially more than the mere "reasonable probability" necessary to show prejudice. Thus, we think the *Schlup* and *Lloyd* standards are substantively the same.

The third element of the *Lloyd* test, specifying that actual innocence cannot be satisfied by evidence which is "merely cumulative or impeaching," is also similar to *Schlup*'s test.[213] Contrary to the State's contention, this element of *Lloyd* does not constitute an "exclusion" of impeachment evidence.[214] Rather, it embodies the principle that a body of new evidence that goes *only* to the weight or credibility of that which was presented to the jury is almost never adequate to meet the demanding bar for being granted

---

[210] *Schlup*, 513 U.S. at 332–33 (O'Connor, J., concurring).

[211] 534 A.2d at 1267 (emphasis added).

[212] 771 A.2d at 291 (emphasis added); *Gattis v. State*, 955 A.2d 1276, 1291 (Del. 2008).

[213] 534 A.2d at 1267.

[214] State's Supp. Ans. Br. at 24.

a new trial.[215]   Generally, to be more than "merely" impeaching or cumulative, new

evidence attacking the weight or credibility of a witness's trial evidence attacks the

credibility of the witness in the case at bar specifically, rather than impeaching the

witness's credibility in general.[216]   Where impeachment evidence is submitted along with

other material evidence, both can operate together to justify relief.[217]   Federal courts

---

[215] *See Mason v. State*, 2020 WL 7392348, at *1 n.2 (Del. Dec. 16, 2020) ("New evidence that is 'merely cumulative or impeaching' will not satisfy the 'actual innocence' standard.") (citing *Emmett Taylor*, 2018 WL 655627, at *1); *see also State v. Brathwaite*, 2017 WL 5054263, at *2 (Del. Super. Oct. 23, 2017) ("Affidavit B is 'merely ... impeaching' because it questions the credibility of one of Defendant's victims who testified against him.") (ellipsis in original), *aff'd*, 2018 WL 2437233 (Del. 2018).

[216] *E.g., State v. Young*, 1982 Del. Super. LEXIS 1062.  *Young* related to a robbery and murder where the defendant was convicted in the absence of physical evidence, based on a witness's testimony about inculpatory statements the defendant allegedly made before and just after the killing.  *Id*. at *7–9.  The defendant sought a new trial based on an affidavit from the witness's brother that the witness had confided ahead of the trial that he intended to swear falsely to obtain the reward money, but that in truth he knew nothing of the killing.  *Id*. at *12–13.  Because the Superior Court reasoned that the "heart and soul of the State's case here was bound to the veracity of the witness," and because the impeaching affidavit came from "a most believable individual with ample opportunity, coupled with a long-standing, trusting relationship with his brother," it held that the "newly discovered evidence is considerably more than 'merely' cumulative and impeaching" and granted a new trial.  *Id*. at *25–26.  We discussed that holding approvingly without adopting it in *Hicks*, 913 A.2d at 1195.  Likewise, even though recantation evidence goes merely to the weight and credibility of the witness's trial testimony, sufficiently persuasive recantation evidence can in rare cases be adequate to justify a new trial.  *See Blankenship v. State*, 447 A.2d 428, 433 (Del. 1982) ("A Motion for a New Trial based upon a witness' recantation is generally viewed with suspicion, and a denial of such a motion will not be reversed on appeal unless there has been an abuse of discretion by the Trial Court.").

[217] In *Fowler v. State*, a defendant in postconviction proceedings learned that the State had failed to provide prior recorded statements from four of its witnesses. 194 A.3d 16, 17 (Del. 2018).  The trial court found that this violation was harmless, "largely based on the testimony of the State's ballistics expert."  But between that ruling and the appeal to this Court, that expert was charged with "Theft by False Pretense over $1,500 and Falsifying Business Records to Make or Cause False Entry for 'providing false [Delaware State Police] activity sheets and receiving compensation from [Delaware State Police] for work that was not performed."  *Id*. (alterations in original).  Without faulting the Superior Court's harmless error analysis on the factual record available at that time, we found that the new impeachment information operated in concert with the discovery violation to justify a new trial.  *Id*. at 26–27.

applying *Schlup* consider the issue similarly. "Mere impeachment evidence is generally

not sufficient to satisfy the actual innocence gateway standard." [218]

Because the language in *Schlup* is confusing, [219] we prefer to rely on our test as set

forth in *Downes* and *Lloyd*. Nevertheless, we continue to find the reasoning of the federal

cases applying *Schlup* useful and persuasive guidance in examining Rule 61 actual

innocence claims.

Satisfying the actual innocence test is, by design, a heavy burden, and such

meritorious claims are exceedingly rare. Under both *Lloyd* and *Schlup*, a defendant must

present additional evidence that was not available at trial and would not have been despite

---

[218] *Reeves*, 897 F.3d at 161 (alterations omitted) (quoting *Munchinski v. Wilson*, 694 F.3d 308, 338 (3d Cir. 2012)).

[219] At the time, Chief Justice Rehnquist objected to the confusing verbiage of the *Schlup* standard:

> The Court informs us that a showing of "actual innocence" requires a habeas petitioner to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." Ante, at 867. But this is a classic mixing of apples and oranges. "More likely than not" is a quintessential charge to a finder of fact, while "no reasonable juror would have convicted him in the light of the new evidence" is an equally quintessential conclusion of law similar to the standard that courts constantly employ in deciding motions for judgment of acquittal in criminal cases. The hybrid which the Court serves up is bound to be a source of confusion.

*Schlup*, 513 U.S. at 339 (Rehnquist, C.J., dissenting). We find his concerns well taken, as some courts, for example, have replaced "juror" with "jury" or "would" with "could." *See, e.g.*, *Goldblum v. Klem*, 510 F.3d 204, 231 (3d Cir. 2007) (quoting *Schlup* but using "could" instead of "would"); *Sweger v. Chesney*, 294 F.3d 506, 524 (3d Cir. 2002) (same); *United States ex rel. Haqq v. Carter*, 176 F. Supp. 2d 820, 829 (N.D. Ill. 2001) (replacing "juror" with "jury"). Other courts have ommitted the "more likely than not" criterion despite the *Schlup* Court's emphasis on its importance. *Hicks v. Hepp*, 871 F.3d 513, 531 (7th Cir. 2017); *Perruquet v. Briley*, 390 F.3d 505, 515 (7th Cir. 2004) ("he must convince the court that no reasonable juror would have found him guilty"); *Perry v. Norris*, 107 F.3d 665, 666 (8th Cir. 1997) (asserting a petitioner must "prove that no reasonable juror would have found him guilty.").

the defendant's exercise of due diligence, thus making it "new."[220]  That new evidence must speak with such persuasive force as to convince the reviewing court that, when considered in the context of all the relevant evidence by a properly instructed jury, it is such as will probably change the result if a new trial were granted.

Although findings of actual innocence are reserved for the "rare" or "extraordinary" case,[221] as we explain next, we believe this is such a case.

### B.      The Superior Court Erred in Applying Rule 61

We begin with the "newness" prong of the actual innocence test.  As discussed in the previous section, the substance of Purnell's claim for relief is procedurally barred unless he can show that his new evidence (1) is such as will probably change the result if a new trial is granted; (2) has been discovered since the trial and could not have been discovered before by the exercise of due diligence; and (3) is not merely cumulative or impeaching.[222]  In terms of the Superior Court's analysis, the second element of this test is the newness prong.

We disagree with the Superior Court's conclusion that virtually none of the evidence Purnell presents in his motion qualifies as "new" evidence.  As the Superior Court correctly observed, almost all of the evidence Purnell submits could have been obtained by a rigorous

---

[220] *See Schlup*, 513 U.S. at 324 ("To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.  Because such evidence is obviously unavailable in the vast majority of cases, claims of actual innocence are rarely successful.").

[221] *Schlup*, 513 at 321.

[222] *Downes*, 771 A.2d at 291.

investigation prior to trial by unconflicted counsel.[223] But the relevant inquiry is whether *Purnell* could have obtained and presented the evidence of his innocence at trial with the exercise of due diligence. The trial court appointed Purnell's counsel and refused that counsel's efforts to withdraw after he brought a clear and actual conflict of interest to the court's attention. The conflict, coupled with the trial court's refusal to let Trial Counsel withdraw, barred Purnell's access to the evidence he now seeks to present with new conflict-free counsel. Because this evidence was unavailable to Purnell even with the exercise of due diligence, as we explain below, we hold that it is "new" for the purposes of this analysis. But implicit in our holding that the conflict renders much of this evidence "new" is our predicate conclusion that Purnell never waived the conflict. Thus, we next explain why, on this record, we cannot conclude that Purnell waived the conflict.

### 1. *Purnell Never Waived the Conflict*

Purnell did not waive the conflict issue, and any assertion that he did ignores the distinction between waiver and forfeiture.[224] "Waiver is the voluntary and intentional relinquishment of a known right."[225] In the criminal context, it is "incumbent upon the State to prove" waiver, and "the courts indulge in every reasonable presumption against

---

[223] *Trial Court Op.*, 2020 WL 837148, at *14–17.

[224] The waiver argument presumes that the conflict was waivable, which in itself is a doubtful proposition.

[225] *Daskin v. Knowles*, 193 A.3d 717, 725 (Del. 2018) (quoting *Realty Growth Investors v. Council of Unit Owners*, 453 A.2d 450, 456 (Del. 1982)).

waiver."[226] "Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake." [227]

By contrast, "forfeiture is the failure to make the timely assertion of a right.'"[228] The distinction between waiver and forfeiture is most visible in so-called 'plain error' analysis, where a forfeited allegation that a defendant's rights were violated can nevertheless be the basis for later reversal[229] but a waived right cannot.[230] Purnell's failure to properly raise Trial Counsel's conflict at an earlier juncture constitutes a forfeiture requiring him to contend with the procedural bar provisions of Rule 61.

In *James Lewis v. State*, we left to the trial court's discretion how to conduct an inquiry and response into a waiver of the right to unconflicted counsel, but required that the colloquy be with the defendant -- not via counsel -- and approvingly quoted the Federal Advisory Committee comment that:

> The Court should seek to elicit a narrative response from each defendant that he or she has been advised of his or her right to effective representation, that he or she understands the details of his or her attorney's possible conflict of

---

[226] *Flamer v. State*, 490 A.2d 104, 113 (Del. 1983) (citing *Brewer v. Williams*, 430 U.S. 387, 404 (1977)).

[227] *United States v. Olano*, 507 U.S. 725, 733 (1993).

[228] *Id.* (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

[229] *Id*. ("Mere forfeiture, as opposed to waiver, does not extinguish an 'error' under [Fed. R. Crim. P.] Rule 52(b).").

[230] *Warner v. State*, 787 A.2d 101, 2001 WL 1512985, at *1 (Del. Nov. 21, 2001) (TABLE) ("Decisions following *Olano* have made clear that only forfeited errors are reviewable for plain error.").

85

interest and the potential perils of such a conflict, that he or she has discussed the matter with his or her attorney or if he or she wishes with outside counsel, and that he or she voluntarily waives his or her Sixth Amendment protections.[231]

That did not happen here.[232]

In this case, Trial Counsel brought the conflict to the trial court's attention. There is nothing in the record that suggests that Purnell was advised of the nature of the conflict and its potential impact on his defense.[233] In fact, in his *pro se* Rule 61 motion, Purnell states that "[i]f Trial Court would have had [sic] conducted an inquiry Defendant could have been aware of the circumstances, HOWEVER, the nature of the Conflict was never mentioned to him."[234] He further argued that "the conflict of interest which arised [sic] before trial and is on the record that Counsel brought to Trial Court and State's attention

---

[231] 757 A.2d 709, 716–17 (Del. 2000) (holding that Superior Court Criminal Rule 44(c) "impose[s] on the trial judge the duty to 'promptly inquire with respect to joint representation by [co-defendants] and [to] personally advise each defendant of the right to the effective assistance of counsel, including separate representation'" and that "the trial judge's Rule 44(c) colloquy with each defendant must take place on the record early in the pretrial proceedings and certainly before the day of trial.") (alterations added). Although this is not a joint representation situation, many of the same concerns regarding Purnell's Trial Counsel's conflict were apparent prior to trial and should have been addressed by the trial court in a manner that would have ensured that Purnell understood the nature and extent of the conflict.

[232] The Delaware Lawyers' Rules of Professional Conduct, discussed in a later section, require any such waiver to be in writing, which also did not happen here. *See also Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 139 (3d Cir. 1984) (holding that the trial judge abused his discretion in failing to disqualify counsel, and stating "the trial court should conduct an evidentiary hearing or factual inquiry to determine whether disqualification is appropriate and should inquire into the nature of the conflict and the client's awareness of the conflict. The court should also determine whether there has been a waiver of the conflict, whether the waiver was effective or whether a waiver was possible.").

[233] The trial court did implore Trial Counsel to speak with Purnell about the conflict. *See* A45 (Motion *in Limine* Transcript) ("THE COURT: Will you have made some conclusion and talk with your client even, perhaps. He'll be here early and Mr. Purnell will be here.").

[234] A922 (*Pro Se* Rule 61 Motion) (alterations added).

was never carefully or Constitutionally ruled upon."[235] Purnell's claim of a lack of informed consent is supported by the record, especially given that Trial Counsel did not appear to appreciate the seriousness of it until shortly before trial when he first raised it with the court.

Nor do we think Purnell waived the issue when he failed to raise it on direct appeal. Independence of counsel is an aspect of effective assistance of counsel, and so in Delaware it is typically considered in the first instance in a Rule 61 motion.[236] Trial Counsel continued to represent Purnell on direct appeal. Although this may have been the atypical case where the issue *could* have been considered on a direct appeal, either via a challenge to the conviction itself or to the trial court's denial of Trial Counsel's withdrawal motion, the general practice is to wait for postconviction proceedings to raise claims regarding the effectiveness of trial counsel.

Whether Purnell waived the issue in his first motion for postconviction review is a closer question, but under the unique facts presented here, we conclude that he did not. Under Rule 61 "any first motion for relief under this rule and that first motion's amendments shall be deemed to have set forth all grounds for relief available to the

---

[235] A1020–21.

[236] *Brooks v. State*, 40 A.3d 346, 352 (Del. 2012) ("this Court generally does not review claims for ineffective assistance of counsel on direct appeal"); *Milton Taylor v. State*, 32 A.3d 374, 381 n.12 (Del. 2011) (same).

87

movant."[237]  Failure to raise an issue in a first postconviction motion is generally treated as waiver of that issue.[238]

First postconviction counsel failed to include Trial Counsel's conflict as a ground for relief in the first motion which came after Purnell's *pro se* motion.  But Purnell *did* set forth Trial Counsel's conflict as his first ground for relief in his initial *pro se* Rule 61 motion, along with summary facts and case law, thus satisfying Rule 61's requirement to preserve it.[239]  Purnell claims he did not know, intend, or authorize his postconviction counsel to withdraw the claims of error he set forth in his initial *pro se* Rule 61 motion when postconviction counsel submitted the amended Rule 61 motion.  He also contends that the amended Rule 61 motion does not make unambiguously clear that it *replaces* rather than *augments* his *pro se* filing.  Further, because postconviction counsel himself died after submitting his reply brief but before oral argument on Purnell's first Rule 61 motion, there

---

[237] Super. Ct. Crim. R. 61(i)(2)(ii).

[238] *See Younger*, 580 A.2d at 554 ("Since the *Burton* case was decided well in advance of Younger's trial, his present insufficiency of evidence contention was available and was known, or should have been known, to Younger at the time of his first motion for postconviction relief. 'It is well established that 'where an appeal was taken from a conviction, the judgment of the reviewing court is *res judicata* as to all issues actually raised, and those that could have been presented, but were not are deemed waived.'") (quoting *Teague v. Lane*, 489 U.S. 288, 297 (1989)).

[239] *See* Super. Ct. Crim. R. 61(b)(2) ("The motion shall specify all the grounds for relief which are available to the movant and of which the movant has or, by the exercise of reasonable diligence, should have knowledge, and shall set forth in summary form the facts supporting each of the grounds thus specified.").  We have held that this requires that the movant set forth "make specific allegations of actual prejudice and substantiate them." *Wright v. State*, 671 A.2d 1353, 1356 (Del. 1996).  Despite Purnell's lack of a legal education and his limitations as an incarcerated litigant, his *pro se* motion's supporting memorandum accurately and robustly cites legal authorities and supporting facts in the record sufficient to state his claims for relief.

is nothing in the record from that counsel to explain the facts surrounding the amended filing and its omission of the conflict claim.[240]

In light of our obligation to "indulge" every reasonable presumption against waiver,[241] under these highly unusual circumstances, we hold that Purnell did not waive Trial Counsel's conflict in his first Rule 61 motion through postconviction counsel's failure to include it in the amended motion.[242]

The State contends that even if Purnell did not waive the conflict issue, other procedural bars potentially apply. That does not appear to be disputed, as Purnell agrees his motion is untimely and successive. And so Purnell cannot obtain relief for the

---

[240] Purnell's attorney filed his reply brief on September 30, 2013 in his first Rule 61 motion. Oral argument, originally scheduled for January 22, 2014, was rescheduled to April 16, 2014. On April 10, Purnell's postconviction counsel made an unopposed request to reschedule those argument due to a health problem. On May 20, 2014, replacement counsel entered appearance for Purnell in lieu of postconviction counsel, who passed away the following month. We held oral argument on September 24, 2014 and handed down our opinion on November 21, 2014. *See also Martinez*, 566 U.S. at 13 ("Ineffective-assistance claims often depend on evidence outside the trial record.").

[241] "Courts indulge every reasonable presumption against waiver of fundamental constitutional rights and we do not presume acquiescence in the loss of fundamental rights." *Moran v. Burbine*, 475 U.S. 412, 450 n.32 (1986) (alterations omitted) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

[242] That is, an incarcerated litigant identified, raised, and fully developed a meritorious Sixth Amendment argument for postconviction relief which his attorney abandoned for unexplained reasons without clear evidence of his client's consent, and that attorney died between briefing before this Court and our decision, depriving us of any possibility of an explanation. Every criminal defendant is entitled to a fair trial, and when the trial court appointed Purnell a conflicted attorney who already represented another suspect in the same crime whose interests were antagonistic to his own and then insisted on that attorney taking the case to trial when the conflict was brought to the court's attention Purnell alleges he was deprived of that fundamental constitutional right. Purnell timely recognized and sought redress for that alleged violation in a properly filed *pro se* motion for postconviction relief. We therefore do not need to determine the legal effect of the "e-signature" on the amended motion -- in this case, a line marked "/s/ Mark Purnell," which Purnell claims he did not authorize.

Constitutional injury the conflict inflicted on him before satisfying the actual innocence exception to the procedural bars. But in this unusual case, the conflict is relevant in considering whether he satisfies that exception.[243]

As we next discuss, Trial Counsel's conflict was of such an extraordinary character as to convince us that the evidence he now submits was not reasonably available to him at trial, even with the exercise of due diligence. We discuss the legal and ethical character of Trial Counsel's conflict to explain how the operation of these rules precluded his access to critical defensive evidence rendering it "new."[244]

### 2. *Purnell's Trial Counsel Had a Disabling Conflict That Deprived Him of His Right to Counsel*

The right to counsel "is the foundation for our adversary system."[245] The right is a

---

[243] *See* Super. Ct. Crim. R. 61(i)(5) ("The bars to relief in paragraphs (1), (2), (3), and (4) of this subdivision shall not apply either to a claim that the court lacked jurisdiction or to a claim that satisfies the pleading requirements of subparagraphs (2)(i) or (2)(ii) of subdivision (d) of this rule."). The cited bars to relief are the prohibitions of (1) motions outside the one-year time limitation, (2) successive motions, (3) procedurally defaulted grounds, and (4) grounds formerly adjudicated, whether on direct appeal, on a prior postconviction relief motion, or in a federal habeas claim. The Rule 61(d)(2)(i) pleading standard referenced is where the movant "pleads with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted."

[244] We stress that a general claim of attorney ineffectiveness in failing to obtain or present evidence does not render evidence "new." Here, Trial Counsel's actual conflict of interest and the denial of his motion to withdraw resulted in a complete inability to investigate and access certain potentially exonerating evidence and defensive strategies.

[245] *Martinez*, 566 U.S. at 12 (quoting *Powell v. Alabama*, 287 U.S. 45 (1932)); *Maine v. Moulton*, 474 U.S. 159, 168–169 (1985) ("The right to the assistance of counsel guaranteed by the Sixth and Fourteenth Amendments is indispensable to the fair administration of our adversarial system of criminal justice."); *State v. Robinson*, 209 A.3d 25, 28 (Del. 2019) (the right to the assistance of counsel is "indispensable to the fair administration of our adversarial system of criminal justice," and it "safeguards the other rights deemed essential for the fair prosecution of a criminal proceeding").

bedrock principle of justice.[246]  "Defense counsel tests the prosecution's case to ensure that the proceedings serve the function of adjudicating guilt or innocence, while protecting the rights of the person charged."[247]

The United States Supreme Court "has recognized that 'the right to counsel is the right to the *effective* assistance of counsel.'"[248]  The right to counsel in a criminal case includes the right to counsel without divided loyalties.[249]  In fact, loyalty is one of counsel's

---

[246] *Martinez*, 566 U.S. at 12 ("The right to the effective assistance of counsel at trial is a bedrock principle in our justice system."); *Gideon v. Wainwright*, 372 U.S. 335, 344 (1963) (It is an "obvious truth" that "any person haled into court, who is too poor to have a lawyer, cannot be assured a fair trial unless counsel is provided for him"); *U.S. v. Smith*, 618 F.3d 657, 664 (7th Cir. 2010) ("The right to counsel is one of the bedrock elements protecting the fairness of the adversary process.").

[247] *Martinez*, 566 U.S. at 12; *see also Strickland*, 466 U.S. at 685  ("The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants the 'ample opportunity to meet the case of the prosecution' to which they are entitled.") (citing *Adams v. United States ex rel. McCann*, 317 U.S. 269, 275 (1942)).

[248] *Strickland*, 466 U.S. at 686 (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *see also Glasser v. United States*, 315 U.S. 60, 70 (1942); *Avery v. Alabama*, 308 U.S. 444, 446 (1940); *Powell*, 287 U.S. at 58.

[249] *Wood v. Georgia*, 450 U.S. 261, 271 (1981) (where the right to counsel exists, there is a correlative Sixth Amendment right to "representation that is free from conflicts of interest."); *United States v. Moscony*, 927 F.2d 742, 748 (3d Cir. 1991) (the Sixth Amendment confers "the right to the attorney's undivided loyalty free of conflict of interest") (internal quotation omitted); *United States v. Acty*, 77 F.3d 1054, 1056 (8th Cir. 1996) ("The Sixth Amendment right to counsel embraces the right to representation that is free from conflicts of interest or divided loyalties."); *James Lewis*, 757 A.2d at 714 ("The Sixth Amendment right to the effective assistance of counsel provides for representation that is 'free from conflicts of interest or divided loyalties.'"); *see also* John Wesley Hall, Jr., *Professional Responsibility in Criminal Defense Practice*, § 9.4 (2020) ("the duty of loyalty is included in all conflict rules and it is embodied in the Sixth Amendment right to counsel which includes the right to counsel without divided loyalties between personal interest or the interests of other clients or persons.").

most basic duties.[250]

An "actual conflict" exists when a movant can show that counsel actually had divided loyalties that affected his or her performance.[251] Here, Purnell's Trial Counsel had an actual conflict of interest based upon his representation of Dawan Harris in connection with the .38-caliber revolver. The operation of the Delaware Lawyers' Rules of

---

[250] *See Strickland*, 466 U.S. at 688 ("Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest."); *Moscony*, 927 F.2d at 748 ("The attorney's undivided loyalty is required because the type of effective 'assistance of counsel' the Sixth Amendment guarantees a criminal defendant is that which puts the government to its proofs in an adversarial manner, and for this counsel free of conflicts of interest is necessary."); *Cooke v. State*, 977 A.2d 803, 841 (Del. 2009) ("Counsel's function is to assist the defendant, and hence counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.") (quoting *Strickland*, 466 U.S. at 688); *see also* Delaware Lawyers' Rule of Professional Conduct 1.7 (comment 1) ("Loyalty and independent judgment are essential elements in the lawyer's relationship to a client.").

[251] *See United States v. Wheat*, 486 U.S. 153, 159–60 (1988) ("While permitting a single attorney to represent codefendants is not *per se* violative of constitutional guarantees of effective assistance of counsel, a court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel.") (internal quotation omitted); *United States v. Stewart*, 185 F.3d 112, 121 (3d Cir. 1999) ("Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties."); *United States v. Moscony*, 927 F.2d 742, 750 (3d Cir. 1991) (same); *United States v. Snell*, 2008 WL 4572399, at *3 (E.D. Pa. Oct. 10, 2008) (same and noting also that "[t]he risk of misuse of privileged information is more pronounced where defense counsel's earlier representation of the witness is substantially related to counsel's later representation of the defendant"); *United States v. Carpenter*, 769 F.2d 258, 263 (5th Cir. 1985) ("A conflict exists when defense counsel places himself in a position conducive to divided loyalties"); *United States v. Alvera-Ramirez*, 2013 WL 1286634, at *3 (N.D. Tex. Mar. 26, 2013) ("A conflict of interest is generally found when counsel is in a position conducive to divided loyalties, and an actual conflict exists when a movant can show that counsel actually had divided loyalties that affected his or her performance) (internal quotations omitted); *see also United States v. Gonzalez-Lopez*, 548 U.S. 140, 147 (2006) ("The requirement that a defendant show prejudice in effective representation cases arises from the very nature of the specific element of the right to counsel at issue there -- *effective* (not mistake-free) representation . . . [t]hus, a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced.") (emphasis in original); *United States v. Williams*, 103 F.3d 1093, 1098–99 (2d Cir. 1997) (finding that a mere potential conflict of interest without a showing of prejudice to the defendant does not violate defendant's Sixth Amendment right to effective assistance of counsel).

Professional Conduct, which we explain next, prevented Trial Counsel from exploring and pursuing defensive strategies that related to his prior representation of Dawan Harris.

> 3. *Attorney Ethics Rules Further Emphasize that Trial Counsel's Actual Conflict Prevented Purnell from Obtaining this Evidence*

The Delaware Lawyers' Rules of Professional Conduct ("DLRPC") limit multiple representations of clients. Trial Counsel was appointed to represent Dawan Harris on February 27, 2006. Dawan was sentenced on December 6, 2006. It is not clear from the record when Trial Counsel's representation of Dawan ended. Trial Counsel was appointed to represent Purnell on May 2, 2007,[252] but Purnell was identified as a suspect when Corey Hammond was arrested for drug charges on January 4, 2007.[253] Thus, Dawan likely was, at that time, a former client, as opposed to a current client of Trial Counsel. Nevertheless, Trial Counsel had certain continuing duties with respect to Dawan Harris. With regard to former clients, DLRPC 1.9 provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interest are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.
>
> (b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client.
>
> (1) whose interests are materially adverse to that person; and

---

[252] A1, A872 (Docket Sheet).

[253] A156–67.

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter; unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representations to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

Even though Trial Counsel's representation of Dawan Harris appears to have ended by the time his representation of Purnell began, Trial Counsel remained under a continuing duty to not use information learned during his representation of Harris to Harris's detriment or to reveal confidential information relating to that representation.

In addition, under Rule 1.7 of the DLRPC, "[a] concurrent conflict of interest exists if: . . . (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, *a former client* or a third person or by a personal interest of the lawyer."[254]  Under this definition, Trial Counsel had a concurrent conflict of interest based upon his prior representation of Dawan Harris.

---

[254] DLRPC 1.7(a)(2).  The rule reads in full:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest.  A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

In *James Lewis v. State*, a case involving a single appointed attorney representing co-defendants in a joint trial, this Court observed that "[t]he United States Supreme Court and this Court have held that the judiciary has an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings are fair."[255]   Addressing when prejudice can result from a conflict, we stated that, "[w]hen it is alleged that the ineffective assistance of trial counsel was the result of a conflict of interest, prejudice is presumed 'only if the defendant demonstrates that counsel actively represented conflicting interests and that an actual conflict of interest

---

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, *a former client* or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent, confirmed in writing.

DLRPC 1.7 (emphasis added).

[255] 757 A.2d at 713 (citing to *Wheat*, 486 U.S. at 160) ("Federal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.")). *But see Nix v. Whiteside*, 475 U.S. 157, 165 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel.").

adversely affected his lawyer's performance.'"[256] In defining what constitutes a "conflict

of interest," we looked to the United States Supreme Court's statement in *Cuyler v.

Sullivan*, that "'an actual, relevant conflict of interest [exists] if, during the course of the

representation, the defendants' interests do diverge with respect to a material factual or

legal issue or to a course of action.'"[257] In other words, an "actual conflict of interest"

means "a conflict that *affected counsel's performance* -- as opposed to a mere theoretical

division of loyalties."[258] In this case, Trial Counsel eventually recognized that he had an

actual conflict, and he unsuccessfully sought the trial court's permission to withdraw.[259]

Trial Counsel's actual conflict prevented him from investigating, developing and

presenting any evidence that implicated Dawan Harris, his former client. Harris's gun

charge was a substantially related matter to the Giles murder. Note 3 to DLRPC 1.9(a)

states that a matter is substantially related when it involves "the same transaction or legal

---

[256] 757 A.2d at 718.

[257] 446 U.S. 335, 356 n.3 (1980).

[258] *United States v. Mickens*, 535 U.S. 162, 171 (2002) (emphasis in original). In *Mickens*, the United States Supreme Court noted "the *Sullivan* standard is not properly read as requiring inquiry into actual conflict as something separate and apart from adverse effect;" rather, "[a]n 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's performance." *Id*. at 172 n.5; *see also McFarland v. Yukins*, 356 F.3d 688, 705–06 (6th Cir. 2004) ("*Mickens* changed the terminology, but not the substance of the [*Sullivan*] test.").

[259] An attorney representing the conflicting clients is entitled to some deference with regard to the question of whether a conflict exists. *See Holloway v. Arkansas*, 435 U.S. 475, 485 (1978) ("[a]n attorney representing two defendants in a criminal matter is in the best position professionally and ethically to determine when a conflict of interest exists or will probably develop in the course of a trial") (quoting *State v. Davis*, 514 P.2d 1025, 1027 (Ariz. 1973)); *see also State v. Stovall*, 312 P.3d 1271, 1282 ("Perhaps the person with the keenest insight into the effect the conflict of interest will have on the defense attorney's ability or capability to zealously represent the defendant is the conflicted attorney.") (Kan. 2013).

dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the [current] client's position in the subsequent matter."[260] Trial Counsel represented Dawan for the latter's prosecution and guilty plea relating to the .38-caliber pistol seized in the February 18, 2006 search. That warrant was a part of the Giles robbery and murder investigation and sought the murder weapon.[261] Trial Counsel's January 4, 2007 letter to the State raising the conflict makes this clear. The matters are indisputably related.

Further, Dawan initially was a suspect in the Giles murder. Two different witnesses implicated Dawan Harris. One of them told Detective Tabor on June 1, 2006, that Harris told him, "you should have seen the way she fell."[262] Another witness implicated Harris in an interview with detectives on July 5, 2006.[263] The conflict prevented Trial Counsel from speaking to Harris about the murder and from investigating and having a firearms expert attempt to show that the .38-caliber revolver Harris possessed was the murder weapon. Trial Counsel's affidavit makes clear that he pursued none of these matters.

Note 2 to DLRPC 1.9(a) makes clear that Trial Counsel was ethically barred from pursuing a potential defense that Dawan was the perpetrator or even involved in the Giles murder. Note 2 provides that, "[w]hen a lawyer has been directly involved in a specific transaction, subsequent representation of other clients with materially adverse interests in

---

[260] DLRPC 1.9(a), n.3.

[261] A492–97 (Search Warrant).

[262] A707 (Wilmington Department of Police Supplemental Report)).

[263] A708.

97

that transaction clearly is prohibited."[264] Rule 1.9 forbade Trial Counsel from revealing not only the confidential communications of his former client, but any information "relating to" his prior representation of Harris. Further, Trial Counsel was forbidden from representing Purnell if Purnell's interests were "materially adverse" to the interests of Harris, and Trial Counsel was forbidden from using information relating to his representation of Harris in his representation of Purnell.

Trial Counsel noted that the defense had multiple theories involving Dawan. One was the belief that Mitchell and Dawan were the true robbers, with the eyewitness misidentifying Dawan as Ronald.[265] Another was that the robbers were Ronald Harris and either Mitchell or Dawan, and that Ronald was falsely implicating Purnell as the accomplice in retaliation for Purnell "snitch[ing] on them for shooting this .38-caliber out of a window in Compton Towers that prompted them getting in trouble."[266] However, presenting those theories would require Trial Counsel to take positions directly adverse to Dawan's interests in the Giles investigation, painting him as the murderer directly, or asserting that the weapon Dawan had pleaded guilty to possessing was the murder weapon. But Trial Counsel was ethically precluded from doing so, and hence from advancing these potential defensive strategies.

---

[264] DLRPC 1.9(a), n.2; *see also Sullivan*, 446 U.S. at 356 ("Because it is the simultaneous representation of conflicting interests against which the Sixth Amendment protects a defendant, he need go no further than to show the existence of an actual conflict.").

[265] A38–39 (Motion *in Limine* Transcript).

[266] A39.

The State's position that "the record indicates the State had no reason to believe Dawan had any knowledge of the crime,"[267] is simply unsustainable.[268] Hammond, whose testimony was so critical to the State's case, in his first interview seeking to obtain a favorable plea deal, claimed that he was with Dawan near the site of the robbery when he heard multiple gunshots.[269] Dawan could thus corroborate or contradict Hammond's account. Thus, the State cannot plausibly claim to have thought that Dawan had "no knowledge" of the crime.

Importantly, Trial Counsel and the trial judge both labored under the mistaken view that Trial Counsel had an actual conflict only if Dawan Harris testified. Although Trial Counsel began representing Purnell in May 2007, it appears that he did not perceive a conflict until eight months later when on January 10, 2008, he advised the State of the conflict in a letter.[270] The pre-trial investigation stage was a critical aspect of Purnell's defense.[271] The record contains evidence suggesting that Dawan Harris was a suspect in

---

[267] State's Supp. Ans. Br. at 13–14.

[268] *See*, *e.g.*, *United States v. Iorizzo*, 786 F.2d 52, 59 (2d Cir. 1986) (noting that the reversal of the conviction was "the direct result of the prosecution's using defense counsel's conflict of interest as a means of affecting the evidence going before the jury instead of moving for his disqualification before the trial. The prosecutors here were aware of defense counsel's conflict of interest at an early stage and were invited by the district judge to make a disqualification motion in writing. We trust that this decision will ensure that a pretrial disposition of such issues will occur in the future.").

[269] A638 (Corey Hammond 2007 Interview).

[270] A835.

[271] In *Maine v. Moulton*, the United States Supreme Court recognized the importance of pre-trial assistance of counsel:

> "[T]he [United States Supreme] Court has also recognized that the assistance of counsel cannot be limited to participation in a trial; to deprive a person of counsel

99

the murder early on. But Trial Counsel states unequivocally that he undertook no pre-trial investigation of Dawan Harris, his former client.

Nor did Trial Counsel call Dawan at trial, and so did not examine him.[272] Trial Counsel could not question Harris about the .38-caliber revolver without revealing or using information relating to his representation of Harris for possession of that very weapon.[273] Trial Counsel recognized that, if Dawan were a witness "I can't cross-examine him."[274] Thus, Trial Counsel could not and did not call Dawan to examine him on his statements that he and Mitchell jointly possessed the .38-caliber revolver and that he stole it from Cameron Johnson on February 14, as opposed to earlier, as Cameron Johnson's statement indicated. Nor could he, or did he, examine Dawan Harris or Etienne Williams on Williams's statement that Dawan was out of her apartment with her sister Aqueshia the

---

during the period prior to trial may be more damaging than denial of counsel during the trial itself. Recognizing that the right to the assistance of counsel is shaped by the need for the assistance of counsel, we have found that the right attaches at earlier, 'critical' stages in the criminal justice process 'where the results might well settle the accused's fate and reduce the trial itself to a mere formality.'"

474 U.S. at 170 (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967).

[272] *See Moss v. United States*, 323 F.3d 445, 460 (6th Cir. 2003) ("The fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information.").

[273] *See Wheat*, 486 U.S. at 164 (noting trial counsel's conflict where counsel would have been unable ethically to provide an effective cross-examination of a government witness also represented by that same counsel); *Moscony*, 927 F.2d at 750 ("Conflicts of interest arise whenever an attorney's loyalties are divided, and an attorney who cross-examines former clients inherently encounters divided loyalties."); *Fitzpatrick v. McCormick*, 869 F.2d 1247, 1252 (9th Cir. 1989) ("Among the dangers in a successive representation situation is that the attorney who has obtained privileged information from the former client may fail to conduct a rigorous cross-examination for fear of misusing that confidential information."); *United States v. Agosto*, 675 F.2d 965, 971 (8th Cir. 1982) (same).

[274] A38 (Motion *in Limine* Transcript).

night of the murder at the same time Mitchell was out.

It is clear that Purnell's defense was adversely affected by Trial Counsel's prior representation of Dawan on the gun charge. The failure to pursue potential significant defense strategies demonstrates the adverse effect the conflict had on Trial Counsel's representation of Purnell.[275] A broad array of state and federal cases support this conclusion.[276]

---

[275] *See*, *e.g.*, *Ciak v. United States,* 59 F.3d 296 (2d Cir. 1995) (judgment reversed and conviction vacated where an important government witness was a recent client of trial counsel in a substantially related matter and trial counsel presented a theory that possibly was at odds with the position he took in related proceedings); *Fitzpatrick*, 869 F.2d at 1253 (reversing convictions and recognizing actual conflict of interest where defense theory involved accusations against defense counsel's former client); *Lockhart v. Terhune*, 250 F.3d 1223 (7th Cir. 2001) (conviction reversed where counsel in a murder trial had an actual conflict where prosecutors presented evidence that petitioner had committed a second, earlier murder and his appointed counsel was also representing another man implicated (but not charged) in that earlier homicide); *United States v. Malpiedi*, 62 F.3d 465, 470 (2d Cir. 1995) (vacating judgment of conviction where trial counsel had actual conflict of interest due to his prior representation of a lay government witness and where court held that cross-examination of that witness about her prior grand jury appearance was a "tactic that was entirely plausible but barred by [counsel's] conflict of interest"); *Iorizzo*, 786 F.2d at 58–59 (reversing mail fraud convictions where trial counsel had an actual conflict causing him to abandon his cross-examination of the government's key witness (trial counsel's former client) as to prior testimony); *People v. Daly*, 792 N.E.2d 446, 451 (Ill. App. Ct. 2003) (reversing conviction due to trial counsel's prior representation of a confidential information, who was the State's chief witness against the defendant and noting that although counsel no longer represented the informant, there was a "continuing" relationship to the extent that counsel would be required to cross-examine the informant about matters occurring during the time counsel represented him.); *Stovall*, 312 P.3d at 1282 (trial court's denial of conflicted defense counsel's motion to withdraw deprived defendant of his right to effective assistance of counsel where counsel was constrained from pursuing a defense strategy that would have implicated a former client; court reversed conviction and remanded for new trial with directions to appoint conflict-free counsel.); *see also Lewis*, 757 A.2d at 720 (holding that there was an actual conflict in the dual representation at trial by the same public defender and that defendant demonstrated prejudice by the divergence of the clients' interests and also by "what the record reflects [defendant's] attorney did not do on his behalf.").

[276] *See*, *e.g.*, *United States v. Gambino*, 864 F.2d 1064, 1070–71 (3d Cir. 1988) ("Clearly, a defendant who establishes that his attorney rejected a plausible defense because it conflicted with the interests of another client establishes not only an actual conflict but the adverse effects of it."); *Stovall*, 312 P.3d at 1279 ("The elimination of a potential defense strategy can surely be

It is difficult to measure the precise impact on defense representation when trial

counsel had a direct conflict that impacts trial strategies and tactics.[277] That is why in cases

of an actual conflict, prejudice is often presumed.[278] And that is why in cases of actual

characterized as adversely affecting the attorney's representation. Moreover, the perils of trying to serve two masters is literally as old as the Bible."); *People v. DiPippo*, 82 A.D.3d 789, 791 (N.Y.S.2d App. 2011) (where trial counsel's former client in a different matter was a possible suspect in murder for which defendant was being tried, effective assistance of counsel was denied and conviction reversed and new trial granted where "among other things, trial counsel did not conduct even a minimal investigation into [the former client] by sending an investigator to ascertain [his] possible involvement.").

[277] *See Strickland*, 466 U.S. at 692 ("[I]t is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests."); S*preitzer v. Peters*, 114 F.3d 1435, 1450 (7th Cir. 1997) ("This presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure.") (quoting *United States v. Fish*, 34 F.3d 488, 492 (7th Cir. 1994)); *United States v. Levy*, 25 F.3d 146, 155 (2d Cir. 1994) ("An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action.") (internal quotation omitted).

[278] *See Strickland*, 466 U.S. at 692 ("Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest.") (internal citation omitted); *Sullivan*, 446 U.S. at 349–50 ("a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief"); *Holloway*, 435 U.S. at 488–89 ("The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial.") (internal citations omitted); *Glasser v. United States*, 315 U.S. 60, 76 (1942) ("[T]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."); *Lockhart*, 250 F.3d at 1226 ("unlike with other Sixth Amendment claims, when a defendant alleges an unconstitutional actual conflict of interest, 'prejudice must be presumed'") (quoting *Delgado v. Lewis*, 223 F.3d 976, 981 (9th Cir. 2000)); *United States v. Fish*, 34 F.3d 488, 492 (7th Cir. 1994) ("This presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure."); *Zepp*, 748 F.2d at 139–40 (holding that a defendant's constitutional rights were violated due to defendant's trial counsel's actual conflict of interest, presuming prejudice, and reversing her judgment of conviction); *United States v. Gerardo*, 1998 WL 292379, at *3 (N.D. Ill. May 15, 1998) ("This presumption of prejudice is necessary because a true conflict of interest forecloses the use of certain strategies and thus the effect is difficult if not impossible to measure."), *aff'd*, 191 F.3d 456, 1999 WL 528093 (7th Cir.

conflict where trial counsel's representation is adversely affected, the result is typically the reversal of the conviction and the granting of a new trial with unconflicted counsel.[279]

We note that federal courts have employed different tests for Sixth Amendment violations and assessing their prejudicial impact, depending on the type of Sixth Amendment violation. One category of violation is where the attorney's performance was so deficient as to deny defendant a fair trial. The test employed there is the two-part *Strickland* test. A second category is referred to as the *Cronic* exception and involves the complete denial of counsel at a critical stage of the proceeding.[280] A third category of Sixth Amendment violation arises when the defense attorney actively represents conflicting interests.[281] A trial counsel's direct conflict deprives his client of his right to counsel and

---

Jul. 20, 1999) (TABLE); *see also* Nancy Burkoff, *Ineffective Assistance of Counsel*, § 3.10 (2020) ("In these circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representations corrupted by conflicting interests.").

[279] *See*, *e.g., State v. Stovall*, *supra* notes 259, 275, and 276; *People v. DiPippo*, *supra* note 276; *Lockhart v. Terhune*, *supra* notes 275 and 278; *People v. Woidtke*, 729 N.E.2d 506, 514, 516 (Ill. App. Ct. 2000) (where an attorney simultaneously represented a murder defendant and another person charged with misdemeanor offenses stemming from the murder who had also been a suspect, a *per se* conflict of interest existed, and the defendant was "entitled, through his new counsel, to proceed anew in all respects, from his decision to waive or not waive a jury and through all other aspects of the trial.").

[280] *See United States v. Cronic*, 466 U.S. 648, 658–59 (1984) ("There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified. Most obvious, of course, is the complete denial of counsel.") (internal footnote omitted). Prejudice is presumed in this second category. *See also Urquhart v. State*, 203 A.3d 719, 730 (Del. 2019) ("A complete denial of counsel occurs when a criminal defendant must navigate a critical stage of the proceedings against him without the aid of an attorney dedicated to the protection of his client's rights under our adversarial system of justice.") (internal quotation omitted).

[281] *See Mickens*, 535 U.S. at 166.

can be tantamount to having no counsel.[282] Specifically, within this third category are three further subcategories. The first two subcategories pertain to concurrent conflicts.[283] A third subcategory includes a situation where the conflict is "rooted in counsel's obligations to former clients."[284] The United States Supreme Court, in *dicta* in *Mickens*, left open the test for assessing prejudice to be applied in successive representation scenarios.[285] The Supreme Court suggested the choice is between the *Cuyler v. Sullivan* "adversely affected" test and the *Strickland* changed outcome test. In *Stovall*, the Kansas Supreme Court, in considering such a successive representation conflict, applied the less stringent *Cuyler* test because "a criminal defendant who claims that his or her attorney had a conflict of interest that affected the adequacy of his or her counsel's representation need not demonstrate prejudice in the traditional sense, *i.e.,* need not establish that the error affected the outcome

---

[282] *Holloway*, 435 U.S. at 490 ("The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters."); *United States v. Edelmann*, 458 F.3d 791, 806 (8th Cir. 2006) ("the right to counsel's undivided loyalty is a critical component of the right to assistance of counsel; when counsel is burdened by a conflict of interest, he deprives his client of his Sixth Amendment right as surely as if he failed to appear at trial.") (quoting *Bonin v. California*, 494 U.S. 1039, 1044 (1990) (Marshall, J., dissenting)).

[283] *Mickens*, 535 U.S. at 174.

[284] One court has referred to the first two subclasses as the automatic reversal effect exception (*e.g., Holloway*), the adverse effect exception (*e.g., Sullivan*), and the third as the "*Mickens* reservation" (since the Court in *Mickens* did not resolve which test to apply in successive representation scenarios). *Galaviz*, 291 P.3d at 71.

[285] *Mickens*, 535 U.S. at 175. A second distinction in these three subcategories, in addition to the temporal distinction, is whether an objection to the multiple representations is made before or during the proceeding. *Mickens*, 535 U.S. at 168–69. There are related distinctions regarding the court's burden of inquiry in each circumstance.

of the proceeding."[286]

Here, we need not decide whether to apply the *Sullivan* test (as we did in the *James Lewis* case involving joint representation of co-defendants) because we find that an actual conflict of interest adversely affected Purnell's case and resulted in prejudice to him in such a manner that the fairness of the trial has been undermined. There is no question on this record that Trial Counsel's actual conflict adversely affected his performance by, among other things, foreclosing significant and obvious avenues of defense to Purnell.

Delaware and federal *habeas* cases are in agreement that evidence is "new" when it was not available at the time of trial and could not have been discovered earlier through the exercise of due diligence. Since Trial Counsel was ethically barred from investigating or pursuing several key areas of evidence and was not permitted to withdraw, Purnell could not have obtained or presented that evidence through the exercise of due diligence. We conclude, therefore, that such evidence is "new" for purposes of the present motion. Since much of his evidence goes to proving facts incompatible with his guilt, it also satisfies the requirement that it goes beyond being merely cumulative or impeaching.

We now move to the final step and examine whether Purnell can satisfy the persuasiveness inquiry.

---

[286] 312 P.3d at 1273–74; *Tueros v. Greiner*, 343 F.3d 587, 594 (2d. Cir. 2003) ("Although *Sullivan* dealt with a lawyer who owed duties to multiple defendants, it may well be unreasonable not to extend *Sullivan's* definition of an 'actual conflict' to a lawyer whose conflict was defined by representing the divergent interests of a defendant and an important subpoenaed witness."). *But see Harvey v. United States*, 798 Fed. App'x 879, 884 (6th Cir. 2020) (noting that the Sixth Circuit has declined to extend the *Sullivan* presumption of prejudice to cases involving successive representations involving different matters).

*4.    Purnell's New Evidence*

In assessing whether a prisoner has met the criteria for demonstrating actual innocence, the court must assess *all* of the evidence, including that which was properly excluded and that which was wrongfully admitted. As the Supreme Court explained in *Schlup*:

> In assessing the adequacy of petitioner's showing, therefore, the [reviewing] court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial. . . [it] must make its determination concerning the petitioner's innocence in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.[287]

We now consider the full corpus of evidence. We agree with the Superior Court that Purnell's evidence can best be aggregated into six categories: (1) ballistic and firearm evidence; (2) Kellee Mitchell's recantation; (3) other evidence inculpating Dawan Harris and Kellee Mitchell (4) evidence undermining Ronald Harris's testimony; (5) evidence undermining Corey Hammond's testimony; and (6) evidence of Purnell's physical incapacity. In accordance with the standard, we contextualize Purnell's new evidence in light of the evidence presented at trial and in light of the other unadmitted material. The burden on the motion, as stated earlier, is satisfying the Court that the new evidence, when considered in the context of all the relevant evidence by a properly instructed jury, is such as will probably change the result if a new trial were granted.

---

[287] *Schlup*, 513 U.S. at 327–28 (alterations added) (internal quotation omitted).

### a. New Ballistic Evidence

The bullet that struck Mrs. Giles was never recovered. The only ballistic evidence, which the State conceded at trial was the only physical evidence tying Purnell to the crime at all, was a single spent 9mm shell casing. Purnell's new ballistic evidence consists of an affidavit, and supporting scientific literature, from an expert criminal investigator from Cobb County, Georgia opining that the spent casing was found too far away to have been ejected from where Mrs. Giles was shot.[288] Based on a study involving thousands of test rounds, he concludes that spent casings from that type of handgun are generally ejected approximately six to seven feet, and never more than twenty-one feet, while Detective Tabor's testimony and the trial exhibits indicate the 9mm casing was found forty to fifty feet away from where the shooting occurred.[289] The evidence detection officer placed the distance from the casing to the curb at sixty feet. The geography of the area, and the geometry of the round, eliminate the possibility of it rolling the remaining difference, and the lack of markings on the casing, combined with officers' quick arrival on scene, make an explanation of the casing being kicked or manually moved a "possibility remote at best."[290] Thus, the expert concludes that the spent casing was "unrelated to the shooting of Ms. Giles."

As the only physical evidence the State relied on to tie Purnell to this crime, the shell casing was a critical aspect of Purnell's trial. No one produced a semi-automatic gun

---

[288] A723–27 (Declaration of Robert Tressel).

[289] A726.

[290] A726–27.

107

that certain witnesses said they saw Purnell with, and those witnesses' credibility, as even the State concedes, was highly questionable. Rather, the ballistic evidence makes it more likely that a revolver was the murder weapon. The .38-caliber revolver, jointly possessed by Dawan Harris and Mitchell and hidden in the hallway ceiling in Compton Towers, was never the subject of any investigation by Purnell's conflicted Trial Counsel.

### b. Kellee Mitchell's Recantation

At trial, Kellee Mitchell denied all knowledge of the Giles murder. The State nevertheless brought in Mitchell's statement inculpating Purnell under 11 *Del. C.* § 3507 and relied heavily upon it in making its case to the jury. That heavy emphasis was noted by this Court on direct review,[291] and by the State itself.[292]

But now Mitchell denies both the truth and the voluntariness of his prior statement, and has sworn out an affidavit stating that:

> Sometime in January 2007, I got picked up on a capias. The detectives brought me in to question me about the murder. They were trying to get me to say that I had heard Mark Mark bragging about it. The police tried to coerce me into a story that they had already made up. They had their story and just wanted me to agree with it. That was impossible because I wasn't there. I don't know what happened.
>
> I was not going to testify to something that wasn't true. I got locked up on a material witness warrant and was told I had to take the stand. The police told me they would make my life miserable if I didn't take the stand and say what they wanted me to say. I didn't care, I still told the truth on the stand, that I didn't know anything. Mark never bragged to me about killing her. I don't know if he did it, but he never told me if he did.

---

[291] *See Purnell*, 979 A.2d at 1106 ("At the close of the State's case, *which relied largely on the testimony of Mitchell and [Ronald] Harris*, Purnell moved to admit Giles' statement in which he failed to identify Purnell as one of the assailants in a photo array.") (emphasis added).

[292] *E.g.*, A349, A350, A354, A365 (State's Closing and Rebuttal Arguments).

To support the conclusion that Mitchell's recantation affidavit is true and his prior statement false, Purnell supplies two other supporting affidavits. In one, Dawon Brown denies that Purnell confessed while they were incarcerated.[293] In Mitchell's prior statement, he asserted that Brown was present for Purnell's purported confession.[294] In the other supporting sworn statement, a friend of Purnell's who was incarcerated with Mitchell in 2012 or 2013 attests that, at that time, he confronted Mitchell about having testified against Purnell, and Mitchell disavowed his testimony, confessing that he was only trying to avoid conviction for the crime himself.[295]

The transcript of Mitchell's interview began *in medias res*, with Detective Tabor presenting a narrative account to which Mitchell responded with short answers, often one-word expressions of assent.[296] Unlike Ronald Harris or Corey Hammond, Mitchell did not testify to any personal knowledge of facts or statements predating the homicide. Rather, his prior statement merely alleges that Purnell confessed while they were both incarcerated. This type of testimony is inherently of questionable reliability, even when the witness continues to maintain the truth of the claim.[297] Here, Mitchell disclaims the prior statement,

---

[293] A506 (Affidavit of Dawan Brown).

[294] A501 (Mitchell 2007 Interview).

[295] A509 (Declaration of Andrew Moore).

[296] A499–504 (Kellee Mitchell January 2007 Interview Transcript). According to Detective Tabor, he was repeating things Mitchell had said in the first, unrecorded part of the interview. A111–12 (Testimony of Detective Tabor).

[297] In the recent *State v. McMullen*, the Superior Court in a bench trial refused to rely on the sworn trial testimony of another inmate that a defendant had confessed while incarcerated, reasoning that "[a]lthough some of his testimony sounded credible, I was not comfortable relying on it" because

109

other witnesses corroborate the prior statement's falsity, and Mitchell's explanation for lying to implicate Purnell accords with other parts of the record.

### c. New Evidence Inculpating Dawan Harris and Kellee Mitchell

In addition to Dawan Harris and Mitchell fitting the physical description given by Angela Rayne, their unlawful possession of the .38-caliber revolver, and the police report suggesting Dawan Harris may have bragged about committing the Giles murder, Purnell points to a police interview with Cameron Johnson from July 19, 2006.[298] In that interview, when police confronted him about the revolver Dawan and Mitchell admitted to having stolen from him, Cameron said that they stole it two or three weeks before the Giles murder, contradicting Dawan Harris's claim that he stole it the week prior to his February 18, 2006 arrest, *i.e.,* after the Giles murder.[299] Cameron Johnson's account is consistent with

---

he "is a jailhouse snitch." 2020 WL 58529, at *12 (Del. Super. Jan. 3, 2020), *aff'd*, --- A.3d --- 2021 WL 2070119, at *1 (Del. May 24, 2021). While the ordinary line of attack on the credibility of this type of testimony flows from the possibility that the inmate seeks to obtain favorable treatment or a shorter sentence for his assistance, *e.g., Cruz-Webster v. State*, 155 A.3d 833, 2017 WL 464536, at *5 (Del. Feb. 2, 2017) (TABLE), in this case the record shows Mitchell knew himself to be under police suspicion for having been the second assailant in the Giles murder. Further explaining his motivation to falsely implicate Purnell, Mitchell's affidavit asserts that police had told him at the time that Purnell had implicated him. A489 (Affidavit of Kellee Mitchell). Although this Court has acknowledged that "a motion for a new trial based upon a witness' recantation is generally viewed with suspicion," *Blankenship*, 447 A.2d at 433, that danger is most prevalent when an incarcerated witness recants. *See Johnson v. State*, 410 A.2d 1014, 1015 (Del. 1980) (affirming the denial of a new trial where the Superior Court had rejected the recantation evidence as "the products of prison atmosphere to be received with great caution."); *State v. Russo*, 700 A.2d 161, 165 (Del. Super. 1996) ("A motion for a new trial based on a witness' recantation is generally viewed with suspicion. This is because a recantation has traditionally been viewed as the 'product of prison atmosphere to be received with great caution.'") (citing *Blankenship* and *Johnson*), *aff'd*, 694 A.2d 48, 1997 WL 317381 (Del. Apr. 17, 1997).

[298] A764 (Statement of Cameron Johnson).

[299] A791–91.

Purnell's statement to Detective Curley. In addition, on actual innocence review, it is appropriate to consider Mr. Giles's eyewitness identification of Kellee Mitchell as the shooter and his failure to identify Ronald Harris when shown Ronald Harris's photo.[300]

### d.    Evidence Undermining Ronald Harris's Testimony

Although Purnell characterizes his new evidence as including Ronald Harris's "recantation," a recantation is a formal or public repudiation of a prior statement or testimony,[301] such as can be accomplished by the recanting witness's affidavit.[302] Purnell provides no affidavit or statement of any kind from Ronald Harris himself. Rather, he provides sworn statements from Ronald Harris's mother[303] and stepfather[304] asserting that Ronald Harris has consistently maintained his innocence to them before, during, and since his plea; that he entered the plea solely to avoid the possibility of a murder conviction; and that he has substantial learning disabilities and can barely read or write.

The evidence as to Ronald Harris is more properly classified as impeachment. On the record before us, Ronald Harris's parents' accounts both express the same narrative -- Ronald Harris was a learning-disabled teenager who had been held for more than a year on an indictment led by a first-degree murder charge. They permitted police to interview Ronald for hours without an attorney present in February 2006 because they were certain

---

[300] A687.

[301] *Germany v. Vance*, 868 F.2d 9, 14 n.6 (1st Cir. 1989); *Recant*, Black's Law Dictionary (11th ed. 2019) ("To withdraw or renounce prior statements or testimony formally or publicly").

[302] *E.g., Blankenship*, 447 A.2d at 433.

[303] A512–13 (Declaration Shawn Harris).

[304] A515–16 (Declaration of Melvin Murphy).

of his innocence,[305] and confirm Ronald's assertions that he barely knew Purnell.  As both his mother and stepfather tell it, aware that the prosecution was supported by a disinterested eyewitness's positive identification, Ronald told them that he accepted the plea agreement and testified against Purnell solely because it would have him home within two years instead of facing a potential life sentence.

e.    *Evidence Undermining Corey Hammond's Testimony*

Purnell presents affidavits from Corey Hammond's mother Naco Hammond[306] and Alfred M. Lewis, a former cellmate of Hammond's late stepfather Corey Johnson[307] to the general effect that Johnson was a career criminal who avoided prosecution by habitually acting as a police informant.  Naco Hammond is convinced that Johnson orchestrated Corey Hammond's implication of Purnell, but admits she has no personal knowledge of

---

[305] We note that the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (Rev. 2003), Guideline 10.7 commentary states:

> Unfortunately, inadequate investigation by defense attorneys -- as well as faulty eyewitness identification, coerced confessions, prosecutorial misconduct, false jailhouse informant testimony, flawed or false forensic evidence, and the special vulnerability of juvenile suspects -- have contributed to wrongful convictions in both capital and non-capital cases.  In capital cases, the mental vulnerabilities of a large portion of the client population compound the possibilities for error.  This underscores the importance of defense counsel's duty to take seriously the possibility of the client's innocence, to scrutinize carefully the quality of the State's case, and to investigate and re-investigate all possible defenses.

31 Hofstra L. Rev. 913, 1017–18 (2003).  This case presents a perfect storm of many aspects of these legitimate concerns.  This case involves multiple instances of troubling treatment of a juvenile with obvious and disclosed cognitive disabilities.  Yet, Ronald Harris's interrogations are just one of the many aspects of the treatment of minors presented in this case that trouble us.  We ask that the Attorney General consider our concerns regarding interrogation techniques, particularly with respect to juveniles with cognitive disabilities.

[306] A668–70 (Affidavit of Naco Hammond).

[307] A665–66 (Affidavit of Alfred M. Lewis, Jr.).

Johnson doing so.[308]  Purnell also presents an affidavit from Troy Hammond, swearing that he was with friends at the corner of Fifth and Jefferson the night of the murder, and that they ran over afterwards, and that his brother Corey was not present.  Troy speculates that Corey may have fabricated his 2007 post-arrest account from overhearing him, Troy, discussing with his friends what they had just seen.

As with Ronald Harris, Purnell characterizes this as evidence of recantation, but it does not contain any formal or public disavowal by Corey Hammond.  Unlike with Ronald Harris's parents, Corey Hammond's mother does not even present a secondhand account of a nonpublic retraction.[309]  Although Naco Hammond's affidavit is "merely" impeaching, Alfred Lewis's affidavit goes further by asserting that Corey Hammond has conceded that he testified falsely,[310] and Troy Hammond's affidavit alleges firsthand personal knowledge that his brother's testimony was false.[311]

---

[308] A669 (Affidavit of Naco Hammond).  During Corey Hammond's interview implicating Purnell, officers asked him "have you discussed this case with your dad at all?"  A647 (Corey Hammond Interview Transcript).  When Hammond responded "I don't even think he have a clue what happen (CU)," Detective Tabor told him "I think he knows a lot more than you think."

[309] *See* A666 (Affidavit of Alfred M. Lewis, Jr.) ("I asked [Corey Hammond] if Mark [Purnell] told him anything about a murder.  He said 'No!' and explained that he just ended up telling the court what everyone was saying in the streets about the crime.").

[310] As the Superior Court has subsequently explained, the operative distinction in *Young*, *see supra* note 216, is that the new evidence of witness dishonesty is not "merely" impeaching when, rather than impeach the witness generally, it substantiates that the witness was "lying about the facts of the case *in which he was testifying*." *State v. Joyner*, 1996 WL 111129, at *2 (Del. Super. Feb. 2, 1996) (emphasis added).

[311] During the 2007 interview with Corey Hammond, Detective Tabor told him that multiple witnesses were "telling me that you witnessed the shooting," and had identified him by name as "Bump."  A641.  Corey Hammond corrected Detective Tabor that his nickname was "Boot."  A641–42.  That exchange is redacted in the transcript for unclear reasons, but is clearly audible in the recording.  Trial Court Exhibit 4.  Contemporaneous police records confirm that *Troy*

Other substantial grounds for impeaching Corey Hammond which were not presented to the jury but were already evident on the pre-trial record clearly exist as well. His inculpatory statements all came immediately after his arrest for a serious felony under which he potentially faced more than a decade-long mandatory minimum Level V sentence, days before the birth of his child. He initially described hearing *multiple gunshots* and only adopted a version claiming to have heard a single gunshot after the interviewing detectives repeatedly referred to a single gunshot in their questioning. He further claimed that both Ronald Harris *and* Purnell had firearms, but that Harris was the shooter -- knowledge which he never explained, and which he had abandoned by the time of his trial testimony. And he likewise changed his story of who he was with at the time, claiming to have been with Dawan Harris in his interview but then specifically denying it was Dawan and claiming not to remember who it was at the time of trial. And Corey Hammond's account materially differs from Ronald Harris's in key respects.[312]

These other avenues for impeachment were evident at trial. Ordinarily, in examining an actual innocence claim, it may not be appropriate to consider the weight of

---

Hammond's nickname was "Bump," giving some corroboration to the truth of Troy's claims. A707 (Wilmington Department of Police Supplemental Report).

[312] For example, Ronald Harris testified that he agreed with Purnell to commit a robbery in the morning of January 30, 2006, before his encounter with police at Fifth and Jefferson where Rayne first saw him, and that he did not see Purnell again until they met at Compton Towers that evening to commit the robbery. He also claimed he was not at his Aunt Sherry's house at any point that day. Hammond claimed that Purnell solicited a partner for the robbery within an hour of committing it, outside Aunt Sherry's house, and that Harris volunteered to join him at that time. Also, Hammond claimed that a few days or a week later, when Purnell bragged about shooting Mrs. Giles, Ronald Harris was also present. Ronald Harris claimed he had not seen Purnell again until his arrest on February 18, 2006.

114

cross-examination attacks that a defendant's trial counsel tactically chose to forbear. But a critical fact changes things in this case: in his January 4, 2007 inculpatory interview, Hammond's initial account *provided an alibi for Dawan Harris*, Trial Counsel's former client. When on cross-examination Trial Counsel elicited Corey Hammond's statement that he was *not* with Dawan Harris at the time, Trial Counsel was faced with the conflict of interest which infected this case, because undermining Corey Hammond by confronting him with this clear contradiction would have been injurious to Dawan's interest in the same matter. Trial Counsel's failure to highlight the numerous vulnerabilities of Hammond's testimony cannot be ascribed to his tactical decision-making.

### f. New Medical Evidence

As the trial record reflects, there is no dispute that Purnell was shot in the knee on January 21, 2006, and that the bullet was removed the following day in a complicated surgery involving three incisions to the front of his knee and a larger incision closed by approximately ten staples to the back. Nor was there any dispute that Purnell left the hospital on January 23 in a wheelchair, or that the staples were eventually removed in early February when he was in the New Castle County Detention Center, or that during his detention he was on crutches at least part of the time.

The disputed issue going to Purnell's factual innocence claim is whether it was medically possible for him to be the person Rayne saw running away fast and at full speed from the Giles murder on January 30, 2006.

Purnell now submits an affidavit from Dr. Francis Xavier McGuigan ("Dr. McGuigan"), an orthopedic surgeon and former military doctor with extensive experience

115

as a trauma surgeon treating gunshot wounds to the leg.[313]  Based on Purnell's medical records, the uncontradicted testimony of White and Dr. Rubano, and a new affidavit from another Youth Rehabilitation Counsel at the New Castle County Detention Center,[314] Dr. McGuigan opines on his belief, "with reasonable medical probability that Mr. Purnell would have likely been unable to run unimpeded on January 30, 2006."[315]

6.      *Purnell's New Evidence, in Light of the Conflict, Necessitates a New Trial*

Taken as a whole, and based on the State's own description of its case from its opening statement and closing argument at trial, the evidence Purnell presents is the rare case that overcomes the daunting burden of showing that it would probably change the result if a new trial were granted.[316]

---

[313] A806 (Declaration of Francis Xavier McGuigan, M.D.).

[314] A813–14 (Affidavit of William Junior Davis).

[315] A806–08 (Declaration of Francis Xavier McGuigan, M.D.).  Importantly, Dr. McGuigan's review and opinion were not based on the witness testimony from Honie and Smith which, as the State's trial cross-examination showed, were at times incorrect or even intentionally false.  Nor does Dr. McGuigan rely on another affidavit Purnell offers from an affiant who claims to have incarcerated with Purnell at the time and who attests to remembering his bandages, crutches, and physical incapacity.  A810–11 (Affidavit of Khiry Brown).

[316] Our dissenting colleague argues that a strong inference of actual innocence in fact requires a greater showing than either *Schlup* or *Downes*.  This is a departure from our precedents.  We have repeatedly affirmed Superior Court cases using the *Schlup* formulation, as discussed extensively in note 199 supra.  Moreover, speaking for the Court in *Carr v. State*, our dissenting colleague rejected a successive Rule 33 motion for a new trial (based upon newly discovered evidence) filed more than thirty years after the movant's conviction, noting that "the Superior Court could have considered Carr's motion for new trial as a motion for postconviction relief under Rule 61" but "was not required to do so" while specifically citing to *Downes* -- a standard for relief the dissent would now hold was not available.  143 A.3d 2, 2016 WL 3453737, at *2 (Del. June 16, 2016) (TABLE).  Moreover, denying relief to a movant who can satisfy *Schlup* accomplishes nothing more than delaying vacatur until a federal court can grant *habeas* relief, and so simply risks continued imprisonment of an innocent person without advancing the cause of finality at all.

116

The State relied on the 9mm shell casing to tie Purnell to the crime. The State argued that the casing excluded the .38-caliber revolver, since a revolver retains spent casings, and so implied that the murder weapon was a semiautomatic weapon like the one Corey Hammond claims he saw Purnell display. The State possesses no other physical evidence tying Purnell to the crime. But to make even this connection, the State told the jury that the casing was found only a "few feet" from where Mrs. Giles fell. This was contrary to the evidence -- it was found approximately forty to sixty feet away. And Purnell's new expert opines that this indicates it was likely unrelated to the shooting. The physical evidence thus suggests the opposite conclusion from the one the State relied on at trial -- Mrs. Giles appears to have likely been shot with a revolver like the one Mitchell and Dawan Harris possessed, not a semiautomatic pistol like the one Purnell allegedly had and which was never found.[317]

The State's case against Purnell, but for the shell casing, relied almost exclusively on the statements and testimony of Corey Hammond, Kellee Mitchell, and Ronald Harris. As the State conceded, all three had enormous credibility problems, even prior to

---

[317] We disagree with our dissenting colleague's argument that expert testimony is not needed for a defendant to prove the limits as to how far a handgun will eject its shell casings. This strikes us as precisely the sort of "scientific, technical, or other specialized knowledge" which calls for expert testimony under D.R.E. 702. Even if jurors could be assumed to have a broad familiarity with handguns -- a dubious proposition at best -- knowing the ejection trajectories and distances of particular types of 9mm pistols is specialized knowledge. Moreover, for Trial Counsel to disprove the connection between the 9mm shell casing and the Giles murder would necessarily be to develop proof that Tameka Giles was murdered with a revolver. Having represented Dawan Harris when he pleaded guilty to the unlawful possession of just such a weapon (which arrest and conviction were outgrowths of the Giles murder investigation), Trial Counsel could not ethically pursue such a defense.

submission of the recantation and impeachment evidence. Not only did they have extensive criminal records, but each sought to avoid serious criminal penalties through their cooperation: Hammond and Ronald Harris, both of whom had small children, testified pursuant to agreements with the State that ensured they would come home swiftly instead of facing mandatory minimums of more than a decade for Hammond, or, potentially, life in prison for Harris.[318] Mitchell himself had been a suspect in the Giles

---

[318] In *Reeves v. Fayette SCI*, discussed *supra* notes 207 and 218, Judge McKee of the Third Circuit joined the majority and wrote separately to further explain why even the defendant's own "apparent confession does not negate the claim of actual innocence based on newly discovered evidence under *Schlup v. Delo*." 897 F.3d at 165 (McKee, J., concurring). As he put it:

> According to the National Registry of Exonerations, roughly half of individuals who have been exonerated following murder convictions involving DNA evidence in the United States since 1989, made a false confession. In Pennsylvania, the rate of false confessions is comparable. Nearly half of individuals who have been exonerated with DNA evidence following a conviction for murder in Pennsylvania had confessed to those murders. In referring to this data, I do not, of course, suggest that police should have completely ignored Reeves's confession. Rather, I refer to it simply to underscore that Reeves's confession does not negate his arguments under *Schlup*. I have already noted that absent the detective's inexplicable failure to pursue leads pointing to Anderson and the equally puzzling three-year gap in this investigation, there would have been no incriminating statement from Reeves.

*Id*. at 172. The flaws undermining the confession which Judge McKee discusses are no less present for Ronald Harris here. Ronald Harris gave new statements to the State admitting to some crimes while inculpating Purnell as the killer only after denying any knowledge or involvement over several extended interrogations as a juvenile and adult. He did so only after a great gap of time from the incident, a gap during which the State appears to have inexplicably failed to further develop or pursue the case against other suspects for whom it had compelling evidence. His new statements were inconsistent internally, inconsistent with each other, inconsistent with the physical evidence, and inconsistent with independent reports of other witnesses. Those infirmities are all the more serious in the context of a confession given pursuant to a plea being invoked against a codefendant. *See also Poventud v. City of New York*, 750 F.3d 121, 144–45 (2d Cir. 2014) (Lynch, J., concurring) ("The choice of freedom in exchange for an admission would be easy for a guilty man, but even an innocent one would be hard pressed to decline the prosecution's offer."); *Bland*, 263 A.2d at 288 ("Despite the lack of any absolute requirement of corroboration of an accomplice's testimony, our Courts have always cautioned juries that, although they have the power to convict solely upon such testimony if firmly convinced of its truth, great care should be exercised in doing so.").

murder. The State's heavy emphasis in its closing arguments to support their credibility was to emphasize the agreement between those three witnesses' account -- pointing out that Hammond heard a single shot, just like Rayne did, and asking "why are they all telling the same lie and why are they all telling the same lie about him?"

But Corey Hammond's interview shows he claimed to have heard multiple shots until the interviewing detectives twice prompted him about hearing "the shot" in the singular. Ronald Harris's multiple contradictory accounts of hearing three shots (his 11-hour 2006 interview), one shot (his trial testimony), and hearing no shots (both his January 24, 2007 interview and April 7, 2008 plea proffer interview) also undermine this argument. Nevertheless, neither of these inconsistencies were brought up on any cross-examination or in closing arguments by Trial Counsel.

Once Corey Hammond accused Mark Purnell, Detectives Tabor and Simmons interviewed Mitchell and Ronald Harris later that month and asked whether Purnell, specifically, had committed or confessed to the murder.[319] Mitchell implicated Purnell at that time. Ronald Harris steadfastly maintained his innocence until after jury selection at a trial where the State had named Mark Purnell as his codefendant before agreeing to enter into a highly favorable plea deal. Ronald Harris, as the State acknowledged during the

---

[319] The first part of the Mitchell interview was not recorded or transcribed, *see supra* note 112. Detective Tabor answered "yes" to the prosecutor's question "did you ask Kellee Mitchell at any time in that interview whether the defendant made statements about the robbery and murder." A111 (Testimony of Detective Tabor). For his part, Mitchell accuses the detectives of presenting him with a version of events upon which they had already decided and to which he merely gave assent. In the Ronald Harris interview in January 2007, again Detective Simmons told Ronald Harris that the authorities believed that Mark Purnell was the second assailant and asked him to corroborate that belief. A552–54 (Ronald Harris January 24, 2007 Interview Transcript).

motion *in limine* hearing, was critical to its case which until then, rested on the statements of Purnell allegedly made to Hammond and Mitchell. Ronald Harris's adherence to his claim of innocence until his plea explains his nearly incoherent plea proffer interview and conflicting trial testimony. In all probability, especially in light of the subsequent change in the legal terrain surrounding the replaying of those witnesses' statements and testimony,[320] we think the jury would not find Ronald Harris, Corey Hammond, or Mitchell's statements sufficiently reliable to base a conviction on them.

On top of that, Purnell also demonstrates that a medical expert, relying on the uncontradicted facts of his own injury and treatment by hospital workers and corrections staff, would support his argument that he was physically unable to run in the manner Rayne describes Mrs. Giles's killers as doing when they fled the scene. Despite calling Dr. Rubano as a rebuttal witness, the State was unable to produce medical expert testimony at trial as to Purnell's physical capacity, and instead relied on the jury disbelieving Purnell's witnesses' lay testimony following able and effective cross-examination. With the new, uncontradicted expert opinion, a jury would probably reach a different conclusion.

We say this even apart from the fact that on the day the jury rendered its verdict, it reported that it was concerned it would be a hung jury if it had to render a verdict by day's

---

[320] As we found in ruling on Purnell's first Rule 61 motion, a *Bland* instruction warning the jury about the dubious reliability of accomplice testimony would be appropriate; and, as we ruled in *Alfred Lewis*, the jury should not be permitted repeat viewings of Section 3507 prior statements over the defendant's objection as occurred at Purnell's pre-*Alfred Lewis* trial.

end.  The State's case, in other words, was a close one even when Purnell's defense was constrained by a severe ethical conflict[321] which his Trial Counsel had noted and raised.

In light of Purnell's persuasive evidence concerning key defensive strategies and supporting evidence involving Mitchell and Dawan Harris that Trial Counsel could not ethically pursue, and in light of Purnell's evidence of his own incapacity, the remaining evidence[322] is not of the character to dissuade us from the conclusion that a jury would probably have reached a different result.

Finally, the Dissent's argument that there is no reliable evidence linking the .38-caliber revolver to this case ignores one of the key injustices bedeviling this case: Trial Counsel was ethically barred from pursuing the obvious leads, including inculpatory statements made by Dawan Harris to various witnesses, his lying about when he stole the revolver, his resemblance to Ronald Harris, and other evidence detailed above.  Trial Counsel represented Purnell through the end of his direct appeal, and he did not obtain unconflicted counsel until August 22, 2011.  That is, Purnell did not have representation

---

[321] The Dissent does not address the conflict of interest and this Court's conclusion that it was never waived, never addressed by any court, and resulted in a manifestly unfair trial.  The Dissent also does not dispute that Trial Counsel's blatant conflict of interest blocked Purnell's access to key evidence and completely barred him from taking any position adverse to Dawan Harris.  It dismisses all of the evidence implicating Dawan Harris as a mere "theory."

[322] The Dissent emphasizes Aqueshia Williams's accusation that Purnell made certain other inculpatory remarks which could be understood as admitting guilt.  The video of the January 2007 interviews with Aqueshia, Etienne, and their mother Michelle, is not of a character as would lead any reasonable juror to base a murder conviction on them.  The Williams' shifting and inconsistent stories, their explanations of personal grievances against Purnell and his father, and most startlingly Aqueshia Williams's disclosure that her sister and mother are both "on drugs" greatly undermine the reliability of that evidence.  These credibility issues are in addition to the Williams sisters' obvious interest in shielding their boyfriends, Dawan Harris and Mitchell, whom they believed were suspected in the Giles murder.

ethically capable of developing proof that the .38-caliber revolver was the murder weapon until more than five-and-a-half years after the crime. Memories have faded and witnesses, including both eyewitnesses (neither of whom identified Purnell), have died.

Notwithstanding these great challenges, we believe Purnell has satisfied the heavy burden he bears as to pleading with particularity new evidence that creates a strong inference that he is actually innocent in fact of the acts underlying the charges of which he was convicted.

Thus, Purnell has satisfied both prongs of his heavy "actual innocence" burden, allowing this Court to consider the impact of his procedurally defaulted Constitutional deprivation of effective assistance of counsel claim. Because, as explained above, that claim is meritorious, we reverse and vacate his judgment of conviction.

### III. CONCLUSION

We observe that legitimate claims of actual innocence are exceedingly rare. Indeed, this is the first case where a defendant has satisfied the actual innocence exception to the procedural bars in Rule 61. Because they are so rare, the actual innocence exception, in our view, poses no threat to our State's interest in finality. We believe the result in this case strikes the appropriate balance between our justice system's interests in "finality, comity and conservation of judicial resources, and the overriding individual interest in doing justice in the 'extraordinary case.'"[323]

---

[323] *Schlup*, 513 U.S. at 313–14 (quoting *Carrier*, 477 U.S. at 496).

Accordingly, the judgment of conviction is **REVERSED** and **VACATED** and we

**REMAND** this matter for a new trial.  The mandate shall issue forthwith.

**VAUGHN**, Justice, dissenting:

Superior Court Criminal Rule 61(d)(2)(i) requires that a defendant plead "with particularity that new evidence exists that creates a strong inference that the movant is actually innocent in fact of the acts underlying the charges of which he was convicted." It is a unique rule. The Majority looks to this Court's cases involving motions for a new trial and the federal habeas corpus case of *Schlup v. Delo*[1] in deciding how to apply the rule. I would apply it according to its own terms as written.

Early in its analysis of the "persuasive burden" of the rule, the Majority observes that the new evidence must show that someone other than the movant committed the crime. I agree with that. The Majority then moves into its *Schlup – Hicks – Brown – Lloyd – Downes* analysis, at the end of which it concludes that actual innocence is established if the new evidence "speak[s] with such persuasive force as to convince the reviewing court that, when considered in the context of all the relevant evidence by a properly instructed jury, it is such as will probably change the result if a new trial were granted."[2] A change of result most favorable to a defendant would be an acquittal, which occurs when a properly instructed jury decides the State has failed to meet its burden of proof and there is a reasonable

---

[1] 513 U.S. 298 (1995).

[2] Maj. Op. At 83.

doubt about the defendant's guilt. It is well known that an acquittal is not the same as a finding of innocence in fact. It simply means that the jury was not convinced that the state met its burden of proving the defendant's guilt beyond a reasonable doubt. Since an acquittal represents a jury determination that there is a reasonable doubt about the defendant's guilt, and Rule 61(d)(2)(i) requires an affirmative showing that the new evidence creates a strong inference that the defendant did not commit the alleged criminal acts, I think the Majority's rule significantly waters down the burden which the rule places on the defendant.

*Hicks, Brown, Lloyd,* and *Downes* are not factual innocence cases. *Hicks, Brown,* and *Lloyd* each involved a motion for a new trial. None of them discuss or mention actual innocence in fact. Under Superior Court Criminal Rule 33, the rule governing motions for a new trial, a new trial is granted in the interest of justice. When a motion for a new trial is based on newly discovered evidence, it is evaluated under the three-part test discussed by the Majority. The prong relevant to the Majority's actual innocence standard is the first, which is that the new evidence will probably change the result if presented to the jury. A change in the result would ordinarily be taken to mean that the new evidence will probably lead to an acquittal. The cases have no bearing at all on Rule 61(d)(2)(i)'s requirement that the new evidence must create a strong inference of the defendant's actual innocence in fact.

In *Downes*, the defendant filed a Rule 61 motion claiming, among other things, that he was entitled to relief because of newly discovered evidence. The trial court denied the claim on the ground that it was not filed within the two-year limitation period required by Rule 33. The Rule 61 motion, however, was filed within the three-year limitation period which then applied to Rule 61 motions. This Court held that to the extent a defendant's claim for a new trial based on newly discovered evidence was time barred under Rule 33, he could seek the same relief in a motion filed under Rule 61, subject only to the limitations of that rule. The Court applied the same three-part test that is applied to motions for a new trial. The Court did not mention or discuss actual innocence in fact. The effect of the Majority's opinion is to extend *Downes* to an untimely, second Rule 61 motion. Now the defendant will not be required to show that the new evidence "creates a strong inference that the defendant is innocent in fact of the acts" underlying the crime. He will be required to show only that the new evidence will probably result in an acquittal, i.e., will probably result in a different outcome.

As to *Schlup*, and as discussed by the Majority, in federal habeas corpus law a claim of actual innocence is the gateway through which the petitioner must pass in order to have his otherwise barred constitutional claims heard on their merits. *Schlup* held that a petitioner passes through the gateway if the petitioner can show that a constitutional violation "probably resulted" in the conviction of an innocent person.

126

The Supreme Court then determined that "[t]o establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[3]  I do not think that *Schlup* provides any guidance in this case for the same reason that I think that our cases on motions for a new trial are not helpful.  I think the rule calls upon the Superior Court judge to engage in direct fact finding and decide whether the evidence is new evidence and, if so, whether it creates a strong inference that the defendant did not commit the criminal acts of which he was convicted.[4]

Accordingly, I would find that Rule 61(d)(2)(i) requires the Superior Court judge to do two things.  First, the judge should determine whether the defendant has pled with particularity that the offered evidence is new evidence, applying the familiar three-part test applied by the Superior Court in this case.  If the judge decides that the evidence satisfies that standard, the judge should proceed to the second step and make findings of fact and draw a conclusion of law as to whether or not the new evidence creates a strong inference, that is, a firm inference, or conclusion, that the defendant is actually innocent of the acts underlying the charges of which he was convicted.

---

[3] *Schlup,* 513 U.S. at 327.

[4] The federal actual innocence exception to procedural barriers is also known as the miscarriage of justice exception.  Ironically, Rule 61's miscarriage of justice exception to procedural barriers was abolished by the 2014 amendment.

The Superior Court judge did not apply the second step of the analysis I think should be performed. As the Majority mentions, he applied *Schlup*'s no reasonable juror standard. Since the Majority remands for a new trial rather than an evidentiary hearing and a new decision by the Superior Court, I will discuss, briefly, how I view the alleged new evidence.

I do not think that the recantations of Kellee Mitchell, Ronald Harris, and Corey Hammond, two of which are second-hand recantations, create a strong inference of anything. This Court has recognized that "a witness' recantation is generally viewed with suspicion."[5] The recantations leave one to wonder whether the witness was telling the truth at trial or as reported in the affidavits filed in this proceeding. Unless a recantation can be clearly corroborated by some supporting evidence, which these are not, it cannot create a strong inference that a defendant is actually innocent in fact. In addition, the recantations of Mitchell, Ronald Harris, and Hammond do not disturb the testimony of Aqueshia Williams. According to her testimony, Purnell's telephone conversation in which he says that Dawan Harris and Mitchell "are in jail for something that I did," is followed by the word sike, which can mean just kidding.[6] But Aqueshia Williams was also interviewed by Det. Tabor. During that interview, he asked her directly whether Purnell told her that he had

---

[5] *Blankenship v. State,* 447 A.2d 428, 433 (Del. 1982).

[6] A196, 197.

murdered Mrs. Giles, and she said no. She did say, however, that on apparently another occasion, in what could be construed as a threat that her sister and she should remain quiet, that he told her that "I shot one b---h, I'll kill another."[7]

The Superior Court found that none of the medical evidence offered in this proceeding qualified as new evidence. In his closing, trial counsel emphasized the testimony that Purnell was physically unable to run and, therefore, could not have committed the crime. In addition to the testimony of Purnell's family members, the jury heard testimony from a youth rehabilitation counselor at the New Castle County detention center that Purnell was using crutches while there between February 1 and February 3, 2016. All of the medical evidence offered in this proceeding could have been discovered before trial through the exercise of reasonable diligence. Trial counsel's conflict of interest in connection with his representation of Dawan Harris did not prevent trial counsel from pursuing all the evidence concerning Purnell's medical condition that could be found. There is no legal error or abuse of discretion in the Superior Court's finding that the medical evidence is not new evidence.

The Superior Court also found that the ballistics evidence was not new evidence. One does not need to be a ballistics expert to have a doubt about whether a handgun will throw a shell casing as far as 50 feet. In its footnote 320, the Majority

---

[7] A201. I have also viewed the interview with Aqueshia Williams and I believe that her statement to the Detective speaks for itself.

takes issue with this statement, and for purposes of trial preparation it is, of course, desirable to have an expert where there are ballistics issues. But jurors are also permitted to exercise a little common sense. I stand by my statement. In any event, this evidence could have been discovered before trial with due diligence by hiring a ballistics expert at the time. I do not believe that trial counsel's conflict prevented him from hiring a ballistics expert in connection with the shell casing and arguing that the casing was unrelated to the murder. There is no legal error or abuse of discretion in the Superior Court's finding that the ballistic evidence is not new evidence.

The final category of new evidence is alleged new evidence that Dawan Harris and Kellee Mitchell are the ones guilty of the death of Mrs. Giles. This theory places great weight on the .38-caliber revolver. However, and despite the alleged suspicious nature of Dawan Harris and Mitchell's acquisition of the weapon, there is no reliable evidence linking the revolver to the crime. And thinking that, if trial counsel had interviewed Dawan Harris, Harris would have made some incriminating statement or made any statement helpful to the defense, if he agreed to speak with trial counsel at all, is real speculation. The theory that Dawan Harris and Kellee Mitchell were the true killers is a theory, but just a theory. It does not satisfy Rule 61(d)(2)(i)'s standard that the new evidence must create a strong inference that the defendant is actually innocent in fact of the murder.

In footnote 324, the Majority notes that I have not addressed the conflict of interest, which, the Majority says resulted in a manifestly unfair trial. It is not my intention to make light of the conflict of interest, which was serious and should not have happened. But the issue is whether Purnell has made the necessary showing that new evidence creates a strong inference of his actual innocence in fact, and I do not believe such a showing has been made.

The Majority says, in footnote 319, that I am departing from precedent. The Majority can hold that opinion if it wishes, but the Court has never directly confronted the interpretation and application of Rule 61(d)(2)(i). The Majority has also apparently searched high and low for anything I might have said that is inconsistent with this dissent, settling on *Carr v. State,* 2016 WL 3453737 (Del. 2016). That case involved a motion for a new trial under Criminal Rule 33. In retrospect, the order issued in that case should probably not have referred to Rule 61, the mention of which was unnecessary to the result. The procedural bars of Rule 61 are not mentioned in the order at all. The footnote concludes by saying, in essence, or implying, that this Court should grant the relief Purnell seeks because a federal court will eventually do so anyway. Maybe, but I would not attempt to anticipate how a federal court might view this case. It is possible that a federal court might agree with the Superior Court's opinion.

While trial counsel argued at trial that Kellee Mitchell was the real culprit, his defense was essentially a reasonable doubt defense. The evidence which has been offered in this proceeding would strengthen that defense, but it fails to meet the standard of Rule 61(d)(2)(i).

Whether Purnell received ineffective assistance of counsel is no longer before the Court. A far more demanding standard now applies, and I do not believe it has been met. I would affirm the judgment of the Superior Court.